UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF LONG BEACH, on behalf of itself and all others similarly situated,<br><br>                              Plaintiff,<br><br>            v.<br><br>TOTAL GAS & POWER NORTH AMERICA, INC.; TOTAL, S.A.; and TOTAL GAS & POWER, LTD.<br><br>                              Defendants. | Case No.:<br><br>**ECF Case**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF FEDERAL ANTITRUST LAWS AND STATE LAW**<br><br>**JURY TRIAL DEMANDED** |

Based upon investigation of counsel from publicly-available information, including but not limited to the Report and Recommendation of the Federal Energy Regulatory Commission ("FERC") Office of Enforcement in the Matter of Total Gas & Power North America, Inc., Total, S.A., Total Gas & Power, Ltd., Aaron Hall and Therese Tran f/k/a Nguyen, FERC Docket No IN12-17, submitted to FERC on April 1, 2016 (the "FERC Report") and made public in the FERC Order and Notice of Proposed Civil Penalties filed April 28, 2016 in that proceeding, Plaintiff, City of Long Beach, on behalf of itself and all others similarly situated (the "Plaintiff Class," as defined below), and alleging upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, brings this class action for damages and other relief pursuant to the federal antitrust laws and applicable state law, and demands a trial by jury.

## I.      NATURE OF THE ACTION

1.      This action arises from a coordinated scheme by Defendant Total Gas & Power North America, Inc. ("TGPNA") through its natural gas traders Aaron Hall and Therese Tran f/k/a Nguyen and other natural gas traders, to engage in conduct that unreasonably restrained the markets for trading natural gas and natural gas-related contracts which set the monthly index prices for four major western U.S. trading hubs, published by *Natural Gas Intelligence's Bidweek Survey* ("NGI") and Mc-Graw-Hill Platts *Inside FERC Gas Market Report* ("Platts") (collectively "Monthly Index Prices"), and by which TGPNA acquired and maintained monopoly power over the setting of such Monthly Index Prices between July 1, 2009 and July 31, 2012 (the "Class Period").

2.      TGPNA's anticompetitive scheme, as described in detail in the FERC Report, consisted of the following.  TGPNA entered into natural gas-related term contracts (usually called "swap" contracts by FERC) which settled based on the "Monthly Index Prices" which were calculated by Platts and NGI based on numerous next-month fixed price natural gas transactions at specific natural gas trading locations executed during the last five trading days of the month preceding the designated pricing month (known as "bidweek"), as reported to NGI and Platts. TGPNA then proceeded to intentionally manipulate the Monthly Index Prices in whichever way (up or down) that benefitted the Monthly Index swap contracts it held relating to the specific location, by buying or selling, generally at a loss and at artificial money-losing prices, large quantities of the underlying next-month fixed price contracts for natural gas at that location during bidweek on which the next month's Monthly Index Prices for that location were calculated. Because of the large size of TGPNA's position in the Monthly Index swap contracts, TGPNA more than offset its losses on its money-losing purchases or sales of the underlying next-month

fixed price gas contracts which it used to manipulate the Monthly Index Prices, by receiving significantly greater revenues under its swap contracts which settled based on the manipulated Monthly Index Prices.

3.      By way of illustration: if, for example the Monthly Index swap contracts TGPNA held at a given time were "*long*" -- that is, if TGPNA would be paid more under such swap contracts if the following month's Monthly Index Prices were *higher* -- TGPNA would *buy* the underlying next-month fixed price contracts on which that Monthly Index was calculated at intentionally *inflated* prices during bidweek, and generally at a loss to itself, and thereby artificially increase the calculated Monthly Index Prices for the next month's settlement.  Because of the large size of TGPNA's long position in the Monthly Index-based swap contracts, TGPNA's manipulation was profitable on a net basis -- the profits it made under the Monthly Index swap contracts which settled at the manipulated inflated Monthly Index settlement prices far exceeded its losses on its purchases of the underlying next-month fixed price physical contracts at artificially inflated prices during bidweek through which it inflated the Monthly Index Price.

4.      Similarly, if TGPNA's Monthly Index swap contracts were on the other hand "*short*" at a given time -- that is, if TGPNA would be paid more under the swap contracts if the following month's Monthly Index Prices were *lower* -- TGPNA would *sell* the underlying next-month fixed price contracts on which the Monthly Index was calculated at intentionally *lower* prices and again generally at a loss to itself, to thereby artificially *depress* the calculated Monthly Index Prices for the next month's settlement.  Because of the large size of TGPNA's short position in the swap contracts, TGPNA's manipulations resulted in substantial net profits.  The profits it made under the Monthly Index swap contracts (this time short) which settled at the manipulated depressed Monthly Index settlement prices far exceeded its losses on its sales of the underlying

next-month fixed price physical contracts during bidweek at artificially depressed prices through which it depressed the Monthly Index price.

5.    By establishing a large position in swap contracts which would reap profits from a change in the Monthly Index which were greater than the losses TGPNA would suffer from its purchase or sale of underlying next-month fixed price physical contracts intended to manipulate the resulting Monthly Index, and by intentionally engaging in such money-losing purchases and sales of the underlying next-month fixed price physical contracts to manipulate the resulting Monthly Index Prices in its favor, TGPNA intentionally acquired the power to effect and did effect increases or decreases in the Monthly Index Prices for natural gas for the hubs and dates identified by FERC and listed in Exhibit A hereto (collectively defined above as the "Monthly Index Prices"). The Monthly Index swap contracts and underlying next-month fixed price contracts entered into by TGPNA during bidweek operated to unreasonably restrain trade in the markets in which the Monthly Index Prices were determined.  The Monthly Index swaps contracts were essential to TGPNA's manipulative and anticompetitive scheme in that they enabled TGPNA to engage in money-losing underlying next-month fixed price physical contracts in sufficiently large quantities which allowed TGPNA to manipulate the Monthly Index. Specifically, they compensated TGPNA for engaging in conduct not dictated by the normal competitive forces of supply and demand, but instead intended to restrain and corrupt, and which did restrain and corrupt, the normal competitive forces of supply and demand in the markets in which the Monthly Index Prices and the contract settlement prices based thereon were determined.  As a result, the Monthly Index swap contracts and next-month fixed price physical contracts entered into by TGPNA during bidweek had an actual adverse effect on competition in the relevant markets.

6.      During the Class Period, TGPNA intentionally acquired and maintained monopoly power over the Monthly Index Prices at the hubs and periods set forth herein, and over the prices for the sale of natural gas under pre-existing contracts that settled against such Monthly Index Prices and the prices payable under financial contracts that settled against such Monthly Index Prices, in violation of Section 2 of the Sherman Act "Sherman Act", 15 U.S.C. § 2.

7.      The persons injured by TGPNA's illegal scheme include any person who held any contract which settled against the Monthly Index Prices for natural gas at any of the four Western United States based trading hubs known as Southern California Gas Co. (SoCal); El Paso Natural Gas Co., Permian Basin (Permian), West Texas, Waha (Waha); and El Paso San Juan Basin (San Juan) between July 1, 2009 and July 31, 2012, and was damaged by the movements in such index prices caused by TGPNA's unlawful scheme.  (The official names of the published Monthly Index Prices for these hubs are Southern Border, SoCal; El Paso, Permian Basin; Waha; and El Paso, San Juan Basin.)

8.      FERC's Office of Enforcement determined that TGPNA profited by in excess of $9 million and caused pecuniary losses to other market participants of at least $89 million from its manipulative and anticompetitive scheme.  According to FERC, this $89 million amount reflects its estimate of the amounts which certain holders of pre-existing contracts that settled against the Monthly Index Prices paid in supracompetitive prices or received in subcompetitive prices, as the case may be, in the relevant markets as a result of TGPNA's manipulation of the Monthly Index Prices.

9.      Plaintiff brings this action on behalf of itself and all members of the Plaintiff Class for the antitrust injury caused by TGPNA's illegal scheme in violation of Section 2 of the Sherman Act.

10.     Plaintiff also brings this action for compensation on behalf of itself and all members of a sub-class of members of the Class who reside or are incorporated in California (the "Sub-Class") for the injury caused by TGPNA's illegal scheme in violation of § 17200, *et seq.*, of the California Business and Professions Code.

11.     Plaintiff also brings this action against TGPNA's parent company, Total, S.A. and its managing trading affiliate company Total Gas & Power, Ltd., to recover for the damages caused by TGPNA's unlawful conduct, as they acted as a single unit during the relevant period and holding these other Defendants responsible for the damages caused by TGPNA's intentional conduct undertaken for their benefit and under their control is necessary in order to prevent injustice and unfairness.

12.     During the Class Period, Plaintiff purchased natural gas under contracts that settled against the Monthly Index Prices relating to the SoCal hub during the point months that TGPNA manipulated the Monthly Index Prices for that hub, as described herein.

## II.     JURISDICTION AND VENUE

13.     Plaintiff brings this action pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and costs of suit, including attorneys' fees, against TGPNA for the injuries Plaintiff and members of the Plaintiff Class (as defined herein) have sustained as a result of its violations of Section 2 of the Sherman Act and applicable California state law.

14.     This Court has subject matter jurisdiction over the federal claims in this matter pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1331 and 1337, and because this action arises under the federal antitrust laws.  This Court also has supplemental jurisdiction over Plaintiff's pendent state law claims pursuant to 28 U.S.C. §1367(a).

15.     This Court has personal jurisdiction over TGPNA and venue is proper under 28 U.S.C. § 1391(b)(1) and (2) and under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) because TGPNA is registered to do business in the State of New York, has a registered agent in New York authorized to accept service of process on its behalf, regularly transacts business in this District, including but not limited to, extensive trading of gas-related products which settle against prices set on the New York Mercantile Exchange (the "NYMEX") located in New York City.  Specifically, TGPNA entered into financial basis swaps that were predicated on the NYMEX settlement price, which were an integral part of the manipulative scheme that is the subject of this action and which injured the Plaintiff and the members of the Class and Sub-Class. In addition, TGPNA's energy trading group during the relevant period had a specific desk devoted to trading, and regularly traded on, the NYMEX (known as the "NYMEX Desk") and/or traded instruments that settled against the NYMEX determined prices.

16.     This Court has personal jurisdiction over Total, S.A. and Total Gas & Power, Ltd. and venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because they regularly transact business in the United States and in this District, including but not limited to, through their management and control of the actions of TGPNA in and affecting the United States, and as otherwise alleged herein. Total, S.A. has American Depository Shares Receipts that trade on the New York Stock Exchange, are registered pursuant to the Securities Act of 1933, and have an aggregate market value of several billion dollars. Total, S.A. is required to file reports with, and does file reports with, the United States Securities and Exchange Commission under Section 13 of the Securities Exchange Act of 1934, is an "issuer" within the meaning of the United States Foreign Corrupt Practices Act (United States "FCPA"), 15 U.S.C. § 78dd-1, and all of Total, S.A.'s United States securities filings are filed with and made available for public inspection in the New York City

office of the Securities and Exchange Commission. Total, S.A. has consented to the jurisdiction of the United States Securities and Exchange Commission, has been prosecuted by the Commission in the United States, and has paid money to the United States Treasury per the Commission's order to disgorge unlawful profits relating to its payment of $60 million in bribes to an official to gain access to oil and gas fields.  Total, S.A., through its wholly-owned subsidiary and agent Total International, Inc., made a $500,000 payment from an account at Banker's Trust in New York City, at Total, S.A.'s direction and for Total, S.A.'s benefit, as a part of Total, S.A.'s bribery scheme for which Total, S.A. was required to make the above disgorgement payment.  A copy of the check for payment of the disgorgement amount was required to be sent, and was sent, by Total, S.A. to the New York Regional Office of the Securities and Exchange Commission in New York City. As a result of such unlawful conduct Total, S.A. has consented to an order of the United States Securities and Exchange Commission (i) to cease and desist from further violations of Sections 30A, 13(b)(2)(A) and 13(b)(2)(B) of the United States Securities Exchange Act, and (ii) requiring extensive monitoring and compliance activities and reports to prevent further such violations.  In addition, the United States Department of Justice filed a criminal information against Total, S.A. based on the above alleged violation of the FCPA, which resulted in Total, S.A.'s making an additional penalty payment to the United States Treasury for such conduct, and Total, S.A. has executed a non-prosecution agreement with the United States Department of Justice which required extensive monitoring of Total, S.A.'s conduct affecting the United States from approximately 2013 to 2016. Total, S.A., operated for many years an investor relations office in New York.  In September 2018, Total, S.A.'s chief executive officer and its chief financial officer delivered the company's major annual company-wide strategy and outlook presentation in New York City to the world-wide investment community. Total, S.A.'s dividends on its American

Depositary Receipts have been paid through JP Morgan Chase Bank, New York City. Total, S.A.'s public website describes "TOTAL IN THE UNITED STATES", and lists 6 major industrial areas in which it is widely active in the United States through its subsidiaries.  The website states, *inter alia*, that "Through our TGPNA affiliate we trade gas … and electricity" and acknowledges that it has been active in the United States since 1957.

### III.     PARTIES

#### A.     Plaintiff

17.     Plaintiff City of Long Beach ("Long Beach") is a municipality incorporated on December 13, 1897 in the State of California with its principal offices located in Long Beach, California.  Long Beach, through its Gas & Oil Department, is engaged in the business of purchasing, selling and distributing natural gas in and around Long Beach, California, to approximately 145,000 residential and commercial/industrial customers.  Long Beach purchased natural gas during the Class Period under pre-existing contracts with a joint exercise of powers agency which is a public entity of the State of California, which settled against the Monthly Index Price for natural gas delivered in the trading hub known as SoCal during the months in which TGPNA manipulated that hub.  As a direct result of TGPNA's conduct in manipulating upward the Monthly Index Price for natural gas delivered at SoCal during those months during the Class Period, Plaintiff Long Beach paid supracompetitive market-derived prices for such natural gas which it otherwise would not have paid in the absence of TGPNA's conduct in violation of the federal antitrust laws and California law.

#### B.     Defendants

18.     Defendant Total Gas & Power North America, Inc. ("TGPNA") is headquartered in Houston, Texas.  TGPNA is an indirect, wholly owned subsidiary of Total, S.A (described below). TGPNA or its predecessors have been engaged in natural gas physical and financial trading

and marketing activities in the U.S. since 1990 (prior to August 1, 2003, TGPNA was known as Total Fina Elf Gas & Power North America, Inc.).  TGPNA is a Delaware corporation and is registered to conduct business in the State of New York as a foreign business corporation, and has consented to accept service of process through a registered agent.  TGPNA and its predecessors have been registered to conduct business in the State of New York since 1997.  TGPNA trades natural gas, petcoke, natural gas liquids ("NGL") and liquefied natural gas ("LNG") in the U.S. and worldwide markets.  TGPNA's activities include all trading, marketing and other commercial activities necessary to optimize market access for Total, S.A.'s current and future natural gas production and reserves.   TGPNA owns approximately 1.0 Bcf/day (10.0 Bcm/year) of regasification capacity in the U.S. and will also purchase up to 3.2 million tons of LNG in the gulf coast for export in worldwide markets. TGPNA markets and optimizes significant quantities of natural gas and NGLs from equity and third party production out of various gas shale plays in the U.S. Due to its size, geographically-balanced trading portfolio and trading expertise, TGPNA is able to optimize U.S. market access for Total, S.A.'s natural gas production and for its LNG trading and marketing business.  During the relevant time, TGPNA operated a West Desk in Houston, Texas, headed initially by Aaron Hall and subsequently by Therese Tran.  The West Desk implemented the manipulative and anticompetitive scheme which is the subject of this action.  At all relevant times, the traders at the West Desk who implemented the manipulative and anticompetitive scheme, including Hall, Tran and others working at the West Desk described below, were employed by and acting as agents for and within the scope of their employment by TGPNA.

19.     Defendant Total, S.A. ("Total") is a French company headquartered in Paris with more than 100,000 employees and conducts oil and gas operations in more than 130 countries.

Total, which reported sales of $236.1 billion in 2014, is one of the world's six "supermajor" oil companies. While organized in the corporate structure as a subsidiary of Total, TGPNA actually is part of Total's trading group. Specifically, along with affiliates based in London, Geneva, and Singapore, TGPNA forms part of the trading group within Total's Global Gas & Power Division. Total's internal auditors referred to TGPNA as the "Houstonian trading office" of the Gas & Power Division.

20.     Defendant Total Gas & Power, Ltd. ("TGPL") is also a wholly-owned subsidiary of Total, is located in London and, effectively, directs Total's global trading operations and as such exercises significant control over TGPNA.

### C.     TGPNA's Traders at the West Desk

21.     Aaron Hall ("Hall") resides in the Houston, Texas area. Hall was a natural gas trader and manager employed by TGPNA from at least 2006 through June 2015, and personally started TGPNA's West Desk for natural gas trading in 2008 and headed it through September 2011. During that period, Hall supervised Therese Tran and all TGPNA employees at the West Desk, including their trading activities, and was continuously aware of their anticompetitive natural gas related trades.

22.     Therese Tran ("Tran") is believed to reside in the Houston, Texas area. Tran was a natural gas trader and manager employed by TGPNA from 2007 and throughout the Class Period. Tran was hired by Hall in 2007 and reported directly to Hall at the West Desk until approximately September 2011, when she replaced Hall as the head of the West Desk. Tran, with Hall, were the primary actors who implemented and supervised the manipulative scheme described herein. Both before and during the time she managed the West Desk, Tran executed the vast majority of the

desk's monthly physical fixed price bidweek trades at the hubs at issue and also executed financial trades both during and outside of bidweek.

23.     Hall and Tran also directly supervised other West Desk traders and/or analysts including Matthew Wilson ("Wilson"). Tran directly supervised Shaun Karimullah ("Karimullah"). These individuals and others trading at the Desk acted pursuant to Hall's and/or Tran's directives to implement the manipulative scheme or observed and revealed the operation of the manipulative scheme, as described herein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     General Background

24.     The FERC Report can be accessed in full at https://www.ferc.gov/CalendarFiles/20160428164930-IN12-17-000.pdf (attached to Order to Show Cause), and includes a detailed description of the manipulative and anticompetitive scheme engaged in by TGPNA to control Monthly Index Prices for natural gas at the four western United States trading hubs which are the subject of this action -- *i.e.*, at SoCal; Permian; Waha; and San Juan -- between July 1, 2009 and July 31 2012.

25.     The FERC Report includes a detailed description of the four western U.S. natural gas trading hubs as well as the dates relating to the manipulation which is the subject of this action and which the FERC Report organizes into 38 "point months." *See* FERC Report at 3, fn.7. The precise dates and natural gas trading hub locations relating to the manipulation are summarized in Appendix A of the FERC Report ("FERC Appendix A"). (A copy of FERC Appendix A with an additional column that indicates the direction of the manipulation, is attached hereto as Exhibit A).  The FERC Report indicates the direction of TGPNA's manipulation in a series of charts attached in Appendix B to the FERC Report.

26.     A more detailed description of TGPNA's manipulations of Monthly Index Prices is set forth below.

### (i)     The Four Natural Gas Trading Hubs Where the Manipulation Occurred: SoCal, Permian, Waha and San Juan

27.     In the western U.S. during the relevant time, natural gas was "traded" with reference to specific recognized geographical trading locations.  Four of the most significant trading locations in the western U.S., and the ones where the manipulation described herein occurred, were known as SoCal; Permian; Waha; and San Juan.

28.     SoCal is a trading hub near the border of California and Arizona.  Permian is a trading hub near the southeast border of New Mexico. San Juan is a trading hub in the northwest part of New Mexico. Waha is a trading hub in western Texas.

### (ii)     Physical vs. Financial Natural Gas Contracts

29.     Natural gas contract transactions are characterized as either physical or financial transactions.  A physical transaction involved the contractual obligation to actually deliver or receive physical natural gas at a particular location during a particular time.  Physical natural gas is typically measured in units of One Million British Thermal Units (or "Mmbtu's"), also known as a dekatherm ("Dth") (*i.e.*, 1 Mmbtu = 1 Dth).  For example, a person with a "long" physical position (*i.e.*, a net buyer) of 1,000 Mmbtu of natural gas at SoCal for each day in August 2011 had purchased a net volume of 1,000 Mmbtu of natural gas to be delivered at SoCal during each day during August 2011, and thus had an obligation to actually take delivery of (*i.e.*, receive) 1,000 Mmbtu of natural gas to be delivered at SoCal during each day during August 2011.

30.     Unlike what were called physical positions, natural gas related financial contracts do not entail physical obligations to deliver or receive natural gas. Rather, financial contracts, including the "financial basis swap" contracts and "financial index swap" contracts ("financial

swap") commonly traded by TGPNA, were financially settled through an exchange of payments, one of which was based on one of the Monthly Price Indexes. The party to the swap who would benefit under the contract from an increase in the referenced Monthly Index Price is said to be long the referenced Monthly Index Price. On the other hand, the party to the swap who would benefit under the contract from a decrease in the referenced Monthly Index Price is said to be short the referenced Monthly Index Price. For example, a buyer of a financial basis swap, under which the buyer would receive the SoCal Monthly Index Price from the seller in exchange for the seller paying the NYMEX monthly price to the buyer, would be "long" the SoCal Monthly Index Price and "short" the NYMEX monthly price.  As stated above, the transaction would typically be settled on the settlement date by a net cash payment by one party to the other.

### (iii)    Fixed Priced vs. Published Monthly Index Priced Transactions

31.    Physical transactions could be priced at either a fixed price agreed to by the counterparties (*e.g.*, $4.10 per Mmbtu) or at a published index that typically reflected the volume-weighted average price ("VWAP") of certain transactions made by natural gas market participants during a bidweek (as determined by the compiler and publisher of the index), such as the Monthly Index Prices.

32.    Two of the most commonly used indices, which are directly relevant for this case, were the Platts and NGI Monthly Price Indices for the hubs that are the subject of this action. The West Desk's scheme centered on its trading during bidweek, which is the last five trading days of each month when producers try to sell their production and consumers try to secure their core gas needs for the coming month.  Based on this trading, the index publishers, such as Platts and NGI, compute the Monthly Index Prices at various trading locations, including SoCal, Permian, Waha and San Juan, by calculating the VWAP of all next-month physical fixed price trades during bidweek that are reported to them. They then publish these regional Monthly Index Prices.

As a result, reported next-month fixed price trades at a particular location during bidweek will determine the Monthly Index Price for the following month at that location. In turn, any physical and financial contracts which are based on the published Monthly Index Price, including "physical index" trades (*i.e.*, physical trades whose price is pegged to the index) and "financial basis swaps" (*i.e.*, financial transactions that involve swapping the NYMEX settlement price with the Monthly Index Price for a given location, plus or minus a fixed price) of the type held by TGPNA, will be affected.  Many physical natural gas transactions and related financial contracts during the relevant time priced off of or settled against the resulting NGI and Platts Monthly Index Prices.

**B.      FERC Office of Enforcement Investigation and the Markets Manipulated**

33.      According to the FERC Report, FERC Office of Enforcement undertook a non-public investigation of TGPNA's bidweek trading activities in natural gas markets in the southwestern U.S. to determine whether TGPNA was trading natural gas-related products uneconomically during bidweek in certain markets to affect the Monthly Index Prices to benefit its related financial positions, the profitability of which were determined by the Monthly Index Prices.  During the investigation, FERC obtained and reviewed productions of data and documents submitted by TGPNA in response to subpoenas issued by Enforcement as well as the Commodity Trading Futures Commission ("CFTC"), which conducted its own independent investigation of TGPNA's trading in coordination with Enforcement. Enforcement also took sworn testimony from a number of witnesses, including current and former TGPNA employees and executives and senior executives at Total and TGPL. Enforcement also conducted interviews with former TGPNA employees and several TGPNA counterparties.

34.      After completing its investigation, FERC's Office of Enforcement submitted, on April 1, 2016, its Report to the Commission finding that TGPNA's West Desk, under the direction

of Hall and Tran, implemented the manipulative scheme described herein to manipulate the Monthly Index Prices at the four hubs between June 2009 and June 2012.

35.     Specifically FERC's Office of Enforcement determined that TGPNA and its traders manipulated natural gas market prices during 38 of what FERC calls "point months" (*i.e.*, buying or selling natural gas relating to a specific location (*e.g.*, SoCal, Permian, Waha or San Juan) for a specific calendar month).  FERC's Office of Enforcement determined TGPNA traders engaged in a coordinated scheme during those months to take the physical next-month contractual positions they had built and offset them with fixed price next-month physical contracts -- generally at a loss -- to impact the Monthly Index Price settlements to benefit TGPNA's related financial positions that settled against those indices.  A list of the 38 manipulated point months, and the direction of the manipulation, is set forth in Exhibit A hereto.

36.     FERC's Office of Enforcement also determined that TGPNA traders executed their manipulative scheme for contracts for natural gas at primary natural gas trading points in the western U.S. at the time: SoCal, Permian, Waha and San Juan.

37.     FERC Office of Enforcement determined that TGPNA made illegal profits of in excess of $9 million and caused pecuniary losses to other market participants of at least $89 million by its manipulative scheme in artificially moving the Monthly Index Prices.

38.     On April 28, 2016, FERC issued an Order to Show Cause and Notice of Proposed Penalty to TGPNA, Total, TGPL, Hall and Tran premised on the Office of Enforcement's report.

### C.     Background of TGPNA's West Desk and Trading

39.     The foregoing manipulative and anticompetitive scheme was perpetrated on behalf of TGPNA by its West Desk which focused on trading contracts for physical and financial natural gas-related products in western U.S markets.

40.     The West Desk was headed initially by Aaron Hall.

41.     Tran, who had worked for Hall at her prior energy trading employer, was recruited by and directly worked for Hall at the West Desk.

42.     TGPNA's western U.S. natural gas trading during the alleged manipulation months focused on  four of the most significant western U.S. trading locations, discussed above: SoCal, Permian, Waha and San Juan.

**D.     The Details of the Manipulative and Anticompetitive Scheme**

43.     TGPNA's West Desk traders' manipulative and anticompetitive scheme involved, for each month of manipulation in which they artificially manipulated a hub's Monthly Index Prices identified in Appendix A to the FERC Report, the following: (1) setting up a financial index position (principally contractual swap agreements), (2) purchasing physical next-month futures contracts that established a position that was in the opposite direction of the financial position (*i.e.*, in the opposite direction of the financial index position) and (3) then "flattening" (*i.e.*, "liquidating") the physical next-month futures contracts position through purchasing or selling next-month fixed price contracts during bidweek, at artificially high or low prices, resulting in a loss in combination with the physical next-month futures contracts, but which caused the Monthly Index Prices to increase or decrease as the traders desired and thereby benefitted the financial index positions (*e.g.,* the swaps). Because of the larger position TGPNA held in the financial index swaps (or other financial contractual position) in step 1, which benefitted by the manipulated movement in the Monthly Index Prices, TGPNA made an overall significant profit on the scheme.

44.     Because TGPNA generally did not own natural gas in the southwest or serve substantial customer load there, TGPNA's contracts for physical next-month positions (step 2) had to be offset prior to delivery or receipt of the natural gas by buying (in the case of a short physical next-month position) or selling (in the case of a long physical next-month position) next-month physical contracts for an equal volume of natural gas (step 3).  The process of purchasing or selling

physical next-month fixed price contracts during bidweek for physical delivery of natural gas during the following month to fully offset previously acquired next-month contracts in the opposite direction (step 3) is called "flattening" the position.

45.     TGPA's holdings of contracts for physical positions going into a bidweek (that were in the opposite direction of TGPA's financial index position) (step 2) thus enabled TGPNA to trade large volumes of next-month fixed price gas in the opposite direction during the bidweek (step 3) as a means of flattening the contracts for the physical positions but also had the effect of moving the relevant Monthly Index in the direction that would benefit its financial index holdings. For example, a short physical next-month contract position of 10,000 Mmbtu of natural gas going into bidweek allowed TGPNA to enter into next-month fixed price contracts to buy 10,000 Mmbtu during bidweek to flatten the physical contract position it had built. Those purchases, if intentionally made at inflated prices, would inflate the Monthly Index Price that was calculated based on such prices and thereby enhance TGPA's return on its financial index contracts.

46.     In other words, because the VWAP of the reported next-month fixed price contracts entered into during bidweek set the Monthly Index Price, TGPNA's flattening of its physical next-month contractual positions in the market allowed TGPNA to impact Monthly Index Prices and benefit its related financial positions, which either paid or received the Monthly Index Prices at settlement.

47.     TGPNA flattened its earlier physical next-month contracts positions by subsequently purchasing or selling next-month gas at fixed prices during bidweek in order to increase or lower the Monthly Index Prices at those points.  Put simply, TGPNA purchased and sold fixed-price next-month natural gas during bidweek not in an attempt to profit from the relationship between the market fundamentals of supply and demand, but rather for the

manipulative purpose of impacting the Monthly Index Prices at particular points so that TGPNA's financial index positions at those points would benefit.

### E.   Relevant Markets Monopolized or Attempted to be Monopolized

48.   The relevant markets which TGPNA unreasonably restrained and monopolized, or attempted to monopolize, are the markets for determining the Monthly Index Prices for the natural gas hubs and periods set forth in Exhibit A ("Relevant Markets"), which index dictated the prices for the sale of natural gas under pre-existing contracts that settled against such Monthly Index Prices and for making payments due under pre-existing financial contracts that settled against such Monthly Index Prices.

### F.   TGPNA's Conduct Had Anticompetitive Effects

49.   The manipulative scheme described herein had an actual adverse effect on competition as a whole in the Relevant Markets, as evidenced by, *inter alia*, the FERC Report which found that TGPNA's scheme distorted the normal forces of supply and demand which should have driven the Monthly Index Prices:

> [T]he West Desk's fixed price trading during the Relevant Period did not reflect supply and demand fundamentals, and its traders were generally indifferent to price. Rather than trade fixed price gas during bidweek based on market fundamentals trying to buy low and sell high—West Desk traders bought and sold gas for the purpose of influencing published index prices. The West Desk traders were generally indifferent to price fundamentals. As Wilson testified, after observing a 12-cent swing in NYMEX prices during the May 2012 bidweek period at Permian, Tran directed Wilson to "just start trading it, and . . . not worry about the volume." Wilson also admitted, "I wasn't concerned whether I made or lost money on the fixed price trades. I was concerned with having an impact on the first-of-the-month index."

FERC Report at 68-69 (footnotes omitted).

50.   TGPNA caused pecuniary losses to other market participants of at least $89 million from its manipulative and anticompetitive scheme.  According to FERC, this $89 million

amount reflects a conservative estimate of the amounts which certain holders of pre-existing contracts that settled against the Monthly Index Prices prices paid in supracompetitive prices or received in subcompetitive prices, as the case may be, in the Relevant Markets as a result of TGPNA's manipulation of the Monthly Index Prices.

51.     TGPNA's scheme of acquiring substantial Monthly Index Price swap contracts, and thereafter engaging in artificial, uneconomic and money-losing purchases or sales of next-month fixed price natural gas contracts at intentionally inflated or deflated prices in the bidweek markets to benefit such swap contracts interfered with the normal forces of supply and demand in those markets and injected false and non-competitive prices into the markets for determining Monthly Index Prices which were intended to be based exclusively on freely-competitive market transactions entered into pursuant to the normal competitive forces of supply and demand in the Relevant Markets.  By reason of such interference with and destruction of competitive market forces in the Relevant Markets, Plaintiff and the members of the Plaintiff Class have been injured. There were no procompetitive benefits of TGPNA's scheme.

### G.     TGPNA Willfully Acquired and Maintained Monopoly Power and Engaged in Anticompetitive Conduct with a Specific Intent to Monopolize

52.     TGPNA's traders intentionally engaged, on behalf of TGPNA, in their unlawful course of conduct from June 2009 through July 2012 to acquire and maintain monopoly power over, or to attempt to monopolize, the Monthly Index Prices which dictated the prices payable under pre-existing contracts that settled against the Monthly Index Prices during the 38 point months for the four trading locations listed in Exhibit A hereto.

53.     In essence, by establishing a large position in Monthly Index swap contracts which would reap profits from a change in the Monthly Index Prices, which profits were greater than the losses TGPNA would suffer from its purchase or sale of underlying next-month fixed price

contracts during bidweek intended to manipulate the resulting Monthly Index Prices, and by intentionally engaging in such money-losing purchases and sales of the underlying next-month fixed price contracts in order to manipulate the resulting Monthly Index Prices in their favor, TGPNA's traders intentionally acquired and utilized the power to effect increases or decreases in the Monthly Index Prices and thereby the prices under all contracts that settled against such Monthly Index Prices, and TGPNA did effect such anticompetitive increases or decreases, causing direct injury to Plaintiff and the members of the Plaintiff Class.  TGPNA's traders therefore acted willfully and with specific intent in acquiring and maintaining monopoly power or in attempting to monopolize the Relevant Markets.

54.     TGPNA's traders knew their next-month fixed price natural gas trading during bidweek was losing money and that it would prevent free market forces from operating in the Relevant Markets, but they were willing to accept such losses because the uneconomic next-month fixed price trading was part of their manipulative scheme to acquire and maintain monopoly power over Monthly Index Prices to benefit their related financial positions.

55.     This willfulness and intent of TGPNA is demonstrated through direct evidence, such as TGPNA's execution of transactions benefiting its Monthly Index swap positions, and trading which would be economically irrational but for the manipulative scheme.  TGPNA traders coordinated their individual and collective actions in furtherance of the manipulative scheme.

56.     There are extensive documents and communications demonstrating TGPNA's traders' knowing participation in the manipulative scheme. This evidence is described in detail in the FERC Report at 19-66.  The evidence not only describes and substantiates the scheme, but also demonstrate the affirmative, coordinated, concerted, and intentional effort among the TGPNA traders individually and collectively to carry out the scheme.

57.     Direct evidence of TGPNA's manipulative intent includes, among other things, (1) testimony from two former TGPNA employees (Wilson and Stephen Callender ("Callender")) who separately and independently "blew the whistle" on TGPNA's manipulative conduct to FERC and to the CFTC, respectively; (2) TGPNA trade data corroborating Wilson's and Callender's account of the West Desk's manipulative conduct; (3) contemporaneous documents showing that, during the Class Period, TGPNA's internal offices and senior management raised specific compliance concerns with the West Desk's bidweek trading, especially with regard to (i) its very high market share of next-month fixed price volumes during bidweek, (ii) the price difference between the West Desk's next-month fixed price trades and the rest of the market, and (iii) large Monthly Index Price financial positions that profited from its manipulative next-month fixed price trading during bidweek; and (4) documents showing that the West Desk employed sophisticated bidweek spreadsheets that facilitated and monitored the success of the manipulation scheme in real time.

(i)     **Wilson and Callender Provided Detailed Accounts of TGPNA's Bidweek Trading Scheme**

58.     TGPNA employees Wilson and Callender independently provided nearly identical accounts of how the West Desk at TGPNA repeatedly and routinely engaged in the scheme to affect Monthly Index Prices in the Western hubs at issue. As detailed below, both of their accounts described the same general mechanics of the scheme. *First*, they described how, just prior to bidweek, the West Desk established a set of initial positions arranged in a way to give it the ability and motive to influence Monthly Index Prices. This arrangement included establishing a large Print Risk position set to make a sizeable amount of money based on movements in the settlement price of the Monthly Index Prices. (Print Risk is a term TGPNA uses to describe its net exposure to the published (*i.e.*, printed) monthly index prices. TGPNA's Print Risk reflects

its overall position resulting from financial and physical products that settle on, and derive value from, the published index price at a particular hub.) The arrangement of initial positions also included a large physical index gas position. *Second*, Wilson and Callender described how the WestDesk used its large cache of physical index natural gas to trade as fixed price gas during bidweek in an effort to move the Monthly Index Price and benefit its related Print Risk position (*i.e.*, its position which would benefit from movements of the Monthly Index Prices in a desired direction), while flattening its physical obligations.  Their descriptions are also corroborated by the trade data, as described in Paragraphs 78-98.  Each witness's account of the scheme is described below.

> a.     **Wilson's Disclosure of the West Desk's Bidweek Trading Scheme**

59.     Wilson's three-year tenure at TGPNA is divided into two phases: an initial phase between 2009 and January 2012 during which Wilson was not involved in the West Desk's bidweek trading, and a second phase during the first half of 2012 when Wilson directly observed and knowingly participated in the desk's scheme under Tran's supervision.

> (1)     **Phase 1 of Wilson's Tenure at TGPNA: Hall Attempts Unsuccessfully to Teach Wilson the Bidweek Scheme**

60.     The fundamentals-based gas trading Wilson had learned at his prior gas employer differed significantly from TGPNA's West Desk's trading operations. As Wilson explained, at his prior employer, "I'm just trying to make an honest forecast and put a trade on, and if I win I win, if I lose I lose. To me, that's trading. You take a risk in the marketplace and make your best assessment." But after he joined TGPNA, Wilson discovered that the West Desk's trading strategy was starkly different from the fundamentals-based approach he had learned. Wilson

described the West Desk's contrasting trading style as "trying to put on a position and mov[ing] the market . . . into the position that you have on."

61.     Within a few months after joining TGPNA, Hall, the initial head of the West Desk, gave Wilson a tutorial explaining the West Desk's bidweek trading strategy. During this 2009 meeting, Hall drew a table on a white board to try to teach Wilson the West Desk's bidweek strategy, but this was an entirely different way to approach the market to Wilson, who later admitted that he did not understand it, or "the broader strategy" at that time. After just "one bid week, maybe two bid weeks at the most" Hall stopped asking Wilson to participate.

62.     Wilson only came to fully understand Hall's description of the bidweek strategy and the table Hall drew on the whiteboard almost two-and-a-half years after their 2009 meeting when, in January 2012, Tran, Hall's successor as head of the West Desk, directed him to help her in the West Desk's bidweek trading, and Wilson thereafter observed and participated in the scheme. The table (reproduced and explained in the FERC Report at 23) highlights two critical components of the scheme.  *First*, the table illustrates the purpose for the initial positions: as Wilson explained, "the whole reason you've established a large short index position is so that you can trade a bunch of fixed price and have an impact on the index." *Second*, it illustrates the impact and overall purpose of the fixed price trades: As Wilson emphasized, by the end of day 4, "I have traded a ton of fixed price to support my financial position."

        **(2)     Phase 2 of Wilson's Tenure at TGPNA: Wilson Learned, Observed, and Participated in the Bidweek Scheme Under Tran's Supervision**

63.     In January 2012—shortly after Hall left for London—Tran asked Wilson to assist her with the West Desk's bidweek trading.  Tran first provided some training, including how to use the detailed bidweek spreadsheets that she and Hall had developed. Wilson learned over the

course of the next few months under Tran's direction and supervision that the West Desk made money using the same strategy that Hall depicted in the table on the white board during the 2009 meeting—by trading fixed price gas during bidweek to affect index prices and benefit its related positions.

### (3)   Overview of Wilson's Account of West Desk's Bidweek Scheme

64.    Wilson traded bidweek under Tran's direction from the end of January 2012 (for the February Market Index Price) through the end of May 2012 (for the June Market Index Price). Based on his experience during these five bidweek periods, Wilson identified two principal factors that led him to realize that the West Desk was designing its trades to influence Market Index Prices.

65.    *First*, Wilson found that during these bidweek periods that the West Desk consistently established an initial position leading up to bidweek or in bidweek that included a large financial position and a physical index position that pointed in opposite directions. For example, Wilson noted that heading into the April 2012 bidweek period at San Juan, the West Desk had a short basis position of approximately 128,000 MMBtu/day and a long index position of approximately 140,000 MMBtu/day. Wilson then described the significance of these initial positions, explaining that TGPNA would trade fixed price gas during bidweek for the dual purpose of flattening the index position and supporting the basis position.

66.    The large physical index position going into bidweek, which included large volumes of physical index gas, especially stood out to Wilson. He explained that it did not make sense for a trading operation like TGPNA, solely interested in speculation, to stockpile such a large physical index position going into bidweek.

67.    *Second*, as Wilson started making bidweek trades and maintaining the bidweek

spreadsheets for Tran, Wilson witnessed "trading activity that benefits [the] financial position." Specifically, Wilson testified that "over four or five bidweeks, I think we were batting a thousand on . . . financial positions being supported by fixed price trading. So that really bothered me, that the company had a financial position on and was trading fixed price around it." As an example, Wilson described in his testimony to FERC a situation where the desk had a long financial position and short physical index position going into bidweek and then bought "back fixed price during bid week, flattening out your physical position, and doing so in a way to benefit your financial position."

### (4)    Wilson's Specific Involvement in West Desk's Bidweek Scheme

68.    In his testimony, Wilson detailed his involvement trading bidweek during the five-month period in 2012 and how he came to understand the nature of the West Desk's scheme. During the month of February heading into the March 2012 bidweek, Wilson familiarized himself with the West Desk's bidweek spreadsheet:

> [it] would allow me to track all of the basis risk, the index risk, the NYMEX risk. It would all be loaded into the sheet on the last day of the month prior to the start of bid week so I could see what the initial front month position was.

FERC Report at 27-28.

69.    Continuing to study the spreadsheets during subsequent bidweeks, Wilson developed an understanding of the West Desk's bidweek trading strategy. He testified that by studying the bidweek spreadsheets and seeing how they worked during bidweek, "I was seeing how various fixed price trades were aligned with financial positions and how those fixed price trades would change certain values that we were keeping track of."

70.    While he was learning about and trading bidweek, Wilson received supervision and

critical tutelage from Tran. Her instruction caused him to execute the West Desk's scheme specifically to have an impact on the index prices. There were also times when Tran told him not to engage in otherwise economic physical trades because prices were not in their favor. In addition, Tran taught Wilson how to use the bidweek spreadsheets to measure the impact of his fixed price trading on index prices.

71.     As Wilson recalled in his testimony, the "watershed" moment occurred at the end of March 2012 (during the April 2012 bidweek period) when he realized that he was being directed to trade a lot of fixed price gas at San Juan after the NYMEX dropped, with the specific intent to lower the index price at San Juan.

72.     After the April 2012 bidweek period, Wilson traded two more bidweeks—May and June 2012. In each of those, he was fully aware of the scheme and, in fact, he intentionally traded fixed price gas to affect the index price in an effort to benefit the desk's related positions. During these bidweeks, Wilson admitted that he knew at that time that he was "having an impact on the index" and that he was "knowingly trading to try to affect the index price." For the May 2012 bidweek, as an example, Wilson made fixed price trades at Permian in order to strengthen the index because the desk had a long Print Risk position. As he described it, "I wasn't concerned whether I made or lost money on the fixed price trades. I was concerned with having an impact on the first-of- the-month index."

73.     In short, Wilson learned about TGPNA's scheme while he was trading fixed price physical contracts during bidweek between January and May 2012. He discovered that the scheme involved establishing related positions that would benefit from a strengthening or weakening index, and then by executing fixed price trades with the purpose and design to move that index in that favorable direction.

27

**b.** **Callender's Disclosure of TGPNA's Bidweek Trading Scheme**

74. Like Wilson, Callender also explained the West Desk's bidweek trading scheme in detail. Callender testified that he believed Hall and Tran engaged in a scheme to trade physical products during bidweek to try to influence index prices, that this strategy "was employed continually month after month after month," and that it occurred at SoCal and Waha.

75. There were two principal bases for Callender's allegation: his review of TGPNA position reports and discussions with other traders at the company that were seated in close proximity to him. Callender testified that he frequently looked at TGPNA's position reports and, like Wilson, he discovered that the West Desk had sizeable financial and physical index positions leading up to bidweek. For example, referring to a position report TGPNA created just prior to the February 2010 bidweek, Callender testified that TGPNA had a short basis position (a position that would benefit from a decline in the Monthly Index Price) of approximately 142,000 MMBtu/day and a long index position of approximately 247,000 MMBtu/day at Permian. Callender then explained how these positions created a prime posture for the West Desk traders to influence the published Monthly Index Price. Specifically, Callender testified that he believed, "[b]ased on history, what normally went on," the traders would take advantage of their large long physical index position to "be a big seller of physical gas throughout bid week " (*i.e.*, sell a lot of next-month fixed price gas during bidweek). He believed the traders did this "to influence the paper" (*i.e.*, drive the published Monthly Index Price in its favor).

76. Moreover, Callender testified that there is no reasonable explanation for TGPNA carrying such a large physical index position going into the February 2010 bidweek: "there would be no reasoning for Total to go into a month 247,000 dekatherms physically long" especially given that TGPNA "had no storage positions, no transport positions and no production." Callender

explained further, "[t]here's really no reason you have an index position that big. Index is the least volatile of all markets, so you really couldn't be expecting to make any money off of buying index."

77.     In addition to his review of position reports showing a consistent pattern of initial positions, Callender also believed the West Desk engaged in its bidweek trading scheme based on discussions he had with other traders at TGPNA. For example, one of Callender's friends at TGPNA explained to him how TGPNA made a lot of money during bidweek by trading physical gas as a way of influencing related financial basis swap positions.

### (ii)     The Trade Data Corroborates the Existence of the Scheme

78.     Wilson's and Callender's accounts of the West Desk's bidweek trading scheme are corroborated by the relevant trade data, which shows that the desk's traders frequently used their monthly physical fixed price bidweek trades to influence published Monthly Index Prices for the purpose of benefiting their related positions. The data confirm that this conduct occurred between June 2009 and June 2012 at SoCal, Waha, Permian, and San Juan during the 38 point months identified by FERC. Moreover, the data verify that the scheme operated under the same two phases described by Wilson and Callender.

79.     *First,* going into each bidweek period, the West Desk regularly established large physical and financial positions exposed to published index prices (*i.e.*, a large Print Risk position), which included basis and index positions in opposite directions and a large physical index position. To obtain these large Print Risk positions, the traders actively traded before (and sometimes during) bidweek, and they frequently discussed and coordinated these positions.

80.     *Second*, armed with a set of initial positions giving them the ability and motive to manipulate index prices, the West Desk traders engaged in generally uneconomic physical fixed

price bidweek trades and strategies designed to move the index price in the direction that benefited their related Print Risk positions. They established a large market share of monthly physical fixed price trades during bidweek – the West Desk was routinely more than half of the trades by volume on the index – in order to steer the market in their preferred direction.

81.     The West Desk lost money on its monthly physical fixed price bidweek trades in the vast majority of the 38 point-months and made only a small profit in the remaining point-months. Overall, it lost approximately $2.09 million on its fixed price trades across the 38 point-months.

82.     The collective and repeated nature of these strategies during the Class Period demonstrates the West Desk's intent to move index prices to benefit its related Print Risk positions.

83.     One of many examples illustrating the essential concepts described by Wilson and Callender—build-up of positions leading into bidweek and fixed price trading during bidweek to influence index prices to benefit those positions — was the bidweek trading in late July 2011 for the month of August 2011 at the SoCal hub, described below.  FERC Report at 38-41

84.     The West Desk entered into numerous financial and physical transactions at SoCal leading into and on the first day of bidweek—July 25, 2011—that created a long Print Risk position (*i.e.*, a position that would benefit from an increase in the SoCal Monthly Index Price) 14,000,000 MMBtu (14 Bcf) for the month of August. This long Print Risk position would benefit from higher prices during bidweek (*i.e.*, if the index settled higher), and would be hurt by falling prices (*i.e.*, if the index settled lower). The long position created a strong financial motivation to drive up the SoCal index price by trading enough fixed price gas at high prices. To fulfill this motive, the West Desk also went into bidweek with a short index position of 139,952 MMBtu/d, which included a large short physical index gas position meaning that it could buy fixed price gas during bidweek

to flatten this position and benefit its long Print Risk position.

85.     This is exactly what Tran did during bidweek. Trading during the first and second days of bidweek, Tran entered into 22 fixed price transactions at SoCal, trading more than 5 Bcf of gas (by gross volumes). The following trading behaviors and patterns show Tran's intent to drive up prices at SoCal: almost all the transactions (20 of 22) were purchases, consistent with a desire to drive up prices; she established sufficient market share to move the index upward by dominating the market for fixed price trades at SoCal during bidweek - and her trades put her on one side of approximately 48 percent of the volumes transacted on ICE underlying the published index price at SoCal; consistent with the intent to move the index upward, Tran transacted at fixed prices above the prices traded by other market participants, and engaged in strategies to pay more, not less, for her purchases, in order to establish a higher index price.

86.     FERC Enforcement's finding that these patterns show Tran's intent to affect prices is consistent with the findings of TGPNA's Vice President of Risk Control, Natalie Bondareva, who found the appearance of what she called "suboptimal trading" during the August 2011 "bidweek" period.

### (iii)     Other Contemporaneous Documents Reveal The Existence and Broad Knowledge of the West Desk's Bidweek Trading Scheme

87.     FERC Enforcement also found that during the relevant period, TGPNA's Compliance Department, Middle Office, Risk Control Office, and senior management knew that the West Desk's bidweek trading raised compliance concerns for the same reasons that were later identified by Wilson and Callender and revealed in the trade data: large positions that profited from TGPNA's effect on published index prices; very high market share of fixed price volumes during bidweek; and deviation in its bidweek prices from the rest of the market.

a.   **Internal Reports Identified the Impact of the West Desk's Bidweek Trading Scheme on Index Prices and TGPNA's Related Positions**

88.      Gary Craven ("Craven"), TGPNA's Chief Compliance Officer from approximately 2008 through 2011, recognized that physical bidweek trading with the intent to benefit related financial positions could constitute market manipulation, and took steps to alert senior management to the risk of such trading at TGPNA.

89.      At the conclusion of each bidweek from February 2009 through February 2011 Craven compiled reports for TGPNA management highlighting, among other things, (1) TGPNA's bidweek market share for trades at various points reported to index publications; and (2) how its bidweek prices at those points differed from the rest of the market and affected the published index prices.

90.      For example, Craven analyzed the effect of TGPNA's bidweek trading at Waha during the December 2009 bidweek period, which is within the relevant period and one of the 38 point-months specifically identified in the FERC Report. Craven found that the West Desk's fixed price trades at Waha during this bidweek period made up 46 percent of the reported volumes during this bidweek period; affected the Waha published index in his view by 3 cents; and benefited TGPNA's long Print Risk position in his view by $7,000.

91.      The above analysis assumed that TGPNA's counterparties did not also report their fixed price trades to index publishers. However, Craven also analyzed TGPNA's trades each month assuming that its counterparties also reported their trades. For example, Craven's above analysis of TGPNA's December 2009 fixed price trades at Waha, assuming its counterparties also reported, found that the fixed price trades made up 91 percent of the reported volumes during this bidweek period; affected the Waha published index by 38 cents; and benefited TGPNA's long Print Risk position by $88,000.

92.     Craven's reports also raised the specter of illegal conduct for TGPNA management. After reviewing Craven's February 2009 report, TGPNA's President, Bruce Henderson, sent a memorandum to and met with executives of Total and TGPL about TGPNA's very high market share at several trading points and resultant regulatory scrutiny.

93.     TGPNA also recognized that the data (and the specific language Craven used to describe the data) might disclose TGPNA's manipulative conduct. Thus, in his September 2010 report, Craven revised some of the language in his reports at the suggestion of the law firm of Covington & Burling LLP. For example, until this time, Craven labeled his calculation for the effect of TGPNA's bidweek fixed price trades on the published Monthly Index Prices as "TGPNA Reporting Effect on Price." Starting in September 2010, after Covington reviewed the documents, Craven still calculated this figure, but, apparently concerned about potentially disclosing TGPNA manipulative conduct, labeled it simply "Dif."

94.     Despite the matters contained in Craven's reports, there is no evidence that TGPNA management conducted any meaningful inquiries regarding the trading activity that Craven identified.

> **b.     Middle Office Reports Raised Concerns With TGPNA's Market Share of Reported Bidweek Trades Contributing to Index Prices**

95.     In addition to Craven's reports, since 2007 TGPNA's Middle Office issued monthly reports showing each of TGPNA's trading desks' market share of reported bidweek trades contributing to monthly index prices. For example, the report from December 2009—during which TGPNA manipulated the Waha and Permian index prices—notified TGPNA management that TGPNA's bidweek trades at several locations, including Waha and Permian, "represented a very high Market Share in terms of number of deals and Volume done at that point."

       **c.**      **Risk Control Analysis Corroborated Wilson's Account of West Desk's Bidweek Trading Scheme**

96.     The potential for manipulation by TGPNA's West Desk was also highlighted by Wilson's internal whistleblowing activities. Wilson sent an email to TGPNA's President, Bruce Henderson, on June 10, 2012, stating that "I have learned that some of the west team trading activity may not be entirely above board, and should be closely examined. At best, I think these activities would generate an ethics discussion and, at worst could be a violation of federal regulations." Shortly after receiving this email, Henderson alerted senior management at Total and TGPL, and asked TGPNA's Vice President of Risk Control, Natalie Bondareva, to analyze the West Desk's bidweek trading.

97.     Bondareva analyzed the West Desk's bidweek trading at Permian, San Juan, SoCal, and Waha between July 2011 and July 2012. Her analysis identified numerous months when the desk had a high market share of fixed price trades contributing to the index.

98.     In addition, based on her review of the trade data, Bondareva identified "patterns that looked like suboptimal trading." Bondareva provided management with a report on her findings, which included a table, shown below, identifying specific months when she identified the "patterns that looked like suboptimal trading."  She identified the appearance of suboptimal trading in 27 point-months between July 2011 and July 2012, including 13 of the point-months where FERC Enforcement found manipulation and which are included in this complaint. Bondareva defined "suboptimal" trading as "buying or selling at a loss, high trade concentration, [and] buying and selling at the same price."

| | El Paso Permian (Platts) | | | | | El Paso San Juan (Platts) | | | | | Socal (NGI) | | | | | Waha (Platts) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Print Risk (in Bcf) | | | Subopt Trades | Day 4 Trades | Print Risk (in Bcf) | | | Subopt Trades | Day 4 Trades | Print Risk (in Bcf) | | | Subopt Trades | Day 4 Trades | Print Risk (in Bcf) | | | Subopt Trades | Day 4 Trades |
| | Financial Deals | Physical Deals | Total | (Y/N) | (Y/N) | Financial Deals | Physical Deals | Total | (Y/N) | (Y/N) | Financial Deals | Physical Deals | Total | (Y/N) | (Y/N) | Financial Deals | Physical Deals | Total | (Y/N) | (Y/N) |
| Jul-11 | 7.6 | -1.1 | 6.5 | Y | Y | 1 | -2.8 | -1.8 | N | N | 14.9 | 8.2 | 23.1 | Y | Y | 1.48 | -0.08 | 1.4 | N | N |
| Aug-11 | 11.3 | 2.6 | 13.9 | N | N | 1.6 | -1.2 | 0.4 | Y | N | 3 | 3.9 | 6.9 | Y | N | -1 | 0.2 | -0.8 | N | N |
| Sep-11 | -6.3 | -6.8 | -13.1 | Y | Y | -0.4 | -2.6 | -3 | Y | Y | 6.1 | 1.1 | 7.2 | Y | Y | 3 | 1.9 | 4.9 | N | Y |
| Oct-11 | -1.7 | -4.2 | -5.9 | Y | Y | -5.9 | -3 | -8.9 | Y | Y | 0.1 | 5.7 | 5.8 | N | N | 1.4 | 1.8 | 3.2 | N | N |
| Nov-11 | -7.24 | -0.06 | -7.3 | Y | Y | 3.7 | -1.5 | 2.2 | N | Y | -0.8 | -3.3 | -4.1 | Y | N | 2.5 | -0.7 | 1.8 | Y | Y |
| Dec-11 | -0.3 | -1.6 | -1.9 | Y | N | -2.3 | -3.2 | -5.5 | N | N | 7.2 | 0 | 7.2 | Y | Y | | | | | |
| Jan-12 | -0.6 | -3 | -3.6 | Y | Y | | | | | | | | | | | -2.5 | -1.3 | -3.8 | Y | Y |
| Feb-12 | | | | | | -0.5 | -1.7 | -2.2 | Y | N | | | | | | 0.5 | 2.8 | 3.3 | Y | Y |
| Mar-12 | | | | | | | | | | | -4.7 | 0 | -4.7 | Y | Y | | | | | |
| Apr-12 | | | | | | -7.3 | -2.2 | -9.5 | Y | Y | 9.2 | 0 | 9.2 | Y | Y | -1.6 | 0.4 | -1.2 | Y | Y |
| May-12 | 4.7 | 0 | 4.7 | Y | Y | 0 | 0 | 0 | N | N | | | | | | | | | | |
| Jun-12 | 0.2 | 0 | 0.2 | Y | N | 0.43 | 0.07 | 0.5 | N | N | -4.2 | 0 | -4.2 | Y | Y | 0.3 | 0.9 | 1.2 | N | N |
| Jul-12 | 0.9 | -0.5 | 0.4 | N | N | | | | | | 6.6 | 0 | 6.6 | Y | N | -5.1 | 1.7 | -3.4 | Y | Y |

FERC Report at 59.

99.     Tran executed the vast majority of relevant trades analyzed and characterized as "suboptimal" by Bondareva.

#### d.     Hall and Tran Adopted Special Bidweek Spreadsheets to Manage and Track the Manipulation Scheme

100.     TGPNA's West Desk traders used uniquely tailored bidweek spreadsheets to monitor in real time the effect of their physical trading on index prices and their related Print Risk positions. The West Desk's use of these spreadsheets shows that it had all of the information needed to execute and monitor the scheme readily available in real time. Moreover, the West Desk's use of these spreadsheets refutes any argument that its traders did not know or understand how their physical bidweek trading affected their Print Risk positions. Although TGPNA's other desks also used spreadsheets to monitor bidweek trading, the West Desk's version was uniquely detailed and contained information critical to the manipulative scheme.

101.     These spreadsheets assisted the desk in executing its scheme by providing traders with an information dashboard to keep them apprised of how their scheme was working and to modify trading behaviors based on the real-time results.

102.     The bidweek spreadsheets tracked all aspects of the West Desk's bidweek trading,

but included three critical components that were central to helping the traders track and manage the scheme. First, the spreadsheets included the West Desk's positions, calculated in terms of risk pool (*i.e.*, Basis, Index, and Fixed Price risk), and additionally, calculated the desk's Print Risk, which comprised all basis and index positions whose value was tied to the published index price. This enabled the trader to know the desk's related positions and how those positions would benefit from trades, including TGPNA's trades, setting the index.

103.     In addition, throughout bidweek the spreadsheet kept a running projection of the published index price by calculating in real time the volume-weighted average of all fixed price trades they knew and believed would be reported to index publishers.

104.     The West Desk traders used sophisticated analytics and market intelligence to keep a running projection of the index price. Wilson explained that the West Desk traders would make an "educated guess at the beginning of bid week of how much . . . will trade . . . based on your experience trading fixed price during bid week and what has traded historically. And then you keep tabs by day of how much is trading against what you think is the total." To keep tabs on the next-month fixed price trades in the market, the West Desk traders collected market data from ICE and brokers and kept running tallies of volume and price data they received.

105.     Some versions of the bidweek spreadsheets even explicitly noted which entities did not report their trades. Thus, for example, when the row tracking "the index if all reported" matches the row tracking "the index with known reporters," that signifies that TGPNA traded only with reporting entities.

106.     Thus, comparing their historically-based estimate of total fixed price trades during bidweek with their running tally of actual trading—including, in some instances, knowledge of which trades would be reported—allowed the West Desk traders to project the index at any time

during bidweek. As Hall explained, "[a]s trades were happening, we were posting the weighted volume price of the trades, so we could track the index." Hall stated they were able to predict the index price with great accuracy.

107.    Finally, the bidweek spreadsheets generated real-time P&L calculations based on the projected Monthly Index Prices, the current value of NYMEX, and the West Desk's benefiting Print Risk positions.

108.    According to Karimullah, he monitored these P&L calculations, and the impact of TGPNA's trades on the P&L, in real time. Hall confirmed that traders could track this information. Moreover, the bidweek spreadsheets allowed traders to test various trading scenarios to determine, for example, how much additional trading they would need to do to move the index and P&L in their favor. As Wilson testified, he was informed that "it's pretty easy to calculate how much we need to trade, because at this level, if we can trade another 40,000 or another 20,000 based on where we're calculating index, if we add in another 20,000 or 30,000 or 40,000 at this 10-cent higher level we will move the index by one penny."

109.    Therefore, the West Desk's bidweek spreadsheets provided real-time P&L for the West Desk's related positions at the very time when it was executing fixed price trades that affected the value of those related positions.

> **(iv)    At Hall's Urging, TGPNA Adopted a Trade Accounting System That Commingled Physical and Financial Positions to Facilitate the Scheme and Disguise Its Losses in Bidweek Fixed Priced Trades**

110.    Another tool that facilitated the West Desk's scheme was its adoption in 2008, per Hall's request, of a trade accounting system that commingled all trades—physical and financial— into single *regional* books. He asked for this change because the traders at TGPNA "don't look at things as physical or financial, we look at how the risk is represented." The problem with the prior system, according to Hall, was that the split between the physical and financial books meant that

"one of those deals could show a very big loss and the other deal could show a very big gain, which is not indicative of the total P&L of the team or the company."

111.    Eventually, TGPNA approved Hall's request and moved to a regional concept where trades were accounted for, irrespective of whether they were physical or financial, based on the type of risk they created. Thus, during the Class Period when TGPNA monitored its positions and P&L, it did not differentiate between physical positions and financial positions. In fact, as Tran testified, TGPNA's system, or book, does not give the traders the ability to "differentiate between physical versus financial and differentiate the profit and loss based on that."

112.    Thus, TGPNA's system for monitoring positions and P&L enabled West Desk traders to disguise and claim ignorance for any losses they might experience in bidweek fixed price trades, and to offset any such losses with their gains on related Print Risk positions. This system helped TGPNA disguise physical losses during the Class Period. As described above, the West Desk lost approximately $2.09 million on its physical fixed price trades across the 38 point-months identified in the FERC Report.

113.    Through its trading scheme, which entailed the trading of next-month fixed price contracts during bidweek at artificially inflated or deflated prices, TGPNA traders captured market share sufficient to move index prices in TGPNA's favor on the major southwestern trading hubs, as demonstrated by, *inter alia*, the evidence discussed above, which shows that the TGPNA traders themselves understood that they traded such contracts in volumes and at artificially-inflated or deflated prices sufficient to move market prices in their favor as a result of their anti-competitive conduct.

### H.    Antitrust Injury

114.    As a result of TGPNA's interference with and destruction of competition in violation of Section 2 of the Sherman Act through its course of conduct described above, Plaintiff

and the members of the Class have been injured in their business or property in the form of, *inter alia*, paying higher and supracompetitive market-derived prices for natural gas under pre-existing contracts that settled based on the market-derived Market Index Prices which TGPNA manipulated, and the other members of the Class have been injured in their business and property during the Class Period in the form of paying higher and supracompetitive market-derived prices, or receiving lower and subcompetitive market-derived prices, as the case may be, under pre-existing contracts that settled based on the market-derived Daily Index Prices which TGPNA manipulated during the Class Period. This injury resulted directly from TGPNA's intentional interference with the normal competitive forces of supply and demand which otherwise would have and should have set the prices in the Relevant Markets in the absence of TGPNA's wrongful conduct.

## I.      Equitable Tolling and Fraudulent Concealment

115.    TGPNA concealed its wrongdoing in acquiring and maintaining monopoly power or attempting to obtain monopoly power over the Relevant Markets by manipulating the prices for Monthly Index Price contracts. The Commodity Futures Trading Commission first disclosed TGPNA's manipulation of three of the 38 point months which are the subject of this action (the September 2011 Permian hub, April 2012 SoCal hub and April 2012 San Juan hub) on December 7, 2015. FERC's first public disclosure of the FERC Enforcement Report disclosing the manipulation of the balance of the 38 point months which are the subject of this action was on April 28, 2016. Plaintiff did not discover, and could not with reasonable due diligence have discovered, the facts supporting Defendants' manipulative conduct any earlier than December 7, 2015.

116.    Application of the doctrine of fraudulent concealment tolled the statute of limitations as to the claims asserted by Plaintiff and members of the Class and Sub-Class.

Plaintiff had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until at least on or after December 7, 2015.

117.    By its very nature, as alleged herein, the unlawful activity that TGPNA engaged in was self-concealing. The nature, existence and extent of such unlawful activity could only be discerned and uncovered by access to TGPNA's internal documents and detailed review by qualified experts of immense amounts of non-public data from a variety of sources.

118.    TGPNA engaged in specific and calculated acts to conceal its manipulative conduct as alleged herein and to attempt to avoid detection. For example, Wilson testified he initially did not fully understand why there was so little open discussion about bidweek strategy at the office. He generally recalled conversations that "your IMs are recorded, you know, they wanted to let us know that the IMs were recorded . . . . If you have anything questionable, don't put anything questionable in IMs, don't put anything questionable in e-mails." Before he started helping with bidweek, Wilson had perceived that bidweek strategy was "a very sensitive subject." As he completed the April 2012 bidweek, he came to a realization: "I didn't know why people hadn't talked about it before until you get to a place like April and then you start seeing what's going on and you realize why people are probably not wanting to talk about this."

119.    In addition, as alleged above, at Hall's specific request, TGPNA adopted and implemented an accounting system change for monitoring positions and profits and losses which enabled West Desk traders to disguise and claim ignorance for any losses they might experience in bidweek fixed price trades, and to offset any such losses with their gains on related Print Risk positions. This system helped TGPNA, for example, disguise physical losses during the relevant period, which were integral to the operation and illegality of the manipulative scheme. As

described above, FERC discovered that the West Desk lost approximately $2.09 million on its physical fixed price trades across the 38 point-months identified in the FERC Report.

120.    Furthermore, as alleged above, TGPNA's employee intentionally changed written documents in order not to disclose TGPNA's illegal conduct. In his September 2010 report, Craven revised some of the language in his reports at the suggestion of the law firm of Covington & Burling LLP. Prior to this time Craven labeled his calculation for the effect of TGPNA's bidweek fixed price trades on the published Monthly Index Prices as "TGPNA Reporting Effect on Price." Starting in September 2010, after Covington reviewed the documents, Craven still calculated this figure, but, apparently concerned about the legal implications of TGPNA's illegal conduct, which could obviously include public disclosure, labeled it simply "Dif."

121.    Because TGPNA employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, Plaintiff and the members of the Class and Sub-Class could not have discovered the existence of this unlawful conduct any earlier than its public disclosure on December 7, 2015, as set forth above.

122.    For these reasons, among others including those alleged herein and presently unknown to Plaintiff and members of the Plaintiff Class and Sub-Class, the statute of limitations applicable to Plaintiff and the Plaintiff Class' and Sub-Class claims was tolled and did not begin to run until at the earliest December 7, 2015, as set forth above.

**J.      TGPNA's Relationship with and Actions on Behalf of Its Parent and Affilliate**

123.    FERC Enforcement has found that "the law and facts support holding Total and TGPL liable for TGPNA's, Hall's and Tran's conduct, which is necessary to prevent them from allowing their undercapitalized "Houstonian trading office" to manipulate United States natural gas markets for years and then avoid the consequences due to insufficient funds."  FERC Report

at 77. FERC has stated that "TGPNA should not be allowed to escape accountability due to insufficient funds, and the law and facts support holding Total and TGPL liable to avoid this result." (*Id.*) TGPNA's own description of itself confirms that it operates not as a separate entity but as the "Houstonian trading office"(October 2012 TGPNA internal audit report) or "North American trading arm," of Total's Global Gas Division (TGPNA Complaint filed in *TGPNA v FERC*, 7:16-cv-00028, at 7 (W. D. Tex Jan. 27, 2016)).

124.    As FERC Enforcement observed, TGPNA is merely a trading office with limited assets (and no natural gas assets) of its own. Moreover, Jean-Pierre Mateille, TGPL's Vice President of Trading and TGPNA's Chairman, testified about TGPNA's recent financial "problems," noting that its budget for 2014 was "slightly above the equilibrium," and "less than 10" million dollars in profits. Also, as described above, Total has provided credit guarantees to TGPNA counterparties for purposes of establishing credit relationships because of TGPNA's lack of sufficient credit.

125.    As FERC Enforcement observed, Total and TGPL acted as a single entity with TGPNA.  FERC Report at 77, 79. TGPNA was not run as a separate profit seeking corporation from TGPL and Total, but, rather, as a component of Total's Gas & Power Division. In this role, Total and TGPL were closely involved in, and exerted significant control over, TGPNA's daily operations. For example, (1) Total established risk limits for TGPNA's traders and TGPNA was required to seek TGPL's authority to breach these limits; (2) TGPNA frequently relied on parent company guarantees in establishing credit relationships in its trading business; (3) officers within TGPNA were required to report directly to TGPL and Total superiors rather than, or in addition to, TGPNA's own management; (4) TGPL retained extraordinary administrative control over the daily operation of critical business components such as IT systems and TGPNA's trading book;

(5) officers of Total and TGPL participated in biweekly steering committee meetings with TGPNA personnel where they discussed TGPNA trading issues, including positions and market views; and (6) officers at TGPL participated in setting the trading strategies and budget of TGPNA, and approved certain staffing decisions as well as the structure of TGPNA's trade floor.

126.    The interconnectedness of Total, TGPL, and TGPNA makes clear that these entities did not act as independent corporations, but rather as a single profit-seeking enterprise.

127.    There was a unity of interest between Total, TGPL, and TGPNA, and lack of respect of the independence of TGPNA by Total and TGPL. Total and TGPL viewed TGPNA for what it was—the "Houstonian trading office" of Total's Gas & Power Division. And Total and TGPL, jointly and separately, treated it as such, managing all aspects of TGPNA's operations, ranging from trading limits to personnel issues and IT infrastructure. TGPNA relied on Total and TGPL for the day-to-day functioning of its business. For example, TGPNA's trading authority and limits flowed directly from Total headquarters in Paris, while TGPL set TGPNA's risk limits by allocating to it some portion of the global limits set by Total. Officers at TGPNA reported directly to Total and TGPL, and officers at TGPL participated in regular discussions about TGPNA's trading strategies and budget and approved certain staffing decisions. TGPL also controlled many aspects of TGPNA's daily operations, including its IT infrastructure and trading book. TGPNA also relied on Total and TGPL for capital. In addition, as discussed above, officers and directors of TGPL and Total received notice of, and participated in meetings about, Craven's concerns about compliance.

128.    TGPNA was under-capitalized relative to the market harm its illegal conduct caused. FERC Report at 79-80.

129. Consistent with what FERC Enforcement observed in its Report, under these facts, adhering strictly to the corporate form and ignoring TGPNA's connection with and reliance on Total and TGPL would frustrate the purpose of the antitrust laws and public policy to effectively police and sanction manipulative conduct because Total has the power to turn any damages assessment against TGPNA into a nullity. As FERC Enforcement observed, not treating these companies as a single entity could allow Total to simply pull funds out of (or close) TGPNA's operations if faced with a penalty for violating United States law (whether market manipulation or otherwise). Treating the organizations as a single entity "would prevent this large multinational corporation from enabling its smaller 'Houstonian trading office' to manipulate natural gas markets for years—by deploying their substantial resources and reputation to underwrite TGPNA—and then avoiding the consequences by shutting it down and moving its assets back to Paris".

130. In addition, respecting the corporate form here would frustrate Congress's statutory mandate to effectively sanction violations of the antitrust laws because, as FERC Enforcement also observed, the magnitude of TGPNA's illegal conduct "could not have been achieved but for Total's and TGPL's resources and reputation."

## V. CLASS ACTION ALLEGATIONS

131. Plaintiff brings this action on behalf of itself, and all others similarly situated, as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure. The Class consists of: Any individual or entity that held any contract which settled against the NGI or Platts published Monthly Index Prices for natural gas at either SoCal, Permian, Waha or San Juan during the point months and hubs identified in Exhibit A hereto between July 1, 2009 to July 31, 2012 (the "Class Period"), and was damaged by movements in such Monthly Index Prices caused by

TGPNA's unlawful scheme (the "Class").  Excluded from the Class are TGPNA and any parent, subsidiary, affiliate, agent or employee of TGPNA.

132.    Plaintiff also brings this action on behalf of a Sub-Class of Class members who reside or are incorporated in California.

133.    The Class and Sub-Class are so numerous that the individual joinder of all members is impracticable.

134.    Common questions of law and fact exist as to all members of the Class and Sub-Class and predominate over any questions that affect only individual members of the Class and Sub-Class.  These common questions of law and fact include, without limitation:

a.    Whether TGPNA acquired or attempted to acquire monopoly power over the Monthly Index Prices set in the Relevant Markets in violation of the Sherman Act;

b.    Whether TGPNA is liable to the members of the Sub-class under California Business and Professions Code §17200 *et seq.*

c.    Whether such injury or the extent of such artificiality in price may be established by common, class-wide means, including, for example, econometric formula, or other economic tests;

d.    Whether TGPNA unjustly enriched itself or is otherwise responsible for disgorgement/restitution under applicable state law;

e.    The responsibility of TGPNA's parent company Defendant Total, S.A. and TGPNA's affiliated company Total Gas & Power, Ltd. for liability to the Plaintiff Class and Sub-Class for the wrongful conduct of TGPNA described herein; and

f.    The measure of appropriate relief.

135.     Plaintiff's claims are all typical of the claims of the members of the Class and Sub-Class.  Plaintiff and all members of the Class and Sub-Class sustained damages arising out of TGPNA's common course of conduct in violation of law as complained of herein. FERC Enforcement found that TGPNA made approximately 1,182 trades all as part of and in order to implement a single manipulative scheme alleged herein. The injuries and damages of each member of the Class and Sub-Class were directly caused by TGPNA's wrongful conduct in violation of law as alleged herein.

136.     Plaintiff will fairly and adequately protect the interests of the members of the Class and Sub-Class.  Plaintiff is an adequate representative of the Class and Sub-Class and has no interests which are adverse to the interests of absent Class or Sub-Class members. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex class action litigation, including commodity futures manipulation, energy market manipulation, Sherman Act Section 2 litigation, and class action litigation in general.

137.     A class action is superior to other methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of claims by many class members who could not afford individually to litigate claims such as those asserted in this Complaint.  The cost to the court system of adjudication of such individualized litigation would be substantial.  The prosecution of separate actions by individual members of the Class or members of the Sub-Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    CLAIMS FOR RELIEF

### COUNT I
**(Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

138.    Plaintiff re-alleges and incorporates all other paragraphs of this Complaint as though set forth herein.

139.    A market is monopolized when a party possesses monopoly power and that monopoly power has been willfully acquired or maintained by anticompetitive conduct.

140.    TGPNA acquired and maintained monopoly power in the Relevant Markets not through competition on the merits but through the anticompetitive course of conduct alleged herein. It was repeatedly able to override the competitive setting of Monthly Index Prices to manipulate them in favor of its large positions in Monthly Index swap contracts, the value of which depended on the value of the Monthly Index.  Specifically, TGPNA knowingly entered into swap contracts which would benefit from movements in the Monthly Index Prices and thereafter engaged in money-losing purchases and sales of next-month fixed price contracts for natural gas for the hubs and periods set forth in Exhibit A hereto to artificially change the Monthly Index Prices and prevent them from being determined by the normal forces of supply and demand which otherwise would have determined such prices in the absence of TGPA's wrongful conduct.  It exercised its monopoly power in order to, and did, control and manipulate the Monthly Index Prices during the point months and at the hubs listed on Exhibit A hereto in TGPA's favor as desired, and thereby make overall greater profits from the manipulation of the Monthly Index Prices.

141.    Through its wrongful conduct as alleged herein, TGPA willfully acquired, maintained and exercised the power to monopolize and to profitably increase or decrease the Monthly Index Prices in the Relevant Markets, and TGPNA did monopolize and profitably increase or decrease such Monthly Index Prices, in violation of Section 2 of the Sherman Act.

142.    The areas of trade or commerce which TGPNA monopolized were the markets for determining the Monthly Index Prices for natural gas for the hubs and periods set forth in Exhibit A, which monopolization prevented a competitive setting of prices for the sale of natural gas under pre-existing contracts that settled against such Monthly Index Prices and the prices payable under financial contracts that settled against such Monthly Index Prices.  During the Class Period, prices under contracts that settled against or were tied to the Monthly Index Prices at the manipulated locations during the Class Period did not result from legitimate market information, supply factors, and demand factors.  On the contrary, the prices were manipulated by TGPNA's misconduct as detailed above.

143.    As a result of TGPNA's unlawful course of conduct in violation of Section 2 of the Sherman Act as set forth herein, Plaintiff has been injured in its business or property as alleged herein.

### COUNT II
**(Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

144.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

145.    An attempt to monopolize occurs when a person (a) engages in anticompetitive conduct (b) with a specific intent to monopolize (c) presenting a dangerous probability of achieving monopoly power.

146.    The manipulative course of conduct engaged in by TGPNA described herein was anticompetitive in that it prevented the Monthly Index Prices from being set by competitive forces by engaging in money losing uneconomic next-month fixed price contract transactions which losses it recouped through profits on its Monthly Index swap contracts that were dependent on the Monthly Index Prices.

147.   TGPNA had a specific intent to monopolize the Relevant Markets as evidenced by the communications among TGPNA's traders described above as well as the nature of their trading strategy and activities, as herein alleged.

148.   Such course of conduct had a dangerous probability of achieving monopoly power over the Relevant Markets.  By such conduct, TGPNA was able to prevent the Monthly Index Prices from being set by freely-competitive forces during 38 point months over a three year period for four of the most significant trading locations in the western U.S. at the time.

149.   Through its course of conduct TGPNA, at a minimum, attempted to monopolize the Monthly Index Prices in the Relevant Markets, in violation of Section 2 of the Sherman Act.

150.   As  a result of such violation, Plaintiff and the members of the Class have been injured in their business or property as alleged herein.

**COUNT III**
**(Violation of California Business & Professions Code Section 17200, *et. seq.*)**

151.   TGPNA's unfair, unconscionable, deceptive or fraudulent acts and practices described in this Complaint directly and proximately caused and were intended to cause Plaintiff and the members of the Sub-Class to pay higher supra-competitive prices, or receive lower and subcompetitive market-derived prices, as the case maybe, under pre-existing contracts that settled based on market-derived Monthly Index Prices which TGPNA manipulated.  During the Class Period, prices under contracts that settled against or were tied to the Monthly Index Prices at the manipulated locations during the Class Period did not result from legitimate market information, supply factors, and demand factors.  On the contrary, the prices were manipulated by TGPNA's misconduct as detailed above.

152.    TGPNA's unfair, unconscionable, deceptive or fraudulent acts and practices described in this Complaint are in violation of California's consumer protection and unfair competition statute, Business and Professions Code §17200 *et seq*.

153.    As a direct and proximate result of TGPNA's unlawful conduct, the members of the Sub-Class have been injured in their business and property as alleged herein.

154.    The Sub-Class members seek restitution and/or monetary recoveries permitted under California law as referenced herein for these injuries.

### COUNT IV
### (Unjust Enrichment)

155.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

156.    TGPNA has been unjustly enriched as a result of the conduct complained of herein.

157.    It would be inequitable for TGPNA to retain the benefit of illicitly obtained monies that were obtained at the expense of the Plaintiff Class members as alleged herein.

158.    Plaintiff and the members of the Class seek restitution with respect to, and/or disgorgement of, all illicitly obtained monies and profits obtained by TGPNA through its willful acts either as damages or restitution.

### COUNT V
### (Total S.A.'s and Total Gas & Power, Ltd.'s Liability for TGPNA's Conduct)

159.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

160.    TGPNA is a mere instrumentality or alter ego of TGPL and Total, and TGPL is a mere instrumentality or alter ego of Total. TGPNA, TGPL and Total operated as a single economic entity. Total and its agent TGPL exercised exclusive domination and control over TGPNA to the point that TGPNA had no legal or independent significance of its own.

161.     Total and TGPL controlled TGPNA and used their control of TGPNA to engage in illegal market manipulation in the United States in violation of United States law for their benefit and used the corporate form of TGPNA to attempt to evade the law of the United States without financial consequence or financial responsibility to injured parties. Total and TGPL controlled TGPNA and used it to commit acts that sought to defeat the ends of justice, to perpetuate fraud, to accomplish a crime, or to otherwise evade the law.

162.     It would be unjust and unfair to allow Total and TGPL, the intended beneficiaries of TGPNA's illegal conduct, to use the corporate form of TGPNA to escape responsibility for illegal conduct and the injury caused thereby for its intended benefit under the circumstances of this case.

163.     TGPNA acted as agent for Total and TGPL in undertaking the illegal manipulative scheme and causing the injury alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment against TGPNA and the other Defendants follows:

a.     Certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and designating Plaintiff as Class Representative and its counsel as Class Counsel in this action;

b.     Adjudging and decreeing that TGPNA has engaged in conduct in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, as well as California Business and Professions Code §17200 *et seq.*;

c.      Awarding against TGPNA the damages that Plaintiff and the other members of the Class and Sub-Class have suffered as a result of TGPNA's violations, the amount of such damages to be determined at trial, trebled, plus interest, costs and attorneys' fees;

d.      Awarding against TGPNA restitution of amounts unlawfully taken from Plaintiff and all other Sub-Class members in connection with TGPNA's unlawful scheme in violation of California Business and Professions Code Section 17200, *et. seq.*;

e.      Awarding Plaintiff and the Class members the amount TGPNA is determined to have been unjustly enriched through its unlawful scheme

f.      Adjudging and decreeing that Total, S.A. and Total Gas & Power, Ltd. are jointly and severally liable to the Class and Sub-Class for the damages and awards against TGPNA set forth above, trebled, plus interest, costs and attorneys' fees; and

g.      Awarding Plaintiff and the Class members such other and further relief to which they may be legally entitled and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  September 19, 2019

Respectfully submitted,

Jeffrey A. Klafter
KLAFTER OLSEN & LESSER LLP
2 International Drive. Suite 350
Rye Brook, NY 10573
Telephone: (914) 934-9200

Solomon B. Cera
Pamela A. Markert
CERA LLP
595 Market Street, Suite 1350
San Francisco, CA 94105
Telephone: (415) 777-2230

Daniel J. Sponseller
LAW OFFICE OF DANIEL J. SPONSELLER
409 Broad Street
Suite 200
Sewickley, PA 15143
Telephone: (412) 741-4422

*Attorneys for Plaintiff and the Proposed Class*

EXHIBIT A

**EXHIBIT A**

| Location | Bidweek Period | Direction of Manipulation |
|---|---|---|
| Waha | Jul-09 | Upward |
| Waha | Dec-09 | Upward |
| Waha | Mar-10 | Upward |
| Waha | Apr-10 | Downward |
| Waha | May-10 | Upward |
| Waha | Mar-11 | Downward |
| Waha | Apr-11 | Upward |
| Waha | May-11 | Upward |
| Waha | Sep-11 | Upward |
| Waha | Oct-11 | Upward |
| Waha | Nov-11 | Upward |
| Waha | Jan-12 | Downward |
| Waha | Feb-12 | Upward |
| Waha | Jun-12 | Upward |
| Waha | Jul-12 | Downward |
| SoCal | Sep-09 | Downward |
| SoCal | Oct-09 | Upward |
| SoCal | Apr-10 | Upward |
| SoCal | Jan-11 | Upward |
| SoCal | Jul-11 | Upward |
| SoCal | Aug-11 | Upward |
| SoCal | Oct-11 | Upward |
| SoCal | Nov-11 | Downward |
| SoCal | Dec-11 | Upward |
| SoCal | Jan-12 | Upward |
| SoCal | Apr-12 | Upward |
| Permian | Dec-09 | Downward |
| Permian | Mar-10 | Downward |
| Permian | May-10 | Downward |
| Permian | Jun-11 | Downward |
| Permian | Aug-11 | Upward |
| Permian | Sep-11 | Downward |
| Permian | Oct-11 | Downward |
| Permian | May-12 | Upward |
| San Juan | May-10 | Downward |
| San Juan | Mar-11 | Downward |
| San Juan | Dec-11 | Downward |
| San Juan | Apr-12 | Downward |