**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
:
CITY OF LONG BEACH, on behalf of itself
and all others similarly situated,                    :
:
                   Plaintiff,                          :
:
         v.                                            :
:         Civil Action No. 1:19-cv-08725-LAK
TOTAL GAS & POWER NORTH                               :
AMERICA, INC.; TOTAL, S.A.; and TOTAL                 :
GAS & POWER, LTD.                                     :
:
                   Defendants.                         :
:
:
-------------------------------------------------------x


**DEFENDANT TOTAL GAS & POWER NORTH AMERICA, INC.'S**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION .................................................................................................. 1

II.  BACKGROUND .................................................................................................. 3

    A.   The Natural Gas Markets and Pricing ................................................................ 3

    B.   The Scheme Alleged By FERC Staff ................................................................ 4

    C.   Prior SDNY Class Action .................................................................................. 6

    D.   The Parties to This Lawsuit .............................................................................. 7

III. LEGAL STANDARD ........................................................................................... 8

IV.  ARGUMENT ........................................................................................................ 9

    A.   Plaintiff Lacks Article III Standing .................................................................... 9

    B.   Plaintiff's Claims Are Time-Barred ................................................................... 11

        1.   All Claims Accrued More Than Seven Years Before This Action. .......... 11

        2.   Plaintiff's Empty Assertions of Fraudulent Concealment Do Not Save Its Untimely Claims. ......................................................................... 12

            a)   Plaintiff Has Not Adequately Alleged That TGPNA's Purported Misconduct Was Self-Concealing. ............................... 12

            b)   Plaintiff Has Not Plausibly Alleged That TGPNA Concealed Any Purported Misconduct. ....................................... 13

            c)   Plaintiff Does Not Plausibly Allege the Diligence Element of Fraudulent Concealment. .......................................................... 14

    C.   All Allegations Traced to The FERC Accusations Are Immaterial Under Rule 12(f) And Thus All Claims Should Be Dismissed. ....................................... 16

    D.   Plaintiff's Sherman Act Claims Must Be Dismissed Because Plaintiff Fails to Allege Antitrust Standing. .......................................................................... 16

        1.   Plaintiff Fails to Allege Antitrust Injury. ................................................. 16

            a)   Plaintiff Fails to Adequately Allege It Suffered Any Injury ......... 17

            b)   Plaintiff Fails to Allege a Type of Injury that the Antitrust Laws Were Intended to Prevent. ................................................... 19

        2.   Plaintiff is Not an Efficient Enforcer of the Antitrust Laws. ................... 20

            a)   Plaintiff Cannot Allege Direct Injury. ......................................... 21

            b)   There Are More Direct Alleged Victims. ..................................... 22

            c)   Plaintiff's Alleged Damages Are Highly Speculative. ................. 23

**TABLE OF CONTENTS** *(continued)*

Page

        d)     Plaintiff Seeks Duplicative Recovery. ........................................... 24

E.    Plaintiff Has Not Alleged A Plausible Claim for Unlawful Monopolization or Attempted Monopolization. ................................................................................. 25

    1.    Plaintiff Fails to Allege Monopoly Power. .................................. 25

    2.    Plaintiff Fails to Allege Intent to Acquire or Maintain Monopoly Power. ...................................................................... 28

    3.    Plaintiff Fails to Allege Attempted Monopolization For the Same Reasons. .................................................................................... 29

F.    Plaintiff's State Law Claims Fail. ........................................................................ 29

    1.    Plaintiff Fails to State A Claim Under California's Unfair Competition Law. ......................................................................... 30

    2.    Plaintiff's Unjust Enrichment Claim Fails On Multiple Bases ................ 31

        a)     Plaintiff's Unjust Enrichment Claim Fails Under California Law. ............................................................................ 32

        b)     Plaintiff's Unjust Enrichment Claim Fails Under New York Law. ............................................................................ 33

V.    CONCLUSION ............................................................................................................. 33

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
   314 F. Supp. 3d 497 (S.D.N.Y. 2018) .......................................................................24

*Aguiar v. Merisant Co.*,
   2014 WL 6492220 (C.D. Cal. Mar. 24, 2014) .........................................................32

*Matter of Allstate Ins. Co.*,
   81 N.Y.2d 219 (N.Y. 1993) ......................................................................................32

*In re Aluminum Warehousing Antitrust Litig.*,
   2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) .....................................................20, 26

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016) ......................................................................................16

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
   802 F. Supp. 2d 1070 (N.D. Cal. 2011) ...................................................................32

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983) ........................................................................................13

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................................8

*Azad v. Tokio Marine HCC-Med. Ins. Servs. LLC*,
   2017 WL 3007040 (N.D. Cal. July 14, 2017) ..........................................................32

*Bank of the West v. Sup. Ct.*,
   2 Cal. 4th 1254 (1992) ..............................................................................................30

*Baur v. Veneman*,
   352 F.3d 625 (2d Cir. 2003) .....................................................................................8, 9

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
   813 F. Supp. 2d 569 (S.D.N.Y. 2011) .....................................................................29

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955 (2007) ....................................................................8, 18

*Bentley v. Dennison*,
   852 F. Supp. 2d 379 (S.D.N.Y. 2012) ........................................................................9

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Birdsong v. Apple, Inc.*,
590 F. 3d 955 (9th Cir. 2009) ...............................................................30

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
985 F. Supp. 2d 612 (S.D.N.Y. 2013)....................................................27

*Brown Shoe Co. v. United States*,
370 U.S. 294, 82 S. Ct. 1502 (1962).......................................................19

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477, 97 S. Ct. 690 (1977).................................................16, 19

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)......................................................................9

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
2013 WL 1100770 (S.D.N.Y. Mar. 18, 2013) ("*Silver Futures*") ....................26, 27

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005)....................................................................20

*Dial Corp. v. News Corp.*,
2016 WL 462515 (S.D.N.Y. Jan. 15, 2016) ...........................................27

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
631 F.3d 42 (2d Cir. 2011).......................................................................33

*Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
612 F. Supp. 2d 330 (S.D.N.Y. 2009)....................................................27

*Fed. Deposit Ins. Corp. v. Dintino*,
84 Cal. Rptr. 3d 38 (CA App. Ct. 2008) ................................................11

*Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*,
368 F. Supp. 3d 681 (S.D.N.Y. 2019).............................................14, 17

*In re Ford Tailgate Litig.*,
2014 WL 1007066 (N.D. Cal. Mar. 12, 2014).......................................32

*FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*,
2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ("*SIBOR*").............................19, 21

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
711 F.3d 68 (2d Cir. 2013)................................................................20, 22

# TABLE OF AUTHORITIES *(continued)*

Page(s)

*Gelboim v. Bank of Am. Corp.*,
823 F.3d 759 (2d Cir. 2016) .................................................................21, 22, 23, 24

*Georgia Malone & Co., Inc. v. Rieder*,
19 N.Y.3d 511 (2012) .......................................................................................33

*In re GSE Bonds Antitrust Litig.*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019) ..................................................................11

*Ham v. Hain Celestial Grp., Inc.*,
70 F. Supp. 3d 1188 (N.D. Cal. 2014) ..................................................................32

*Harry v. Total Gas & Power N. Am., Inc.*,
244 F. Supp. 3d 402 (S.D.N.Y. 2017) ("*Total Gas I*") ..................................2, 6, 17

*Harry v. Total Gas & Power N. Am., Inc.*,
889 F.3d 104 (2d Cir. 2018) ("*Total Gas II*") ............................................... *passim*

*Hart v. BHH, LLC*,
2016 WL 2642228 (S.D.N.Y. May 5, 2016) .........................................................32

*Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*,
61 Cal. 4th 988 (2015) .......................................................................................33

*Hill v. Roll Internet. Corp.*,
195 Cal. App. 4th 1295 (Cal. App. 2011) ............................................................32

*Hinds County, Miss. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009) ..................................................................12

*Hinds County, Miss. v. Wachovia Bank N.A.*,
700 F. Supp. 2d 378 (S.D.N.Y. 2010) ...................................................................8

*Ingrami v. Rovner*,
45 A.D.3d 806 (2d Dep't 2007) .........................................................................11

*Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*,
812 F.2d 786 (2d Cir. 1987) ..............................................................................29

*Kraus v. Trinity Mgmt. Servs., Inc.*,
23 Cal. 4th 116 (2000) .......................................................................................31

*Labajo v. Best Buy Stores, L.P.*,
478 F. Supp. 2d 523 (S.D.N.Y. 2007) ..................................................................31

## TABLE OF AUTHORITIES *(continued)*

Page(s)

*Laydon v. Mizuho Bank, Ltd.*,
  2014 WL 1280464 (S.D.N.Y. Mar. 28, 2014) ("*Laydon I*").......................................17, 20, 23

*Laydon v. Mizuho Bank, Ltd.*,
  2017 WL 1093288 (S.D.N.Y. Mar. 10, 2017) ("*Laydon III*").................................................11

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
  935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("*LIBOR I*").............................................................33

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
  962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("*LIBOR II*") ...........................................................17

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
  27 F. Supp. 3d 447 (S.D.N.Y. 2014) ("*LIBOR III*") ............................................................18

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*")..................................................13

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") ...............................21, 22, 23, 24

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ("*LIBOR VII*")......................................................21, 23

*In re: LIBOR-Based Fin. Instruments Antitrust Litig.*,
  2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ("*LIBOR VIII*") ..............................................21

*In re: LIBOR-Based Fin. Instruments*,
  2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016).................................................................10, 11

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016) ("*Silver I*")..............................................................33

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  332 F. Supp. 3d 885 (S.D.N.Y. 2018) ("*Silver II*") ...............................................19, 21, 23, 24

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S. Ct. 2130 (1992)..................................................................................9

*Mandarin Trading Ltd. v. Wildenstein*,
  16 N.Y.3d 173 (2011) .......................................................................................................33

*Manning Int'l Inc. v. Home Shopping Network, Inc.*,
  152 F. Supp. 2d 432 (S.D.N.Y. 2001)................................................................................32

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Melchior v. New Line Prod., Inc.*,
    106 Cal. App. 4th 779 (2003) ...................................................................................32

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)........................................................................................8

*Morrison v. Nat'l Austl. Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008).......................................................................................8

*Moss v. Infinity Ins. Co.*,
    197 F. Supp. 3d 1191 (N.D. Cal. 2016) ...................................................................30

*Munning v. The Gap, Inc.*,
    238 F. Supp. 3d 1195 (N.D. Cal. 2017) ...................................................................30

*Natsource LLC v. GFI Grp., Inc.*,
    332 F. Supp. 2d 626 (S.D.N.Y. 2004).....................................................................29

*NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012).....................................................................................11

*New York v. Hendrickson Bros.*,
    840 F.2d 1065 (2d Cir. 1988)..............................................................................12, 13

*Park v. Cytodyne Tech., Inc.*,
    2003 WL 21283814 (Cal. Sup. Ct. 2003) ................................................................31

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)................................................................................25, 27

*In re Platinum & Palladium Antitrust Litig.*,
    2017 WL 1169626 (S.D.N.Y Mar. 28, 2017) ("*Platinum & Palladium*") .................19, 21, 24

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007)......................................................................................20

*Price v. L'Oreal USA, Inc.*,
    2017 WL 4480887 (S.D.N.Y. Oct. 5, 2017) ........................................................8, 32

*Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*,
    786 F. Supp. 2d 1202 (S.D. Tex. 2009) ...................................................................20

*Rio Tinto PLC v. Vale*,
    2015 WL 7769534 (S.D.N.Y. Nov. 20, 2015)....................................................14, 15

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Rubio v. Capital One Bank*,
　613 F.3d 1195 (9th Cir. 2010) ..............................................................30

*In re Scotts EZ Seed Litig.*,
　304 F.R.D. 397 (S.D.N.Y. 2015) ..........................................................33

*SEC v. Jones*,
　476 F. Supp. 2d 374 (S.D.N.Y. 2007) ...................................................12

*Sell It Soc., LLC v. Acumen Brands, Inc.*,
　2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015) ......................................20

*Shak v. JPMorgan Chase & Co.*,
　2016 WL 154119 (S.D.N.Y. Jan. 12, 2016) ..........................................28

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
　366 F. Supp. 3d 516 (S.D.N.Y. 2018) ("*Sterling LIBOR*") .............19, 21

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*,
　277 F. Supp. 3d 521 (S.D.N.Y. 2017) ("*CHF LIBOR*") ................. *passim*

*Sonterra Capital Master Fund, Ltd. v. UBS AG*,
　2017 WL 1091983 (S.D.N.Y. Mar. 10, 2017) ("*JPY LIBOR*") .................10, 11, 19

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
　903 F. Supp. 2d 942 (S.D. Cal. 2012) ...................................................32

*Spokeo, Inc. v. Robins*,
　136 S. Ct. 1540 (2016) ............................................................................9

*In re SSA Bonds Antitrust Litig.*,
　2018 WL 4118979 (S.D.N.Y. Aug. 28, 2018) ......................................17

*Sullivan v. Barclays PLC*,
　2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ..........................19, 21, 22, 23

*Todd v. Exxon Corp.*,
　275 F.3d 191 (2d Cir. 2001) ..................................................................20

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
　142 F.3d 90 (2d Cir. 1998) .........................................................25, 27, 29

*Warth v. Seldin*,
　422 U.S. 490, 95 S. Ct. 2197 (1975) .....................................................10

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*,
    178 F. Supp. 2d 1099 (C.D. Cal. 2001) .......................................................................30, 31

**Statutes**

7 U.S.C. § 25(c) .........................................................................................................................1

15 U.S.C. § 15b ........................................................................................................................11

15 U.S.C. § 717c-1 ....................................................................................................................4

Cal. Bus. & Prof. Code § 17203 .........................................................................................29, 30

Cal. Bus. & Prof. Code § 17208 ..............................................................................................11

**Rules**

CPLR 214(3)............................................................................................................................11

Fed. R. Civ. P. 9(b) ........................................................................................................8, 11, 13

Fed. R. Civ. P. 12(b)(6)............................................................................................................8

Fed. R. Civ. P. 12(f)................................................................................................................15

**Regulations**

18 C.F.R. § 1c.1 ........................................................................................................................4

## I.    INTRODUCTION

This lawsuit asserts legally insufficient claims, raised too late, by a plaintiff that lacks standing to assert them in any event.  The Court should do what the Second Circuit did when other plaintiffs raised the same allegations about the same conduct:  reject all counts as a matter of law.

Plaintiff, City of Long Beach, alleges that public trading by Defendant TOTAL Gas & Power North America, Inc. ("TGPNA") caused benchmark prices of natural gas in certain locales to be reported as higher (at times) or lower (at some other times) than otherwise would have been the case.  The alleged conduct dates back more than a decade (beginning July 2009), with the most recent allegedly occurring more than seven years ago (July 2012).[1]

The Complaint merely piggybacks on unadjudicated, preliminary accusations publicized in 2015 and 2016 by enforcement staff at the Federal Energy Regulatory Commission ("FERC").  Those staff members proposed an enforcement action for use of a manipulative or deceptive device in violation of the Natural Gas Act ("NGA").  The Commodity Futures Trading Commission ("CFTC") entered into a "neither admit nor deny" settlement with TGPNA in 2015 that also rested on purported manipulation and deception under the Commodity Exchange Act ("CEA").  Neither type of claim is available to Plaintiff here:  there is no private right of action for NGA violations; and the two-year limitations period in the CEA has long since run, *see* 7 U.S.C. § 25(c).

Plaintiff therefore brings inapt antitrust claims that cannot survive Rule 12(b)(6) scrutiny.  Plaintiff recognizes that a claim of restraint of trade among competitors is unavailable, because no competitors allegedly participated in any supposed wrongdoing.  That leaves a monopolization theory, which fails just as it did when this Court granted, and the Second Circuit affirmed, dismissal

---

[1]    The Complaint is inconsistent on when the conduct allegedly began (June versus July 2009) and ended (June versus July 2012).  *Compare, e.g.*, Compl. ¶ 1 (defining the Class Period as "between July 1, 2009 and July 31, 2012"), *with id.* ¶ 52 ("conduct from June 2009 through July 2012"), *and id.* ¶ 78 ("conduct occurred between June 2009 and June 2012").

of antitrust claims brought by other plaintiffs based on the exact same conduct.  *See Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 419-23 (S.D.N.Y. 2017) (Koeltl, J.) ("*Total Gas I*"); *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115-16 (2d Cir. 2018) ("*Total Gas II*").

The grounds for dismissal here are six-fold.  *First*, Plaintiff lacks the injury-in-fact needed for Article III standing.  It has not alleged being a net purchaser of natural gas, and it affirmatively alleges that it re-sells the gas that it buys to commercial and residential customers.  *Second*, all of Plaintiff's claims are time-barred by the applicable statutes of limitation, and Plaintiff's conclusory attempts to plead fraudulent concealment cannot salvage its untimely claims.  *Third*, the Complaint is wholly reliant on unadjudicated, preliminary accusations by FERC's enforcement staff, which, when disregarded, leave the Complaint so bare that no claim can be sustained.  *Fourth*, Plaintiff lacks antitrust standing to assert its only federal claims because it does not adequately allege either antitrust injury or that it is an efficient enforcer of the antitrust laws.  *Fifth*, Plaintiff's claims of monopolization and attempted monopolization fail because the Complaint does not plausibly allege that TGPNA possessed the requisite market power, attempted to attain such power, engaged in any exclusionary conduct, or had an anticompetitive purpose.  *Finally*, Plaintiff's pendent state law claims for unjust enrichment and violation of California's Unfair Competition Law ("UCL") fail for various reasons, including that Plaintiff alleges no relationship with TGPNA, no benefit to TGPNA at Plaintiff's expense, and no plausible harm to Plaintiff whatsoever.  For all of these reasons, Plaintiff's Complaint should be dismissed.

## II.    BACKGROUND

This lawsuit is based on unadjudicated assertions, by enforcement staff at FERC, that TGPNA employees "manipulate[d] . . . Monthly Index Prices" of natural gas on discrete occasions at four regional hubs between July 2009 and July 2012.  Compl. ¶¶ 1-2.[2]

### A.    The Natural Gas Markets and Pricing

Natural gas is a commodity that trades in "physical" and "financial" markets.  Compl. ¶ 29. In **physical** transactions, the parties agree to "actually deliver or receive physical natural gas at a particular location during a particular time."  *Id.*  The "particular location[s]" are **regional hubs** connected by pipelines.  Out of dozens of these hubs, four in the southwest are at issue here:  El Paso Natural Gas Co., Permian Basin ("**Permian**"); El Paso San Juan Basin ("**San Juan**"); Southern California Gas Co. ("**SoCal**"); and West Texas, Waha ("**Waha**").  *Id.* ¶¶ 27-28.  Physical gas trades on public exchange platforms or in over-the-counter transactions between individual parties.

In **financial** transactions, parties that seek, *e.g.*, to hedge risk or speculate, trade derivatives tied to prices of physical natural gas without "physical obligations to deliver or receive natural gas."  *Id.* ¶ 30.  These transactions take the form of standardized, exchange-traded contracts or over-the-counter derivative contracts.

Natural gas is usually traded "in units of One Million British Thermal Units" or MMBtus. *Id.* ¶ 29.  A trade of gas at a specified volume and dollar amount is considered a **fixed price** transaction.  *See id.* ¶ 31.  Parties can also agree to trade gas for future delivery at a yet-to-be-set index price.  The published indices for **monthly index prices** at the four regional hubs are *Natural Gas Intelligence's Bidweek Survey* ("**NGI**") and McGraw-Hill Platts *Inside FERC Gas Market*

---

[2]    All allegations in the Complaint are assumed true merely for the sake of this Motion.

*Report* ("**Platts**").  *Id.* ¶¶ 1, 32.  For example, A might agree with B on February 1 that, on March 5, A will deliver to B at the SoCal hub 10,000 MMBtus of gas priced at SoCal's March index price. The monthly index price is "the volume-weighted average price . . . of certain transactions made by natural gas market participants during a bidweek (as determined by the compiler and publisher of the index)."  *Id.* ¶ 31.  The **bidweek** used to determine a monthly index price for the four regional hubs is the last five trading days of the previous month.  *Id.* ¶ 32.

### B.     The Scheme Alleged By FERC Staff

On September 21, 2015, FERC issued a Staff Notice of Alleged Violations ("NAV") that publicly asserted the enforcement staff's preliminary position that TGPNA had violated the NGA and FERC regulations "by devising and executing a scheme to manipulate" gas prices at certain southwestern regional hubs.  Declaration of Brad Schoenfeldt ("Schoenfeldt Decl.") Ex. 1 (NAV); *see also id.* Ex. 2 (NGI Article, dated September 22, 2015).[3]  Plaintiff's Complaint relies heavily on the enforcement staff's mere accusations, and it repeatedly cites and references the staff's April 1, 2016 Report and Recommendation to FERC (the "Staff Report" or "Report").  *See, e.g.*, Compl. ¶¶ 33-38, 49-50, 56-57, 62, 67-68, 78, 83, 87.  The Staff Report alleges that in some months TGPNA's financial positions benefited from a higher monthly index price at a particular regional hub, while in some other months those positions benefited from a lower monthly index price at such a hub.  *Id.* ¶ 43.  According to the Report, TGPNA periodically engaged in bidweek trading activity "to impact the Monthly Index Price[s]" in order "to benefit TGPNA's related financial positions that settled against those indices."  *Id.* ¶ 35; *see also id.* ¶¶ 3-4.  The 37 months between July 2009 and July 2012, with four different hubs, yields 148 **point-months** (37 x 4 = 148).  The

---

[3]   FERC's enforcement staff alleged that TGPNA's conduct violated Section 4A of the Natural Gas Act, 15 U.S.C. § 717c-1 ("Prohibition on Market Manipulation"), and Section 1c.1 of FERC's regulations, 18 C.F.R. § 1c.1 ("Prohibition of natural gas market manipulation").

Report stated that such trading occurred during 38 of those point-months—*i.e.*, about one out of four. *Id.* ¶¶ 34-35. The Report acknowledges that TGPNA traded at "market prices," Staff Report at 70—*i.e.*, it bought and sold within the bid-ask ranges generated by other parties on public exchanges. The enforcement staff's theory is that TGPNA was "not motivated to receive the highest price or pay the lowest price for their gas" during relevant point-months. *Id.* at 37.

On April 28, 2016, FERC issued an Order to Show Cause "premised on" the Staff Report. Compl. ¶ 38. On July 12, 2016, TGPNA submitted its Answer contesting the enforcement staff's allegations and denying all wrongdoing. *See* Schoenfeldt Decl. Ex. 3 ("TGPNA's FERC Answer"). Among other things, TGPNA explained that (1) FERC's enforcement staff had improperly viewed TGPNA's fixed price trades in isolation when they were part of a broader, legitimate strategy to create market positions by combining different forms of risk via transactions in both physical and financial products; and (2) the Staff Report's theory was inconsistent with TGPNA's trade data as a whole. *Id.* at 43-64. FERC has taken no further action since TGPNA submitted its Answer in July 2016.[4]

TGPNA's "West Desk" traders in Houston, "like traders elsewhere, used market fundamentals to understand and manage the risk associated with trading natural gas and its derivatives." *Id.* at 3. They sought profits from, among other things, trading on the price differential between the market price of natural gas on the New York Mercantile Exchange ("NYMEX"), which is determined by settlement prices at Henry Hub, Louisiana, the nation's largest natural gas distribution point, and the market price of natural gas at a specific physical location. *Id.*; Staff Report at 15-16. This difference between the NYMEX price and the price at a

---

[4]   As explained in footnote 2 of the Motion to Strike filed contemporaneously with this Motion, if FERC pursues enforcement, it will need to litigate that action in federal court.

regional hub is known in the industry as "physical basis."  TGPNA's FERC Answer at 3; Staff Report at 14-16.  Trading physical basis is entirely legitimate and may occur as a result of identified instances of mispricing or arbitrage opportunities at different locations.  TGPNA's FERC Answer at 3.  In fact, physical basis is routinely traded as a product in the eastern U.S.  Significantly, though, physical basis is traded much less frequently as a standalone product in the West.  *Id.*; Staff Report at 14 n.69.  "In order to trade the equivalent of physical basis in the West, TGPNA's traders combined trades of different products, including fixed price [natural gas], to replicate the risk of a physical basis trade."  TGPNA's FERC Answer at 3.  Typically, TGPNA bought or sold a fixed price product and then traded an equal volume of NYMEX in the opposite direction, thus offsetting the NYMEX risk assumed through the fixed price trade.[5]  *Id.*  As a result, TGPNA, through completely legitimate means, was left with the physical basis risk that it desired.  *Id.*

### C.        Prior SDNY Class Action

In March 2017, this Court dismissed a putative class action alleging the same conduct against the same defendants.  *See Total Gas I*, 244 F. Supp. 3d at 406.  Those plaintiffs brought claims under the CEA and, as here, the Sherman Act.  *Id.* at 411.  Also like here, those plaintiffs relied extensively on the Staff Report for their allegations.  *Id.* at 409-11.  The earlier plaintiffs traded natural gas futures contracts.  *Id.* at 409.  Judge Koeltl ruled, *inter alia*, that they failed to plausibly allege economic injury, specific intent, antitrust injury, and the efficient enforcer element of antitrust standing.  *Id.* at 413, 418, 420, 423.  The Second Circuit affirmed in a published opinion.  *Total Gas II*, 889 F.3d at 107.

---

[5]   In connection with such transactions, traders bought and sold gas at prices that were attractive in relative terms (*i.e.*, based on how both products were moving in relation to each other) instead of in isolation.  *See, e.g.*, TGPNA's FERC Answer at 12-13, 52, 59-62.

### D.      The Parties to This Lawsuit

Defendant TGPNA is a Delaware corporation, headquartered in Texas, that trades in the U.S.'s physical and financial natural gas markets.  Compl. ¶ 18.  TGPNA is an indirect, wholly-owned subsidiary of defendant TOTAL S.A. ("TOTAL"), a publicly-traded oil and gas company headquartered in France.  *Id.*  Neither TOTAL nor the third defendant here, Total Gas & Power, Ltd. ("TGPL"), have U.S. operations, and neither had been served with the Complaint as of the time the schedule for this Motion was set.  Thus, although the allegations against TOTAL and TGPL are wholly derivative of those against TGPNA, this Motion is on behalf of TGPNA only.

Plaintiff, City of Long Beach, is a California municipality.  It sues on behalf of "[a]ny individual or entity that held any contract which settled against the NGI or Platts published Monthly Index Prices for natural gas at either SoCal, Permian, Waha or San Juan during the point months and hubs identified in Exhibit A" to the Complaint "between July 1, 2009 to July 31, 2012 . . . , and was damaged by movements in such Monthly Index Prices caused by TGPNA's unlawful scheme" (the "Class").  Compl. ¶ 131.

Plaintiff alleges that it "purchased natural gas during the Class Period under pre-existing contracts with a joint exercise of powers agency which is a public entity of the State of California, which settled against the Monthly Index Price for natural gas delivered in the trading hub known as SoCal during the months in which TGPNA manipulated that hub."  *Id.* ¶ 17.  But the Complaint is missing every basic attribute of Plaintiffs' *own* transactions:  the date, the quantity, the price, and the seller of any gas Plaintiff purchased under any contract.  *See id.*  Plaintiff also does not identify the "joint exercise of powers agency" or allege that this agency or Plaintiff transacted, or had any other relationship, with TGPNA.  *See id.*

### III.    LEGAL STANDARD

Plaintiff bears the burden to establish Article III standing and "cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003).  Rather, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation marks and citation omitted).

To survive dismissal under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)).  A complaint must contain more than "conclusory statements" or "naked assertions devoid of further factual enhancement." *Id.* (quotation marks, alteration, and citation omitted).  And if a complaint pleads facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. at 1966).

The Complaint, including the allegations that defendants fraudulently concealed manipulative trading, is subject to the heightened pleading requirements of Rule 9(b) for fraud allegations. *See* Fed. R. Civ. P. 9(b); *see also Price v. L'Oreal USA, Inc.*, 2017 WL 4480887, at *3 (S.D.N.Y. Oct. 5, 2017) ("Rule 9(b)'s pleading requirements apply when there are factual allegations of fraud regardless of the cause of action.") (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010)); *Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F. Supp.

2d 378, 399 (S.D.N.Y. 2010) ("A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Rule 9(b).").[6]

## IV.    ARGUMENT

### A.    Plaintiff Lacks Article III Standing.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the U.S. Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136 (1992).  Plaintiff does not adequately allege that it "suffered an injury-in-fact that is fairly traceable to the challenged action of [TGPNA], and which is likely to be redressed by the requested relief." *Baur*, 352 F.3d at 632.  Indeed, Plaintiff's own statements affirmatively concede that it was not harmed by TGPNA's conduct.

Plaintiff "must clearly allege facts demonstrating" that it experienced losses as a result of TGPNA's purported manipulation of the monthly index prices at the regional hubs during specific point-months.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (alterations and internal quotation marks omitted).  But Plaintiff fails to provide even the most rudimentary information about its purported natural gas transactions, including dates, prices, and amounts.  *See* Compl. ¶ 17.  Without such information, Plaintiff is left with "conclusory allegations" about impacts from the alleged conduct.  *See Baur*, 352 F.3d at 637.

That failing is fatal when combined with the absence of an allegation that Plaintiff was harmed when the totality of its gas transactions are accounted for.  Plaintiff admits it sells the

---

[6]   In addition to matters that are attached to the Complaint or incorporated by reference, the Court may consider "matters of which judicial notice may be taken" when evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also Bentley v. Dennison*, 852 F. Supp. 2d 379, 382 n.5 (S.D.N.Y. 2012) ("Judicial notice of public records is appropriate—and does not convert a motion to dismiss into a motion for summary judgment—because the facts noticed are not subject to reasonable dispute and are capable of being verified by sources whose accuracy cannot be reasonably questioned."), *aff'd sub nom. Betances v. Fischer*, 519 F. App'x 39 (2d Cir. 2013).

natural gas that it buys.  *See* Compl. ¶ 17 (stating Plaintiff is "engaged in the business of purchasing, selling and distributing natural gas" to residential and commercial customers). Without an allegation that Plaintiff was, at a minimum, a *net* purchaser (*i.e.*, bought more than it sold), it lacks standing.  *See, e.g.*, *In re: LIBOR-Based Fin. Instruments*, 2016 WL 1558504, at *8 (S.D.N.Y. Apr. 15, 2016) (finding it essential that "named plaintiffs held a net position consistent with injury").  Indeed, Plaintiff publicly states that its "cost of natural gas purchased at the SoCal CityGate Hub is passed directly onto [it]s customers with absolutely no added cost," and that its customers' "gas utility rates include . . . the cost of the natural gas commodity charged by our suppliers."  Schoenfeldt Decl. Exs. 4, 5.[7]

Plaintiff separately cannot establish standing for any allegations beyond the SoCal hub. Plaintiff does not allege that it ever engaged in any transactions in Permian, Waha, or San Juan gas.  *See* Compl. ¶¶ 12, 17.  Allegations extending to those hubs must be dismissed for lack of standing on that ground alone.  *See Warth v. Seldin*, 422 U.S. 490, 502, 95 S. Ct. 2197, 2207 (1975) (plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class"); *see also In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *8 ("[P]laintiffs have failed to show that claims for which no named plaintiff suffered an injury can survive."); *Sonterra Capital Master Fund, Ltd. v. UBS AG*, 2017 WL 1091983, at *3 (S.D.N.Y. Mar. 10, 2017) ("*JPY LIBOR*").  Plaintiff cannot

---

[7]   The Second Circuit found that the plaintiffs in the earlier class action had Article III standing despite certain other failings, including the fact that the alleged scheme moved prices in different directions in different months.  *Total Gas II*, 889 F.3d at 110-11.  TGPNA thus preserves, without unnecessary elaboration on, the argument currently foreclosed by *Total Gas II* that the same failing deprives Plaintiff of Article III standing here.  *See* Compl. ¶ 2 (alleging manipulation of prices "up or down," depending on the point-month).

avoid that outcome by bringing a class action.  *See, e.g.*, *Laydon v. Mizuho Bank, Ltd.*, 2017 WL 1093288, at *3 (S.D.N.Y. Mar. 10, 2017) ("*Laydon III*").[8]

### B.    Plaintiff's Claims Are Time-Barred.

Dismissal is separately warranted because Plaintiff's claims are time-barred.

### 1.    All Claims Accrued More Than Seven Years Before This Action.

Plaintiff alleges conduct between July 2009 and July 2012.  Compl. ¶ 1.  Plaintiff filed its Complaint on September 19, 2019, more than seven years after the latest of the acts that allegedly injured Plaintiff.  *See* Dkt. 1; *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 367 (S.D.N.Y. 2019) ("An antitrust action accrues and the statute of limitations begins to run when the defendant commits an act that injures the plaintiff.").  The longest limitations period here is four years.  *See* 15 U.S.C. § 15b (four-year limitations period for private Sherman Act claims); Cal. Bus. & Prof. § 17208 (four years for UCL claims); *Fed. Deposit Ins. Corp. v. Dintino*, 84 Cal. Rptr. 3d 38, 50 (CA App. Ct. 2008) (three years for unjust enrichment claim).[9]

---

[8]    Plaintiff would have to show that class members' injuries implicate "the same set of concerns" and that the named plaintiff "personally has suffered some actual injury as a result of the putatively illegal conduct." *Sonterra Capital Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 544 (S.D.N.Y. 2017) ("*CHF LIBOR*") (quoting *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012) (internal quotation marks and alterations omitted)).  Courts in this district have found this test unmet where, as here, the other transactions had different attributes, including allegedly episodic manipulation in varying directions.  *See, e.g.*, *Laydon III*, 2017 WL 1093288, at *3 ("Plaintiffs allege that [defendants] manipulated these rates upward on some days [and] downward on some days . . . at different periods.  Consequently, claims on behalf of absent class members will not involve the 'same set of concerns' nor would 'the proof contemplated for all of the claims . . . be sufficiently similar' as required by *NECA-IBEW*." (internal citations omitted)); *In re: LIBOR-Based Fin. Instruments*, 2016 WL 1558504, at *9 ("Proof that a [defendant] caused an artificial price one day will not determine whether it did so on another day.  Therefore, claims on behalf of absent class members . . . do not involve 'the same set of concerns' as the claims brought on behalf of named plaintiffs, and the named plaintiffs do not have class standing to bring claims on days on which they did not hold a relevant net position."); *JPY LIBOR*, 2017 WL 1091983, at *2 ("Because Plaintiff[] did not transact in [the relevant instruments], . . . [it] lack[s] standing to bring these claims.").

[9]    If New York law applied, the limitations period for unjust enrichment would still be three years.  *See* CPLR 214(3); *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007) (applying a three-year limitations period to plaintiff's unjust enrichment claim where plaintiff sought monetary relief).

### 2.    Plaintiff's Empty Assertions of Fraudulent Concealment Do Not Save Its Untimely Claims.

Plaintiff's twin conclusory assertions that TGPNA fraudulently "concealed its wrongdoing" and that Plaintiff exercised due diligence throughout the period of alleged concealment, Compl. at ¶¶ 115-16, are insufficient to toll the applicable limitations periods.

"A claim of fraudulent concealment must be pled with particularity, in accordance with the heightened pleading standards of Fed. R. Civ. P. 9(b)." *Hinds County, Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 520 (S.D.N.Y. 2009).  In particular, Plaintiff must plead:  (1) that TGPNA concealed the existence of Plaintiff's cause of action, (2) that Plaintiff remained ignorant of the cause of action until some point within the limitations period, and (3) that Plaintiff's ignorance was not attributable to a lack of due diligence. *See New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988).  The concealment element will be satisfied if either:  "the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury"; or "the wrong itself was of such a nature as to be self-concealing." *Id.*  Plaintiff has failed to satisfy either, nor has it adequately alleged the separate diligence element.

### a)    Plaintiff Has Not Adequately Alleged That TGPNA's Purported Misconduct Was Self-Concealing.

Plaintiff's mere assertion of "self-concealing" conduct, Compl. ¶ 117, fails to satisfy the requirement to plead with particularity.  All Plaintiff says here is that the "nature, existence and extent of the unlawful activity could only be discerned and uncovered by access to TGPNA's internal documents" and expert-aided review of voluminous non-public data. *Id.*  That broad assertion could only be enough if fraud were inherently self-concealing, but "allegations of fraud are generally insufficient to demonstrate that a particular act is self-concealing." *SEC v. Jones*, 476 F. Supp. 2d 374, 382 (S.D.N.Y. 2007).  Instead, a fraud is "self-concealing" only if a defendant "engaged in some misleading, deceptive or otherwise contrived action or scheme, *in the course of*

*committing the wrong*, that was designed to mask the cause of action." *Id.* (internal quotation marks and alterations omitted). "Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry." *Id.* (same). A conspiracy in which competitors agree to rig bids, for example, is quintessentially self-concealing because "a collusive bid purport[s] to reflect genuine competition" in the eyes of the victim that receives the bids from the conspirators. *Hendrickson*, 840 F.2d at 1083-84 (for the bid-rigging scheme "to endure, it must remain concealed from the victim of the collusive bids," just as "[t]he passing of a sham article as one that is genuine is an inherently self-concealing fraud").

Plaintiff points to no steps here that were intended to conceal misconduct from a counterparty to any of TGPNA's transactions. The alleged conduct instead consisted of publicly accepting a third party's "bid" or "ask" for gas during bidweek. No concealment from, or misrepresentation to, the counterparty is inherent in that conduct. And far from concealment of purchases or sales at supposedly uneconomic prices, Plaintiff's theory *depends* on TGPNA reporting those prices to a price-index publisher. *See* Staff Report at 15-16; TGPNA's FERC Answer at 118; *see also In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *115 (S.D.N.Y. Oct. 20, 2015) ("*LIBOR IV*") (explaining that alleged "LIBOR manipulation was not 'inherently self-concealing' . . . because each individual bank's LIBOR submission was published every day").

### b)   Plaintiff Has Not Plausibly Alleged That TGPNA Concealed Any Purported Misconduct.

Plaintiff also has not plausibly alleged that TGPNA actively concealed any alleged misconduct. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983) ("[Plaintiff's] generalized and conclusory allegations of fraudulent concealment do not satisfy the requirements of Fed. R. Civ. P. 9(b).").  All three supposed categories of concealment have to do with operations that

inherently remain internal to any company, whether acting properly or not.  *See* Compl. ¶ 118 (referring to internal discussions "at the office" "about bidweek strategy"); ¶¶ 110-11, 119 (internal accounting system for trades); ¶¶ 89, 120 (internal report label revised on legal advice of Covington & Burling LLP).

> ### c) Plaintiff Does Not Plausibly Allege the Diligence Element of Fraudulent Concealment.

Plaintiff also fails to adequately allege the third necessary element of fraudulent concealment:  its exercise of due diligence "throughout the period to be equitably tolled."  *Rio Tinto PLC v. Vale*, 2015 WL 7769534, at *8 (S.D.N.Y. Nov. 20, 2015).  Fraudulent concealment is not adequately pleaded if plaintiffs (1) "did not allege in the complaint that they exercised due diligence" or (2) "make no allegation of any specific inquiries of defendants, or detail when such inquiries were made, to whom, regarding what, and with what response."  *Fire & Police Pension Ass'n of Colo. v. Bank of Montreal*, 368 F. Supp. 3d 681, 703-04 (S.D.N.Y. 2019) (internal quotation marks omitted) (rejecting as conclusory the assertion that "Plaintiff and the class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered same by exercise of due diligence").

The Complaint here merely asserts, in conclusory fashion, that Plaintiff "could not with reasonable due diligence have discovered[] the facts supporting Defendants' manipulative conduct any earlier than December 7, 2015," which is the date the CFTC announced a settlement covering the conduct at issue.  Compl. ¶ 115.  Plaintiff does not say it inquired of *anyone* at any time before December 7, 2015 about having to pay prices that Plaintiff asserts were inflated due to monopolization at the SoCal hub on seven separate occasions over a three-year period.  Compl. at Ex. A.  Apart from failing to satisfy Rule 9(b)'s particularity requirements, Plaintiff ignores that the supposedly monopolistic behavior occurred in public markets subject to analysis by any market

participant.  Plaintiff mentions no effort over this lengthy period to access natural gas pricing data—from Platts, NGI, or other public sources—nor does it identify any effort to investigate the supposed changes in its purchase prices that it attributes to monopolistic manipulation of the market.  This failure is particularly notable given Plaintiff's allegation that TGPNA carried out a scheme (i) in the open through public trades; (ii) that supposedly monopolized a local market on multiple discrete occasions; (iii) for a commodity that TGPNA supposedly did not need; (iv) at prices that allegedly were abnormal and "uneconomic"; and (v) that pushed prices lower than market some months and higher than market in others, including opposite directions in consecutive months.  Compl. ¶¶ 33, 51, 54.[10]

Plaintiff simply has not plausibly alleged, with particularity, diligence "throughout the period to be equitably tolled," *Rio Tinto*, 2015 WL 7769534, at *8, a period that Plaintiff says ended on December 7, 2015, Compl. ¶ 115.  In fact, Plaintiff highlights its lack of diligence by failing to recognize that on September 21, 2015, FERC publicly announced its investigation of the same conduct.  *See* Schoenfeldt Decl. Ex. 1 (NAV); *see also id.* Ex. 2 (NGI Article, dated September 22, 2015).  And, at a bare minimum, a diligent entity in Plaintiff's shoes would have been aware of TGPNA's conduct at some point *prior to* September 21, 2015, almost exactly four years before the Complaint was filed, because FERC contacted various market participants about the subject of the investigation before its public announcement.  *See* Staff Report at 18 (TGPNA counterparties among those contacted), 98 (FERC notified at least "45 market participants" of investigation to obtain data).  Indeed, included among the parties known to have been contacted

---

[10]  Plaintiff asserts, for example, that the price at SoCal was abnormally low in September 2009, followed by abnormally high the next month.  Similarly, Plaintiff contends the price was abnormally high in October 2011, then abnormally low the next month, and then abnormally high the next two months. Compl. Ex. A.

by FERC well in advance of FERC's announcement was Southern California Gas Company ("SoCalGas"), the entity that operated the SoCal hub and transmitted to the City of Long Beach all of its natural gas. *See* Schoenfeldt Decl. ¶ 7 & Ex. 4. Plaintiff does not satisfy the pleading requirement for the diligence prong of fraudulent concealment. Finally, even accepting Plaintiff's dates for purposes of tolling, Plaintiff still failed to plead Count IV (unjust enrichment) within that claim's three-year limitations period.

### C.    All Allegations Traced to The FERC Accusations Are Immaterial Under Rule 12(f) And Thus All Claims Should Be Dismissed.

For the reasons stated in TGPNA's Motion to Strike, filed alongside this Motion, Plaintiff may not rely on unadjudicated, preliminary accusations made by FERC's enforcement staff. When those parts of the Complaint are disregarded, the Complaint is devoid of any plausible allegation as to any of Plaintiff's claims, and thus should be dismissed.

### D.    Plaintiff's Sherman Act Claims Must Be Dismissed Because Plaintiff Fails to Allege Antitrust Standing.

Above and beyond the need for Article III standing, Plaintiff must establish antitrust standing for its Sherman Act claims (Counts I and II). Plaintiff must (1) have suffered an antitrust injury and (2) be an efficient enforcer of the antitrust laws. Dismissal is required because "[a]ntitrust standing is a threshold, pleading-stage inquiry," and Plaintiff fails to adequately allege either requirement. *See In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157 (2d Cir. 2016) ("[W]hen a complaint by its terms fails to establish this requirement [a court] must dismiss it as a matter of law." (internal quotation marks omitted)).

#### 1.    Plaintiff Fails to Allege Antitrust Injury.

For the first prong, Plaintiff must allege it suffered an injury that (1) is "of the type the antitrust laws were intended to prevent," and (2) "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 697

(1977); *Total Gas II*, 889 F.3d at 115-16.  Put another way, Plaintiff "must plausibly allege: (i) an injury-in-fact; (ii) that has been caused by the antitrust violation; and (iii) that is the type of injury contemplated by the statute." *Bank of Montreal*, 368 F. Supp. 3d at 705 (alteration and internal quotations marks omitted).  Plaintiff fails to satisfy these requirements for alleging antitrust injury. That was reason alone for the Second Circuit to affirm dismissal of the antitrust claims in *Total Gas II*, and it should be reason alone here as well.  *See* 889 F.3d at 116.

### a)      Plaintiff Fails to Adequately Allege It Suffered Any Injury.

For multiple reasons, some overlapping with the Article III analysis above, Plaintiff has not plausibly alleged an injury-in-fact.  *First*, Plaintiff falls short by failing to provide any of the basic attributes for any of its own transactions:  the date, the quantity, the price, and the seller of any gas Plaintiff purchased under any contract.  *See* Compl. ¶ 17.  This omission is fatal.  *See In re SSA Bonds Antitrust Litig.*, 2018 WL 4118979, at *6 (S.D.N.Y. Aug. 28, 2018) ("[C]ourts have found no injury where the plaintiffs failed to allege any specific transactions . . . that harmed them.").  This Court has found antitrust injury allegations "insufficient" where the plaintiff did "not identify or describe a single actual transaction underlying [its] claim" or "provide any detail about" its positions, "such as when they were initiated, how long they were held, and whether [and how plaintiff] exited those positions" and at what "prices."  *Laydon v. Mizuho Bank, Ltd.*, 2014 WL 1280464, at *8 (S.D.N.Y. Mar. 28, 2014) ("*Laydon I*").  This failure is particularly inexcusable given that Plaintiff "indisputably ha[s] access to [its] own . . . trading records."  *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 621 (S.D.N.Y. 2013) ("*LIBOR II*"). The Second Circuit affirmed dismissal of identical antitrust claims in *Total Gas II*, noting "no actual injury [that] Plaintiffs allege, let alone a connection between Defendants' unlawful conduct and that non-injury."  *Total Gas II*, 889 F.3d at 116; *see also Total Gas I*, 244 F. Supp. 3d at 415-

16, 420 (no plausible allegation of actual injury for antitrust claims because, *inter alia*, plaintiffs provided no details of their own transactions). The same outcome is warranted here.

*Second*, Plaintiff's failure to plausibly allege it was a *net* purchaser, *supra* at Section IV.A, requires dismissal. *Cf. In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 466 (S.D.N.Y. 2014) ("*LIBOR III*") (amendment allowed following dismissal because plaintiffs, by listing details of specific trades, adequately "plead[ed] that they were either net purchasers . . . or that they were net sellers" depending on the direction of the alleged manipulation). Because Plaintiff fails to provide "reason to believe that any damage has occurred at all," Plaintiff's antitrust claims should be dismissed for lack of antitrust injury. *Total Gas II*, 889 F.3d at 115.

*Third*, the bi-directional nature of Plaintiff's manipulation theory means Plaintiff has failed to plead a plausible injury. The Complaint alleges that TGPNA "manipulate[d] the Monthly Index Prices in whichever way (up or down) that benefitted [TGPNA]." Compl. ¶ 2; *see also, e.g.*, *id.* ¶ 47 ("TGPNA . . . purchas[ed] or s[old] next-month gas at fixed prices during bidweek in order to increase or lower the Monthly Index Prices."). Under this theory, Plaintiff (a gas purchaser) would benefit from downward price manipulation. Where, as here, a plaintiff seeks to sue "based on episodic acts of manipulation in varying directions . . ., the unelaborated allegation that plaintiff[] transacted in the affected market at some point during the class period is not sufficient to 'nudge[] their claims across the line from conceivable to plausible.'" *CHF LIBOR*, 277 F. Supp. 3d at 571 (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974); *see also Total Gas II*, 889 F.3d at 113 (where a plaintiff alleges manipulation in both directions, it must "plead additional facts to make it plausible that the impact" of that conduct "was harmful rather than neutral or beneficial"); *see also id.* at 115 (dismissing CEA claims because, *inter alia*, "even . . . assuming that Total Gas's manipulations impacted Plaintiffs, their complaint provides just as much support for the

proposition that they were *benefited* by Total Gas's trading as for the proposition that they were *harmed* by it"; "[o]nly speculation could lead us to" "believe that any damage has occurred at all").[11]

        **b)**      **Plaintiff Fails to Allege a Type of Injury that the Antitrust Laws Were Intended to Prevent.**

The harm that Plaintiff claims to have suffered is not an anticompetitive injury, and that is all the Sherman Act was intended to prevent. *See Brunswick Corp.*, 429 U.S. at 488-89, 97 S. Ct. at 697 ("The antitrust laws . . . were enacted for the protection of competition, not competitors." (internal quotation marks omitted) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S. Ct. 1502, 1521 (1962))). At bottom, Plaintiff alleges a manipulation of prices that a publisher later compiled to report an index price, not monopolization or any other harm to *competition* itself.[12]

For its antitrust claims, Plaintiff asserts that TGPNA made natural gas purchases, during specific one-week periods in particular localities, when the market prices were relatively high. Plaintiff does not claim it was harmed by a shortage of gas from monopolization that drove up the price of gas. Rather, it asserts that the prices TGPNA paid were part of the inputs a publisher used to calculate and report an index price at which Plaintiff purchased gas. "Plaintiff fails to allege antitrust injury" with those assertions of manipulation and misleading behavior, because "Plaintiff

---

    [11]   At a minimum, Plaintiff fails to plead injury-in-fact for the three hubs at which Plaintiff never traded in gas. *See* Compl. ¶¶ 12, 17. It therefore lacks antitrust standing as to that conduct.

    [12]   Plaintiff's antitrust claims are particularly out of place because they require proof of unlawful monopolization under Sherman Act § 2. This contrasts with other purported benchmark manipulation cases in which, unlike here, the defendants allegedly conspired with competitors to restrain trade—a *per se* violation under Sherman Act § 1. *See, e.g.*, *In re London Silver Fixing, Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885 (S.D.N.Y. 2018) ("*Silver II*"); *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516 (S.D.N.Y. 2018) ("*Sterling LIBOR*"); *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, 2018 WL 4830087 (S.D.N.Y. Oct. 4, 2018) ("*SIBOR*"); *CHF LIBOR*, 277 F. Supp. 3d at 558; *JPY LIBOR*, 2017 WL 1091983, at *2; *Sullivan v. Barclays PLC*, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017); *In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626 (S.D.N.Y Mar. 28, 2017).

fails plausibly to allege an adverse effect on competition market-wide." *Sell It Soc., LLC v. Acumen Brands, Inc.*, 2015 WL 1345927, at *5 (S.D.N.Y. Mar. 20, 2015) (internal quotation marks omitted) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001)). *Competition* was not harmed under this theory, nor could Plaintiff plausibly allege a link between its purported injury and any "anticompetitive" conduct. *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 76 (2d Cir. 2013); *see also In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *16 (S.D.N.Y. Aug. 29, 2014) ("[I]njury does not constitute 'antitrust injury' unless it is attributable to an anticompetitive aspect of the challenged conduct."); *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1202, 1214 (S.D. Tex. 2009) (noting "no authority for the proposition that low, but not predatory, prices can support antitrust injury for a Section 2 claim"). "At most, Plaintiff alleges that prices were distorted. Plaintiff, however, does not allege that this was a result of reduction in competition." *Laydon I*, 2014 WL 1280464 at *8.

Finally, Plaintiff pleads no "facts that would plausibly suggest that [defendant's] *purpose* was anticompetitive." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc*., 507 F.3d 117, 126 (2d Cir. 2007) (emphasis added) (affirming dismissal of monopolization claim for lack of antitrust standing). According to Plaintiff, the purpose instead was to benefit financial positions in other transactions in other markets through means other than reduced competition. Plaintiff fails this prong.

### 2. Plaintiff is Not an Efficient Enforcer of the Antitrust Laws.

Plaintiff also fails to plausibly allege it is an "efficient enforcer of the antitrust laws." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005). Four factors apply here: "(1) the directness or indirectness of the asserted injury, which requires evaluation of the chain of causation linking [plaintiff's] asserted injury and the [defendant's] alleged price-fixing; (2) the

existence of more direct victims of the alleged [conduct]; (3) the extent to which [plaintiff's] damages claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment on the other." *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *15 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016)). Each factor weighs heavily against Plaintiff.

### a)   Plaintiff Cannot Allege Direct Injury.

The link between "alleged price-fixing" and Plaintiff's "asserted injury" is highly attenuated. To begin, Plaintiff does not allege that it bought any gas from TGPNA, not even indirectly through the unidentified public entity. This is reason alone to dismiss, because "a plaintiff who did not transact with a [defendant] is not an efficient enforcer of the antitrust laws against that [defendant] and therefore lacks antitrust standing to assert antitrust claims against that [defendant]." *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 581 n.160 (S.D.N.Y. 2018) ("*LIBOR VII*"). Indeed, "a critical mass of judges within this district have concluded that plaintiffs who are not direct purchasers are not efficient enforcers in a benchmark manipulation case." *Silver II*, 332 F. Supp. 3d at 905.[13] Simply put, the fact "[t]hat [plaintiff] did not trade directly with any defendant[] is sufficient reason to dismiss [its] antitrust claims." *SIBOR*, 2018 WL 4830087, at *5.

---

[13]   *See, e.g.*, *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *35 (S.D.N.Y. Mar. 25, 2019) ("*LIBOR VIII*") ("[W]e dismiss [plaintiff's antitrust] claims based on transactions with non-defendant third parties."); *LIBOR VII*, 299 F. Supp. 3d at 581 n.160; *SIBOR*, 2018 WL 4830087, at *5; *Sterling LIBOR*, 366 F. Supp. 3d at 532-33, 548; *CHF LIBOR*, 277 F. Supp. 3d at 558; *Sullivan*, 2017 WL 685570, at *15 (not efficient enforcers where "plaintiffs had no direct dealings with the defendants"); *Platinum & Palladium*, 2017 WL 1169626, at *22; *LIBOR VI*, 2016 WL 7378980, at *16.

Moreover, Plaintiff does not claim it directly purchased gas from anyone at a regional hub. Rather, Plaintiff says it acquired gas through an unnamed public entity with which Plaintiff had pre-existing contracts.[14]  *See* Compl. ¶ 17.  The sole alleged connection to TGPNA is that contracts between third parties (*i.e.*, the public entity and a seller other than TGPNA) incorporated a benchmark price that was allegedly affected by TGPNA's conduct.  This Court has rejected antitrust standing under indistinguishable facts.  In the LIBOR cases, "plaintiff and a third party could, and did, easily incorporate [the relevant benchmark] into a financial transaction without any action by defendant[] whatsoever," and "[t]heir independent decision to do so breaks the chain of causation between defendant['s] actions and [] plaintiff's injury."  *LIBOR VI*, 2016 WL 7378980, at *16.  Because Plaintiff "transacted with identifiable counterparties other than [TGPNA]" and "seek[s] to impose liability for transactions [that TGPNA] did not control and of which [TGPNA was] not even aware," Plaintiff is not an efficient enforcer.  *CHF LIBOR*, 277 F. Supp. 3d at 560-61 ("[W]here a plaintiff's counterparty is reasonably ascertainable and is not a defendant . . . a plaintiff is not an efficient enforcer."); *see also Sullivan*, 2017 WL 685570, at *17 (finding that it would "enlarge[ ] the scope of private antitrust enforcement beyond the Sherman Act's intent" to confer standing on plaintiffs who transacted with third parties).

### b)      There Are More Direct Alleged Victims.

Plaintiff also is not an efficient enforcer because there are "more direct victims" of the alleged conduct.  *Gelboim*, 823 F.3d at 778.  The Second Circuit has recognized "that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced."  *Id.* at 779; *see also Gatt*, 711 F.3d at 75 ("[T]he potent

---

[14]   This anonymous third party also is not alleged to have transacted with TGPNA or even to have been a direct market participant at any of the four relevant regional hubs.  *See* Compl. ¶ 17.

private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws."). And, as discussed above, those who, at a minimum, were direct market participants at any of the four regional hubs, or who transacted directly with TGPNA, would be better suited than Plaintiff to bring these claims. *See, e.g.*, *LIBOR VII*, 299 F. Supp. 3d at 581 n.160; *Sullivan*, 2017 WL 685570, at *15.

### c) Plaintiff's Alleged Damages Are Highly Speculative.

Plaintiff is not an efficient enforcer for the additional reason that it alleges highly speculative damages. *See Gelboim*, 823 F.3d at 779; *CHF LIBOR*, 277 F. Supp. 3d at 563. First, Plaintiff's damages are conjectural because the Complaint "alleges that the manipulation was varied and episodic." *CHF LIBOR*, 277 F. Supp. 3d at 563. Faced with similar allegations—*i.e.*, manipulation in different directions at different times—courts have held "it would be extremely difficult, if not impossible, to isolate the impact [of such manipulation] . . . on an umbrella plaintiff's trades."[15] *Silver II*, 332 F. Supp. 3d at 910. These difficulties are heightened here, because Plaintiff and others in the putative class would need to net out their damages "to offset any benefit from [the alleged] manipulation." *See CHF LIBOR*, 277 F. Supp. 3d at 563.

A second reason Plaintiff's damages are highly speculative is that the calculation would require reconstructing hypothetical "but-for" monthly index prices and determining if, and to what extent, each index price moved each point-month based on any alleged manipulation. *See, e.g.*, *Laydon I*, 2014 WL 1280464, at *10. The task of dissociating a variety of intervening variables and external market factors would be daunting. *See Gelboim*, 823 F.3d at 779-80 ("[I]t is difficult to see how [Plaintiff] would arrive at such an estimate, even with the aid of expert testimony.").

---

[15] "Plaintiffs who purchased products from non-defendants but allege that defendants' actions raised their prices are called 'umbrella purchasers.'" *LIBOR VI*, 2016 WL 7378980, at *15.

"Where, as here, the theory of antitrust injury depends upon a complicated series of market interactions, the damages are speculative because countless other market variables could affect pricing decisions." *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc*., 314 F. Supp. 3d 497, 514 (S.D.N.Y. 2018) (quotation marks and alterations omitted).  Courts have correctly declined to find antitrust standing in such circumstances.  *See, e.g.*, *Platinum & Palladium*, 2017 WL 1169626, at *25 ("To find antitrust damages in this case would engage the court in hopeless speculation concerning the relative effect of [manipulation] in a market where countless other market variables could have intervened to affect those pricing decisions." (internal alterations omitted)).

### d)      Plaintiff Seeks Duplicative Recovery.

Lastly, Plaintiff is not an efficient enforcer because of the "risk that other plaintiffs would be entitled to recover duplicative damages or that damages would be difficult to apportion among possible victims of the antitrust injury."  *Gelboim*, 823 F.3d at 772.  Plaintiff's claims would "vastly extend the potential scope of antitrust liability in myriad markets where derivative instruments have proliferated."  *Id.* at 779.  Plaintiff's effort to obtain damages as a result of transactions to which the defendant was a stranger would "raise[] serious concerns of ruinous, potentially-disproportionate liability."  *Silver II*, 332 F. Supp. 3d at 908; *see also LIBOR VI*, 2016 WL 7378980, at *16 (explaining that "'damages disproportionate to wrongdoing'" would result if a defendant's liability could stem from a plaintiff's "own decisions to incorporate" an index price "into [its] transactions," over which the defendant "had no control" and from which it "did not profit" (quoting *Gelboim*, 823 F.3d at 779)).

Because every efficient enforcer factor weighs against Plaintiff, Counts I and II should be dismissed for lack of antitrust standing.

E.    **Plaintiff Has Not Alleged A Plausible Claim for Unlawful Monopolization or Attempted Monopolization.**

Problems with antitrust standing aside, Plaintiff has failed to state a claim for either unlawful monopolization or attempted monopolization under Section 2 of the Sherman Act. Plaintiff's Complaint fails to establish, as it must for monopolization, both "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal quotation marks and citations omitted).   Likewise, the Complaint fails to state the elements of an attempted monopolization claim:  "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Id*.

1.    **Plaintiff Fails to Allege Monopoly Power.**

Plaintiff seeks to hammer a square peg (the asserted manipulation of index prices) into a round hole (a claim that requires proof of monopoly power abuse).  Plaintiff does not plausibly allege that an ability to manipulate index prices under Plaintiff's theory is the product of market share, power over pricing, or the ability to exclude competitors from natural gas markets.

"Monopoly power, also referred to as market power, is the power to control prices or exclude competition" and can be:  (1) proven "by evidence of the control of prices or the exclusion of competition," or (2) "inferred from one firm's large percentage share of the relevant market." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998) (internal citation omitted). A high market share is not conclusive; instead, courts will consider other relevant factors "such as barriers to entry."  *Id.* at 99.  Courts are roughly guided by the following: "a market share below

50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power." *Id.*

Plaintiff's first problem is that it misconceives what counts as high market share. *See* Compl. ¶¶ 57, 87, 92, 95, 97. Because Plaintiff asserts harm in the prices it paid for physical gas delivered at the SoCal hub, Plaintiff must at least show that TGPNA controlled a high share of the gas available at that hub at the relevant time. The Complaint instead narrowly alleges that, on discrete days of discrete months, TGPNA accounted for a high percentage of physical gas *traded* at SoCal. *See* Compl. Ex. A. But trading volume is not market share. Plaintiff does not allege— nor *could* it plausibly allege—that TGPNA controlled a large share of the gas *available* to be traded at SoCal, or anywhere else, at any time.[16] In fact, Plaintiff has not even "alleged the necessary facts to support any plausible product or geographic markets." *In re Aluminum Warehousing*, 2014 WL 4277510, at *36. Moreover, monopoly power cannot be based on trading volume during a single week at just one regional hub. The Court found as much when it dismissed a monopolization claim in *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 2013 WL 1100770, at *6 n.6 (S.D.N.Y. Mar. 18, 2013) ("*Silver Futures II*") (allegations of large holdings at particular times—*e.g.*, that defendant "sometimes held 30-40% of the short open interest in the important COMEX silver futures contracts expiring in the 'front' months"—failed to "make clear what relative stake . . . [defendant] held as compared to other silver futures traders" in the silver futures

---

[16]   Producers and suppliers of natural gas (or any other product)—as opposed to traders like TGPNA— will dominate when market share is measured correctly. In Plaintiff's myopic view, however, a local car dealership that accounted for 50% of car sales in a given week would have 50% market share, even though *market* share depends on existing local inventory (cars sitting on dealership lots) and the ability of other dealers to add readily to that inventory through manufacturers or other sources of supply. Also, even on Plaintiff's own terms (consideration of trading volume and nothing else) the Complaint does not plausibly allege that TGPNA had a high share in any given week, because Plaintiff's numbers are based solely on trading volume that participants *voluntarily* self-report. *See, e.g.*, Compl. ¶ 32 (Platts and NGI only use those "trades during bidweek that are reported to them."); Staff Report at 16 (publishers collect trade data "provided by [market participants] on a voluntary basis").

market as a whole).  One's share of gas traded in a single bidweek at a single hub does not equate

with overall *market share* during a relevant period.

Moreover, even a high market share is insufficient to infer market power unless the plaintiff

can plausibly allege that the defendant was able to exclude market competitors.  *See Tops Mkts.*,

142 F.3d at 99; *see also PepsiCo, Inc.*, 315 F.3d at 109 (holding that even "a 64 percent market

share" is "insufficient to infer monopoly power" "[a]bsent additional evidence, such as an ability

to control prices or exclude competition"); *Dial Corp. v. News Corp.*, 2016 WL 462515, at *7

(S.D.N.Y. Jan. 15, 2016) ("Under the antitrust laws, an overwhelmingly large market share

alone—even one as large as 90.5%—does not equal an antitrust violation."); *Emigra Grp., LLC v.*

*Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 362 (S.D.N.Y. 2009) ("[T]he

lack of significant entry barriers can defeat a monopolization claim, even in the face of a

defendant's high market share.").

Plaintiff does not even try to allege that TGPNA had the ability to control prices or exclude

competition.  Indeed, it would be implausible to assert that TGPNA—a gas trader—had any power

over the supply of natural gas or the ability to exclude others.  Instead, Plaintiff alleges that when

TGPNA bought or sold gas it did so at "false and non-competitive prices."  Compl. ¶ 51.  The

alleged *means* had nothing to do with excluding others.  Rather, Plaintiff claims that TGPNA

responded to legitimate market-created bid-ask ranges by buying when the market price was high

or selling when it was low.  *See* Staff Report at 70.  Plaintiff "simply do[es] not explain how" that

alleged behavior "might have acted to control prices or to exclude other [natural gas] traders."

*Silver Futures II*, 2013 WL 1100770, at *6.  Natural gas was, at all times, available for purchase

and sale in each market at prices other than a monthly index.  And nothing about the alleged

conduct would have kept others from participating in the markets for natural gas.  *See Bookhouse*

*of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013) (plaintiffs failed to allege facts "suggesting monopoly power" and "acknowledge[d] that during the relevant time period," competitors could enter the market).

### 2. Plaintiff Fails to Allege Intent to Acquire or Maintain Monopoly Power.

Plaintiff must also plausibly allege an *intent* to exclude others—meaning conduct "undertaken to obtain or cement monopoly power." *Shak v. JPMorgan Chase & Co.*, 2016 WL 154119, at *16 (S.D.N.Y. Jan. 12, 2016).  Plaintiff proposes to satisfy this element by repeatedly asserting that TGPNA engaged in "uneconomic" purchases or sales at the regional hubs.  *See, e.g.*, Compl. at ¶¶ 53-55.  But merely parroting the Staff Report in that conclusory manner is not enough. *See, e.g.*, *Shak*, 2016 WL 154119, at *18 (dismissing because "plaintiffs' complaints simply conclude—rather than show—that [defendant's] bids and offers were 'uneconomic,' and declare, *ipse dixit*, there 'was no legitimate justification' for certain activity").

Even if Plaintiff could fix the conclusory nature of its "uneconomic" trading allegation, that assertion would still fall well short of a plausible allegation of willful intent to acquire or maintain monopoly power.  Plaintiff uniformly describes the conduct as reactions by TGPNA traders to external forces, rather than efforts to corner the market by excluding others.  *See, e.g.*, Compl. ¶¶ 57, 100-09 (alleging spreadsheets that, among other things, (1) kept a running projection of monthly index prices and (2) generated real-time P&L calculations based on the monthly index prices); *id.* ¶ 49 (alleging that "after observing a 12-cent swing in NYMEX prices . . . Tran directed Wilson to 'just start trading [Permian fixed price gas]'"); *id.* ¶ 67 (alleging TGPNA "had a financial position on and was trading fixed price around it").

### 3.      Plaintiff Fails to Allege Attempted Monopolization For the Same Reasons.

Each of these flaws also requires dismissal of Count II (attempted monopolization), because the same deficiencies prevent Plaintiff from adequately pleading a dangerous probability of TGPNA achieving monopoly power.  *See Int'l Distribution Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 792 (2d Cir. 1987) ("[I]n determining whether a given firm . . . has a dangerous probability of acquiring monopoly power," various "market characteristics" besides market share "must . . . be considered," including "the strength of the competition" and "the barriers to entry."); *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 578 (S.D.N.Y. 2011) (same). Notably, even "market shares of approximately 50% are insufficient to demonstrate market power where other factors such as low barriers to entry and strong competition . . . exist." *Natsource LLC v. GFI Grp., Inc.*, 332 F. Supp. 2d 626, 635 (S.D.N.Y. 2004); *see also Tops Mkts.*, 142 F.3d at 98-99 (holding possession of more than 70% market share did not support inference of market power for purposes of attempted monopolization claim because of "marketplace realities," including low barriers to entry).  Count II should therefore also be dismissed.

### F.      Plaintiff's State Law Claims Fail.

The Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims after it dismisses the federal claims.  *See CHF LIBOR*, 277 F. Supp. 3d at 584 ("[W]hen all federal claims are eliminated . . . the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them."  (quoting *Tops Mkts.*, 142 F.3d at 103)).  Regardless, those counts (III & IV) also fail as a matter of law.

29

      **1.**     **Plaintiff Fails to State A Claim Under California's Unfair Competition Law.**

Plaintiff's UCL claim must be dismissed.  First, Plaintiff has failed to allege facts needed for standing under the UCL.  *See Birdsong v. Apple, Inc.*, 590 F. 3d 955, 960 n.4 (9th Cir. 2009) (UCL has its own standing requirement).  That is, Plaintiff must plausibly allege that it lost "money or property" due to TGPNA's purported misconduct.  Cal. Bus. & Profs. Code § 17203 ("Section 17203"); *see also Rubio v. Capital One Bank*, 613 F.3d 1195, 1203-04 (9th Cir. 2010).  As discussed above, *see* Sections IV.A & IV.D.1(a), Plaintiff does not demonstrate that it suffered any injury—a deficiency that precludes a finding of UCL standing.[17]

Additionally, this claim should be dismissed, and the prayer for restitution stricken, as an impermissible claim for damages.[18]  "[D]amages are not available under section 17203."  *Bank of the West v. Sup. Ct.*, 2 Cal. 4th 1254, 1266 (1992).  Nor is any other form of non-restitutionary financial relief.  *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121-22 (C.D. Cal. 2001) (explaining the UCL does not provide for damages, unjust enrichment, or disgorgement of profits).  The *only* non-punitive financial remedy contemplated by the UCL is restitution, which the California Legislature has defined narrowly: "The court may make such orders or judgments . . . as may be necessary to *restore* to any *person in interest* any money or property, real or personal, which may have been *acquired by means of such unfair competition*."  Section 17203 (emphases added).  "[A]ny person in interest" means a person with "an *ownership*

---

[17]    At a minimum, Plaintiff's claims under the fraudulent and unfair "prongs" of the UCL should be dismissed for lack of standing as Plaintiff limits its threadbare allegation of lost money or property to the unlawful prong.  *See* Compl. ¶ 153.

[18]    The remedies under the UCL are equitable in nature, and shall not be exercised unless no adequate remedy exists at law.  *Munning v. The Gap, Inc.*, 238 F. Supp. 3d 1195, 1203 (N.D. Cal. 2017); *see also Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1203 (N.D. Cal. 2016).  Here, Plaintiff seeks damages under its antitrust claims, and its "restitution" claim is substantively indistinguishable from damages.  Dismissal of the UCL claim is therefore appropriate.

*interest* in the property." *Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal. 4th 116, 96 (2000) (emphasis added); *Watson Labs.*, 178 F. Supp. 2d at 1121-22 ("vested property rights").   "There is a difference between 'getting' and 'getting back.'   The abstract property rights that [Plaintiff] invokes do not entitle it to get something it never had." *Watson Labs.*, 178 F. Supp. 2d at 1122. Moreover, the term "acquired" through unfair competition means Plaintiff can only recover from the party to whom it lost something.   *See Park v. Cytodyne Tech., Inc.*, 2003 WL 21283814, at *24 (Cal. Sup. Ct. 2003) ("[R]estitution . . . involve[s] a return of what defendant gained in the transaction.").

To the extent any loss could be theorized here, it would be an extra amount Plaintiff paid for gas due to a higher index price.   But TGPNA did not sell gas to Plaintiff or anyone related to Plaintiff.   And Plaintiff contends that, during the relevant bidweeks, TGPNA paid *too much* for gas it *bought*.   Plaintiff therefore has not alleged that TGPNA "acquired" what Plaintiff says it overpaid.   In any event, as noted earlier, Plaintiff passed along the wholesale price of natural gas "directly" to its customers.   Schoenfeldt Decl. Ex. 4.   Finally, Plaintiff never held a "vested property right" to purchase gas at any particular price, making this a damages issue rather than a recovery or restoration of property it lost.   Because Plaintiff seeks statutorily impermissible damages under the guise of "restitution," and restitution is the only relief Plaintiff seeks under the UCL, the Court should dismiss Count III of the Complaint.

### 2.   Plaintiff's Unjust Enrichment Claim Fails On Multiple Bases.

Plaintiff fails to plausibly allege a claim for unjust enrichment under either California or New York law.[19]   As such, Count IV of the Complaint should be dismissed.

---

[19]   Although the Complaint does not say whether Plaintiff brings its unjust enrichment claim under California law or New York law, there is "no real conflict between the laws of California and New York for . . . unjust enrichment." *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 528 (S.D.N.Y. 2007).

### a) Plaintiff's Unjust Enrichment Claim Fails Under California Law.

Plaintiff's unjust enrichment count should be dismissed for the simple reason that "'there is no cause of action in California for unjust enrichment.'" *Hart v. BHH, LLC*, 2016 WL 2642228, at *5 (S.D.N.Y. May 5, 2016) (quoting *In re Apple & AT&T iPad Unlimited Data Plan Litig.*, 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011)); *Price v. L'Oreal USA, Inc.*, 2017 WL 4480887, at *5 ("[I]n California, . . . there is no standalone cause of action for unjust enrichment.").[20] "Unjust enrichment is not a cause of action" in California, "just a restitution claim." *Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1196 (N.D. Cal. 2014) (quoting *Hill v. Roll Internet. Corp.*, 195 Cal. App. 4th 1295, 1307 (Cal. App. 2011)).[21]

Even viewing unjust enrichment solely as a restitution claim, Plaintiff fails the requirement to allege a relationship with TGPNA that caused TGPNA to be enriched at Plaintiff's expense. "To prevail on a claim for unjust enrichment under California law, plaintiffs must demonstrate

---

Thus, applying New York's choice-of-law rules, *see Manning Int'l Inc. v. Home Shopping Network, Inc.*, 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001), the absence of "an actual conflict between the laws of the jurisdictions involved" makes further inquiry unnecessary. *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (N.Y. 1993).

[20]  Although there is some discrepancy, "a majority of courts—including federal courts sitting in California—have found that [unjust enrichment] claims are not cognizable under California law." *Hart*, 2016 WL 2642228, at *5; *see also Azad v. Tokio Marine HCC-Med. Ins. Servs. LLC*, 2017 WL 3007040, at *8 (N.D. Cal. July 14, 2017) ("Unjust enrichment is not an independent cause of action in California."); *In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 974 (S.D. Cal. 2012) ("Simply put, 'there is no cause of action in California for unjust enrichment.'") (quoting *Melchior v. New Line Prod., Inc.*, 106 Cal. App. 4th 779, 793 (2003)); *Aguiar v. Merisant Co.*, 2014 WL 6492220, at *9 (C.D. Cal. Mar. 24, 2014) ("Defendants contend that California law does not recognize a cause of action for unjust enrichment.  The Court agrees."); *In re Ford Tailgate Litig.*, 2014 WL 1007066, at *5 (N.D. Cal. Mar. 12, 2014) ("California, among other jurisdictions, has rejected independent unjust enrichment claims.").

[21]  Moreover, California law would bar Plaintiff's unjust enrichment claim, even in that limited capacity, because it is duplicative of its UCL claim.  *See In re Apple*, 802 F. Supp. 2d at 1077 ("Plaintiffs cannot assert unjust enrichment claims that are merely duplicative of statutory or tort claims."); *Azad*, 2017 WL 3007040, at *8 ("[S]ince plaintiffs have alleged . . . a UCL claim for restitution, the unjust enrichment claim is duplicative.").

defendants' '(1) receipt of a benefit; and (2) unjust retention of the benefit at the expense of another.'"  *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 412 (S.D.N.Y. 2015).  Plaintiff claims to be injured in transactions in which TGPNA did not participate.  *Hartford Cas. Ins. Co. v. J.R. Mktg., LLC*, 61 Cal. 4th 988, 998 (2015) (relationship between parties in unjust enrichment claim must be, at a minimum, "quasi-contractual").  Accordingly, Count IV should be dismissed.

> **b)**     **Plaintiff's Unjust Enrichment Claim Fails Under New York Law.**

Plaintiff's claim fails for substantially similar reasons if analyzed under New York law, which requires showing that "(1) [the] defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011); *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).  "[C]ourts require proof that the defendant received a 'specific and direct benefit' from the property sought to be recovered, rather than an 'indirect benefit.'"  *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 574 (S.D.N.Y. 2016) ("*Silver I*").  Accordingly, while privity is not required, "there must exist a relationship or connection between the parties that is not 'too attenuated.'"  *In re: LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 737 (S.D.N.Y. 2013) ("*LIBOR I*") (quoting *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012)).  "Where plaintiff and defendant simply had no dealings with each other, their relationship is too attenuated."  *Id*. (quotation marks omitted); *Silver I*, 213 F. Supp. 3d at 574.  Because that is this case, Count IV fails under New York law too.

## V.     CONCLUSION

For all of the foregoing reasons, the Complaint should be dismissed in its entirety and with prejudice.

Dated:  November 22, 2019
New York, New York

Respectfully submitted,


GIBSON, DUNN & CRUTCHER LLP

By:  _/s/ Brad Schoenfeldt_____
       Brad Schoenfeldt

200 Park Avenue, 48th Floor
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Email:  bschoenfeldt@gibsondunn.com

William S. Scherman (*pro hac vice pending*)
David Debold (*pro hac vice forthcoming*)
Jason Fleischer (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
Telephone:  (202) 955-8500
Facsimile:  (202) 467-0539
wscherman@gibsondunn.com
ddebold@gibsondunn.com
jfleischer@gibsondunn.com


*Attorneys for Defendant TOTAL Gas & Power
North America, Inc.*