UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CITY OF LONG BEACH, on behalf of itself and all
others similarly situated,

                      Plaintiff,


         -against-                                                 19 Civ. 8725 (LAK)


TOTAL GAS & POWER NORTH AMERICA, INC.,
TOTAL, S.A., and TOTAL GAS & POWER, LTD.,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Solomon B. Cera
        Pamela A. Markert
        CERA LLP

        Jeffrey A. Klafter
        Seth R. Lesser
        Morgan Stacey
        KLAFTER OLSEN & LESSER LLP

        Daniel J. Sponseller
        LAW OFFICE OF DANIEL J. SPONSELLER

        *Attorneys for Plaintiff*

        Brad Schoenfeldt
        William S. Scherman
        David Debold
        Jason Fleischer
        GIBSON, DUNN & CRUTCHER LLP

        *Attorneys for Defendants*

2

LEWIS A. KAPLAN, *District Judge.*

This class action involves futures contracts for natural gas.  The complaint alleges that the three defendants – Total Gas & Power North America ("Total Gas"), its French parent company Total, S.A. ("Total S.A."), and Total Gas & Power, Ltd. ("Total Ltd."), a U.K. subsidiary of Total S.A. – unlawfully manipulated various indices that are used to price natural gas contracts traded at four hubs in the Southwestern United States.  The plaintiff, the City of Long Beach, California, ("Long Beach"), claims that this conduct caused it to pay artificially inflated prices for natural gas that it purchased at one such hub.[1]  On behalf of itself and others similarly situated, Long Beach raises claims for damages under Section 2 of the Sherman Act, restitution under the California Unfair Competition Law ("UCL"), and restitution and damages under the law of unjust enrichment.[2]

Before the Court are two motions to dismiss, one filed jointly by Total S.A. and Total Ltd. and one filed by Total Gas.  The former presents issues concerning personal jurisdiction.  The latter raises the question whether this alleged manipulation of a futures market states a legally sufficient antitrust claim.  I hold that it does not.  For the following reasons, both motions are granted.

---

[1]      Complaint, Dkt. 1 ("Cmplt.") ¶ 17.

[2]      The laws of several jurisdictions theoretically could apply to the unjust enrichment claim. For reasons explained later in this opinion, the Court assumes without deciding that the claim arises under New York law.

*Facts*

The facts alleged are fairly straightforward but require some understanding of abstract financial instruments called derivatives.  The Court begins by explaining what those instruments are and how they are used in the natural gas trade.

*Derivatives and the Natural Gas Trade*

"The term 'derivative,' as it is used in today's financial world, refers to a financial instrument that derives its value from the price of an underlying instrument or index."[3]  Like other financial instruments, derivatives can be bought and sold.  This case involves two types of derivatives: futures and swaps.

*Futures Contracts and Natural Gas Pricing*

A futures contract is a derivative that requires the holder to purchase a physical commodity in the future.  The futures at issue here were for the purchase of natural gas throughout the following month at one of four delivery hubs in the Southwestern United States (the "Southwestern Hubs").  Those hubs are known as Southern California Gas Co. ("SoCal"), El Paso Natural Gas Co., Permian Basin ("Permian"), West Texas, Waha ("Waha"), and El Paso San Juan Basin ("San Juan").[4]

There are two common ways of pricing natural gas, quantities of which typically are referred to in millions of British Thermal Units ("MMBtu").  Some contracts use a predetermined

---

[3]      *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 709 (S.D.N.Y. 2017).

[4]      Cmplt. ¶ 7.

4

"fixed rate," such as $4.10 per MMBtu, that remains the same throughout the life of the contract.[5] Others use a "floating rate," which is a rate pegged to a variable quantity that changes over time.[6] At the four Southwestern Hubs, the floating rates in some natural gas contracts incorporated hub-specific indices.[7]  According to the complaint, companies called Platts and NGI calculated a "Monthly Index Price" for each hub by averaging the price of natural gas sold on the hub (as reported by the traders) during the last five business days of each month, a period called "bidweek."[8] Other floating rate contracts used the New York Mercantile Exchange ("NYMEX") price, which was derived from trading prices at Henry Hub, Louisiana.[9]  The Monthly Index Prices essentially were local rates specific to each of the four hubs, while the NYMEX price was used as a nationwide benchmark.

*Swap Contracts*

The second type of derivative relevant to this case is a "swap" contract.  A swap is an "instrument[] whereby two counterparties agree to exchange cash flows on two financial

---

[5]

*Id.* ¶ 31.

[6]

*Id.*; *see* Mitchell Grant, *Floating Interest Rate*, INVESTOPEDIA (last updated Jun. 25, 2019), https://www.investopedia.com/terms/f/floatinginterestrate.asp.

[7]

Cmplt. ¶ 32.

[8]

*Id.*

[9]

*Id.* ¶ 15.  The NYMEX price frequently is used as a benchmark for the entire North American natural gas market.  *See* James Chen, *Henry Hub*, INVESTOPEDIA (last updated Jul. 1, 2019), https://www.investopedia.com/terms/h/henry_hub.asp.

5

instruments over a specific period of time."[10]  "These are (1) a 'reference obligation' or 'underlying asset' such as a security, a bank loan, or an index, and (2) a benchmark loan, generally with an interest rate set relative to a commonly used reference rate such as the London Inter–Bank Offered Rate ('LIBOR')."[11]  Swaps are purely financial transactions and do not involve the exchange of commodities.  While parties often enter into swaps because they have exposure to the underlying commodity and wish to hedge various types of risk, others simply are speculating.  Typically, swaps making use of different cash flows are executed when the party with the less favorable cash flow pays the difference between the two quantities to the counterparty.[12]

This case involves swaps referenced to the price of natural gas.  Many involved exchanging the Monthly Index Price at a Southwestern Hub with the NYMEX price.[13]  To understand how this works, imagine that Alice believes that the NYMEX price for natural gas in June will be lower than the SoCal Monthly Index Price.  Alice can bet on this belief by swapping the SoCal price for the NYMEX price.  If the NYMEX price is lower, the counterparty will pay Alice the difference between the prices multiplied by the quantity covered by the transaction.  If instead the SoCal Monthly Index Price is lower, Alice will pay the difference to the counterparty.  Neither party needs to own or purchase natural gas to enter into this transaction, and no natural gas changes hands.

---

[10]

*trueEX*, 266 F. Supp. 3d at 709.

[11]

*Id.*

[12]

*See, e.g.*, James Chen, *Swap*, INVESTOPEDIA (last updated Feb. 4, 2020), https://www.investopedia.com/terms/s/swap.asp.

[13]

Cmplt. ¶ 32.

For the swaps at issue in this case,[14] everything turned on the Monthly Index Price at one of the Southwestern Hubs.  Depending on the net position of a trader's swaps for a given month at a given hub, an increase or decrease in the Monthly Index Price for that hub would yield higher or lower profits on the swaps.  Accordingly, if a swap trader could control the Monthly Index Price at a particular hub, that trader could increase its profits at will – at the expense of the counterparties to its swaps, and to the detriment of other traders whose financial instruments are priced according to the same Monthly Index Price.  That, in essence, is what Long Beach claims happened here.

*This Lawsuit*

   *The Defendants*

Total S.A. is a large oil and gas company headquartered in Paris that operates all over the world.[15]  Total Ltd. is a subsidiary of Total S.A. based in London that directs Total S.A.'s global trading operations.[16]  Total Gas is a subsidiary of Total S.A. headquartered in Houston, Texas and incorporated in Delaware that trades natural gas and related energy products in the United States and worldwide markets.[17]  Long Beach alleges that Total Gas, through its trading activity, serves "to

---

[14]
   These swaps are index and basis swaps, the differences between which are immaterial for the purposes of this opinion.  For more information about these swaps, see *Harry v. Total Gas & Power North America, Inc.*, 889 F.3d 104, 108 (2d Cir. 2018) (discussing the same contracts at issue in this case).

[15]
   Cmplt. ¶ 19.

[16]
   *Id.* ¶ 20.

[17]
   *Id.* ¶ 18.

optimize market access for [Total S.A.'s] current and future natural gas production and reserves."[18] In furtherance of this purported goal, Total Gas purchases large quantities of natural gas products, and particularly liquefied natural gas, for export each year.[19]

        In 2008, a natural gas trader at Total Gas in Houston named Aaron Hall founded the company's "West Desk."[20]  Total Gas there executed trades of physical and financial natural gas securities – meaning, as explained above, futures and swaps.[21]  From at least July 1, 2009 through July 31, 2012  (the "Class Period"), the West Desk traded futures and swaps pertaining to natural gas sold at the Southwestern Hubs.[22]  Hall ran the West Desk until approximately September 2011.[23] At that time, a veteran West Desk trader named Therese Tran took over as its leader.[24]

*Total Gas's Alleged Scheme*

        According to the complaint, the traders at Total Gas's West Desk, in Long Beach's word, "manipulated" the Monthly Index Prices for natural gas at the Southwestern Hubs during the Class Period.  The alleged scheme involved two steps.  Prior to certain bidweeks, Total Gas traded

---

[18]     *Id.*

[19]     *Id.*

[20]     *Id.* ¶ 21.

[21]     *See, e.g.*, *id.* ¶ 43.

[22]     *See, e.g.*, *id.* ¶¶ 1-2.

[23]     *Id.* ¶ 21.

[24]     *Id.* ¶ 22.

large volumes of futures and swaps using floating rates and taking positions on a Monthly Index Price at one of the four Southwestern Hubs relative to the NYMEX price.[25]  Then, during those bidweeks, Total Gas traded large volumes of natural gas futures using fixed rate prices.[26]  According to the complaint, these fixed rate futures offset the floating rate futures that Total Gas had purchased prior to bidweek.[27]  This "flattening" process generally meant that Total Gas owned no natural gas at the end of the month.[28]

        According to the complaint, Total Gas lost $2.09 million on its bidweek trades during the Class Period.[29]  Allegedly, these trades often were made at artificially high or low prices, meaning that Total Gas could have gotten better rates.[30]  However, the complaint claims that Total Gas ultimately made over $9 million in profit from its net trading activity throughout the Class Period.[31]  This occurred because the bidweek trades moved the Monthly Index Prices in directions favorable to Total Gas's positions on its pre-bidweek trades.[32]  The purported scheme allegedly succeeded because the West Desk traded a large volume of natural gas during the bidweek periods.

---

[25]

    *Id.* ¶¶ 32, 43, 79.

[26]

    *Id.* ¶¶ 43, 80.

[27]

    *Id.* ¶¶ 44-45.

[28]

    *Id.*

[29]

    *Id.* ¶ 81.

[30]

    *Id.* ¶ 43.

[31]

    *Id.* ¶ 8.

[32]

    *Id.* ¶¶ 37, 43, 80.

Often, it was on one side or the other of transactions accounting for more than 50 percent of the total volume traded at a given hub during the measured period.[33]

These fairly abstract allegations can be explained more easily with an example. As alleged in the complaint: Prior to the July 2011 bidweek, the West Desk entered into numerous futures and swaps that left it with a "long" position of 14,000,000 MMBtu.[34] Total Gas would profit on these trades if the SoCal Monthly Index Price for August 2011 was high.[35] And the Monthly Index Price would be high if, during bidweek, buyers of fixed price futures at SoCal agreed to pay high fixed rates.[36] When SoCal bidweek arrived, Total Gas bought natural gas futures accounting for 48 percent of the reported trading volume during the week.[37] It paid higher prices than other buyers on these trades.[38] When all was said and done, Total Gas lost money on its bidweek trades, but it pushed up the SoCal Monthly Index Price and profited accordingly on its pre-bidweek trades.[39]

The complaint alleges that Hall and Tran orchestrated this scheme on behalf of Total Gas with the knowing and willful participation of other traders at the West Desk and, to a vaguely

---

[33]
      *Id.* ¶ 80.

[34]
      *Id.* ¶ 84-85.

[35]
      *Id.*

[36]
      *Id.*

[37]
      *Id.*

[38]
      *Id.*

[39]
      *Id.*

described but apparently limited degree, the knowledge of other individuals at Total Gas.[40]  It does not allege that Total S.A. or Total Ltd. played any role in orchestrating the scheme or even knew of its existence while it was ongoing.  Two allegations in some sense pertain to those defendants and the price manipulation scheme.  One is that some time after 2009, Total Gas's president sent a memorandum to, and met with, unnamed executives of both foreign entities "about [Total Gas's] very high market share at several trading points and resultant regulatory scrutiny."[41]  The other is that Total Gas's president "alerted senior management at [Total S.A. and Total Ltd.]" shortly after receiving a June 10, 2012 "whistleblower" email informing him about the West Desk scheme."[42]

*Prior Legal Actions*

Before turning to Long Beach's claims, the Court notes three earlier proceedings –
two regulatory and one judicial – involving the allegations outlined above.

*Regulatory Investigations*

In June 2012, Matt Wilson, a West Desk trader, contacted the Commodity Futures Trading Commission ("CFTC") and the Federal Energy Regulatory Commission ("FERC"), both of which are federal agencies, and each of which has a degree of regulatory authority over natural

---

[40]
      *Id.* ¶¶ 1, 18, 88.

[41]
      *Id.* ¶ 92.

[42]
      *Id.* ¶ 96.

gas derivative trading.[43]  Wilson told both agencies that Total Gas had been engaged in market manipulation – namely, the scheme described above.[44]   Both agencies investigated these allegations.[45]

The CFTC issued a report on December 7, 2015 finding that Total Gas had manipulated some of the markets at issue during three of the months included in the Class Period.[46] Long Beach alleges that it did not discover, and could not have discovered, that Total Gas had engaged in any market manipulation prior to this date.[47]  On April 28, 2016, FERC published a report alleging that Total Gas had manipulated rates at all four Southwestern Hubs 38 times during the Class Period – each manipulation representing one month for one market.[48]  FERC found, and Long Beach now alleges, that Total Gas's manipulation of the Monthly Index Prices cost other market participants at least $89 million.[49]

---

[43]
    *Harry*, 889 F.3d at 108.

[44]
    *Id.*

[45]
    *Id.*

[46]
    Cmplt. ¶ 115.

[47]
    *Id.*

[48]
    *Id.*  Long Beach's complaint relies heavily on the allegations in FERC's report, which it incorporates by reference.

[49]
    *Id.* ¶ 8.

*The Harry Litigation*

On December 10, 2015, on the heels of the CFTC report, Michael Anastasio filed a class action against Total Gas in this Court on behalf of all individuals who traded derivatives at the Southwestern Hubs during the Class Period.[50]  Anastasio, and eventually several other plaintiffs, brought claims under the Commodity Exchange Act ("CEA") and Section 2 of the Sherman Act against Total Gas, Total S.A., and Total Ltd.[51]

On March 27, 2017, Judge Koeltl dismissed the complaint.[52]  He concluded first that the plaintiffs had failed to state a claim under the CEA.[53]  Then, turning to the Sherman Act claim, he held that the plaintiffs lacked antitrust standing.[54]  The premise of this holding was that none of the plaintiffs alleged to have traded natural gas contracts on any of the four Southwestern Hubs.[55] For essentially the same reason, the court held that the plaintiffs lacked Article III standing.[56]  The

---

[50]

   Complaint, *Anastasio v. Total Gas & Power North America, Inc.*, No. 15-cv-9689 (JGK), Dkt. 1 (S.D.N.Y. Dec. 10, 2015).

[51]

   *Id.*  Ultimately, Anastasio withdrew from the case and Alan Harry and several other plaintiffs took his place.  Consolidated Amended Class Action Complaint, *id.*, Dkt. 58 (S.D.N.Y. May 12, 2016).

[52]

   *Harry v. Total Gas & Power N. Am., Inc.*, 244 F. Supp. 3d 402, 406 (S.D.N.Y. 2017), *aff'd as modified*, 889 F.3d 104 (2d Cir. 2018).

[53]

   *Id.* at 412-19.

[54]

   *Id.* at 419-23.

[55]

   *Id.*

[56]

   *Id.* at 415 n.5.

court declined to consider an argument by Total S.A. and Total Ltd. that it lacked personal jurisdiction over them.[57]

The Second Circuit affirmed in *Harry v. Total Gas & Power North America, Inc.*[58] The panel disagreed with the district court's conclusion that the plaintiffs lacked Article III standing, finding it "within the realm of possibility" – though not "plausible" – that "prices at U.S. natural gas hubs are so interconnected that manipulation at any of the hubs amounts to manipulation of all of them, including the one on which the prices of their derivative contracts were based."[59]  However, the court agreed with the district court that the plaintiffs lacked antitrust standing because none of them alleged to having traded on the Southwestern Hubs or at "artificial prices" as a result of the alleged market manipulation.[60]  Likewise, it agreed with the district court that the plaintiffs had failed to state a claim under the CEA.[61]  It did not pass on the merits of the Section 2 claim or resolve the personal jurisdiction issue.

*The Complaint*

On September 19, 2019, Long Beach filed this complaint against Total Gas, Total S.A., and Total Ltd. on behalf of itself and all those who held a contract that settled against the NGI

---

[57] *Id.* at 423.

[58] 889 F.3d 104 (2d Cir. 2018).

[59] *Id.* at 111.

[60] *Id.* at 116.

[61] *Id.* at 111-15.

or Platts Monthly Index Prices for natural gas at SoCal, Permian, Waha, or San Juan during the Class Period.  It asserts claims against Total Gas for monopolization and attempted monopolization under Section 2 of the Sherman Act.[62]  In addition, Long Beach asserts claims against Total Gas on behalf of all members of the class who reside in California for a violation of the California UCL and the law of unjust enrichment.[63]

Count V asserts claims against Total S.A. and Total Ltd. on theories that they "controlled" Total Gas and that Total Gas was their *alter ego* or agent.[64]  It is not entirely clear whether the "controlled" language in this claim is intended to mean that Long Beach is *directly* liable on the first four counts, each of which mentions only Total Gas, or instead is intended to assert only that they are *derivatively* liable on the *alter ego* and agency theories.  The Court construes Count V to assert theories of direct and derivative liability against Total S.A. and Total Ltd.

*Discussion*

Total S.A. and Total Ltd. argue that (1) the Court lacks personal jurisdiction over them and (2) Long Beach fails to allege plausibly that they are directly or derivatively liable for the alleged wrongdoing of Total Gas.  Total Gas argues that (1) Long Beach lacks Article III standing, (2) its claims are untimely, (3) it has not pled antitrust standing as required for its Sherman Act claims, (4) it in any event fails to state claims for unlawful monopolization or attempted monopolization, and (5) its UCL and unjust enrichment claims fail as a matter of law.  Total S.A.

---

[62]   Cmplt. ¶¶ 131, 138-58.

[63]   *Id.*

[64]   *Id.* ¶¶ 159-63.

and Total Ltd. join Total Gas's arguments.  The Court addresses these arguments only as needed to resolve the motions.

I.      *Personal Jurisdiction over Total S.A. and Total Ltd.*

Personal jurisdiction is a court's authority to require a non-consenting party to appear before it.  A federal court may exercise personal jurisdiction over a defendant where (1) it properly was served, (2) jurisdiction is authorized by statute, and (3) jurisdiction is not prohibited by the Constitution.[65]  "A plaintiff 'must establish the court's jurisdiction with respect to each claim asserted.'"[66]

Total S.A. and Total Ltd. argue on various grounds that the court lacks a statutory basis for asserting personal jurisdiction against them and, in any event, that the exercise of such jurisdiction would be unconstitutional.

A.      *Personal Jurisdiction Arising from Total S.A.'s and Total Ltd.'s Contacts*

1.      *Statutory Jurisdiction*

i.      *Sherman Act Section 2 Claims*

Long Beach contends that the Court may assert personal jurisdiction over Total S.A. and Total Ltd. with respect to the federal antitrust claims under either Section 12 of the Clayton Act or Federal Rule of Civil Procedure 4(k)(2).

---

[65]     *See, e.g.*, *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016).

[66]     *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83 (2d Cir. 2018) (quoting *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).

a.    *Section 12 of the Clayton Act*

Section 12 of the Clayton Act states:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."[67]

"Because the service of process provision [the second clause] applies only to 'such cases' described in the [venue provision, the first] clause, the Second Circuit has concluded that nationwide service of process is permissible 'only in cases in which [the] venue provision is satisfied.'"[68]

Total S.A. and Total Ltd. concede that they were served in accordance with Section 12. They argue, however, that the venue component is not satisfied because they are not "inhabitant[s]" of the Southern District of New York, they are not "found" here, and they do not "transact[] business" here.[69]

Total S.A. is based and incorporated in France and Total Ltd. is based and incorporated in the United Kingdom. The complaint does not allege that either has offices, employees, or any significant presence or operations in the Southern District of New York or even the United States. They plainly are not inhabitants of the district and are not "found" here within the meaning of Section 12. Long Beach does not challenge these findings; it focuses only on the

---

[67]

15 U.S.C. § 22.

[68]

*Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 198 (S.D.N.Y. 2018) (quoting *Sullivan v. Barclays PLC*, No. 13-cv-2811 (PKC), 2017 WL 685570, at *42 (S.D.N.Y. Feb. 21, 2017) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 423 (2d Cir. 2005))).

[69]

Dkt. 45 at 7-8.

"transacts business" prong.

In no significant way does the complaint allege that Total S.A. or Total Ltd. transacts business in the Southern District of New York.  "The Supreme Court has construed the phrase 'transacts business,' as used in the venue provision of Clayton Act Section 12, to refer to 'the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character.'"[70] This requires "some amount of business continuity and certainly more than a few isolated and peripheral contacts with the particular judicial district."[71] Long Beach alleges that Total S.A. has made securities filings with the New York offices of the Securities and Exchange Commission ("SEC"), that an agent of Total S.A. once paid a $500,000 settlement to the SEC through a New York bank account, and that Total S.A.'s CEO and CFO gave a strategy presentation in New York City in 2018.[72]  None of these sporadic contacts, each of which concerned only Total S.A., comes close to satisfying the "transacts business" standard for either defendant.  Nor does anything else alleged in the complaint.

Long Beach argues that "the relevant geographic area for assessing minimum contacts under the Clayton Act is 'the United States as a whole, not just New York.'"[73] But Section 12's venue requirement is not concerned with "minimum contacts" at all.  It unambiguously authorizes suit only "in the judicial district" where the defendant is an inhabitant or "in any district"

---

[70]

    *Dennis*, 343 F. Supp. 3d 198 (quoting *Daniel*, 428 F.3d at 428).

[71]

    *Id.* (citations omitted).

[72]

    Cmplt. ¶ 16.

[73]

    Dkt. 53 at 6 (quoting *FrontPoint Asian Event Driven Fund, L.P. v. Citibank, N.A.*, No. 16-cv-5263 (AKH), 2018 WL 4830087, at *6 (S.D.N.Y. Oct. 4, 2018)).

18

where it is found or transacts business.  As Long Beach's own authority makes clear, nationwide contacts are relevant to the different question of "whether the exercise of personal jurisdiction would comport with due process."[74]

### b.      Rule 4(k)(2)

Federal Rule of Civil Procedure 4(k)(2) authorizes the exercise of personal jurisdiction over defendants sued under federal law where "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" and "exercising jurisdiction is consistent with the United States Constitution and laws."  By arguing that Rule 4(k)(2) applies, Long Beach necessarily concedes that Total S.A. and Total Ltd. are not subject under state law to the jurisdiction of any state court.[75]  This inquiry thus merges with the constitutional analysis, to which the Court turns momentarily.[76]

---

[74]

*See Dennis*, 343 F. Supp. 3d at 202; *FrontPoint Asian Event Driven Fund*, No. 16-cv-5263 (AKH), 2018 WL 4830087, at *6.

[75]

Long Beach asserts that neither foreign defendant is "jurisdictionally present in *any* of the fifty states sufficient to subject them to general jurisdiction in *any* district." Dkt. 53 at 4. While it makes this assertion to invoke the first requirement of Rule 4(k)(2), it evidently misreads the phrase "courts of general jurisdiction" to mean "general personal jurisdiction," which is a type of personal jurisdiction rather than a type of court.  Nonetheless, the Court concludes – and therefore does not survey the laws of all fifty states – that Long Beach's failure to assert that any state court would exercise jurisdiction over Total S.A. or Total Ltd. is a concession that none would.

[76]

The Court need not, and does not, address Total S.A. and Total Ltd.'s argument that they were not served in accordance with Rule 4(k).

> ii.     *State Law Claims*

Rule 4(k)(1)(A) authorizes the exercise of personal jurisdiction over a defendant where doing so would be consistent with the laws of the forum state.[77]   Under New York's applicable long arm statute, C.P.L.R. § 302(a), a court may exercise jurisdiction over a non-domiciliary based on its conduct if, among other possibilities not relevant here, the defendant "transacts any business within the state."[78]  "To determine the existence of jurisdiction under section 302(a)(1), a court must decide (1) whether the defendant 'transacts any business' in New York and, if so, (2) whether [the] cause of action 'aris[es] from' such a business transaction."[79]

By failing entirely to respond to Total S.A. and Total Ltd.'s argument that the Court lacks a statutory basis under New York law to exercise personal jurisdiction with respect to the state law claims, Long Beach has waived its opposition.  In any event, nothing in the complaint permits an inference that Total S.A. or Total Ltd. transacts business in New York.  The sporadic contacts referenced above do not suffice and have no relationship to the state law claims.  To the extent that the complaint alleges that Total S.A. and Total Ltd. acted in any manner relevant to this lawsuit – a point to which the Court will return – it alleges that they acted from France and the United Kingdom to control Total Gas's conduct in Texas, California, and New Mexico.

---

[77]

*See, e.g.*, *Spiegal v. Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010).

[78]

N.Y. C.P.L.R. § 302(a)(1).

Other possibilities include that the defendant contracts anywhere to supply goods or services in the state, that under certain circumstances it commits a tortious act within the state, and that it owns, possesses, or uses real property situated within the state.  N.Y. C.P.L.R. § 302(a).  Nothing alleged in the complaint supports the exercise of jurisdiction on any of these bases, and Long Beach does not argue otherwise.

[79]

*Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citation omitted).

2.      *Constitutional Minimum Contacts*

The Constitution sets an outer limit on a court's authority to assert personal jurisdiction over a defendant. Litigants have a substantive due process right not to be haled into court unless they have minimum contacts with the forum in which the court sits.[80]

i.      *Which Forum?*

The parties disagree over the appropriate forum to be considered in the minimum contacts analysis.  Total S.A. and Total Ltd. contend that New York is the proper jurisdiction for the federal and state law claims.  Long Beach argues that the Court instead must ask whether the foreign defendants have minimum contacts with the United States as a whole.

With respect to each claim, the appropriate forum for assessing minimum contacts depends on which statute authorizes personal jurisdiction.  That question, in turn, depends upon which statute authorizes service of process.

Several courts in this circuit, including this one, have held that where a claim "arises under federal law and a federal statute authorizes nationwide service of process, the relevant contacts for determining personal jurisdiction are contacts with the United States as a whole."[81] Although the Second Circuit has not yet passed on this issue, the Court reaches this conclusion once

---

[80]

       *See, e.g.*, *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945).

[81]

       *Dennis*, 343 F. Supp. 3d at 201 (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014)).

again for the reasons stated in a prior opinion.[82]  In appropriate circumstances, Section 12 of the

Clayton Act and Rule 4(k)(2) both may authorize nationwide service of process for federal antitrust

claims.  Thus, regardless of which provision is treated as having authorized service of process here,

the relevant minimum contacts for the federal antitrust claims are with the United States as a whole.

Personal jurisdiction with respect to the state law claims, however, is another matter.

Personal jurisdiction over these claims would flow through Rule 4(k)(1)(A), which does not

authorize nationwide service of process.  Where a defendant is served in accordance with Rule

4(k)(1)(A), a court must look instead to the defendant's contacts with the forum state to determine

whether it has personal jurisdiction.[83]

The United States is the appropriate forum for contacts associated with the federal

claims, and New York is the appropriate forum for contacts associated with the state law claims.

Nonetheless, because the law is unsettled with respect to the federal claims, the Court will consider

whether either set of claims bears a sufficient nexus to either forum.

### ii.    *Minimum Contacts*

The minimum contacts test can be satisfied where the forum jurisdiction's courts

have general or specific jurisdiction over a defendant.[84]  General jurisdiction authorizes suit against

---

[82]

The issue ultimately does not matter here because, as explained, Long Beach fails to allege that Total S.A. or Total Ltd. has minimum contacts with either the Untied States as a whole or with New York specifically.

[83]

*See, e.g.*, *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012).

[84]

*See, e.g.*, *Gucci*, 768 F.3d at 134.

22

a corporation in forums where it is "essentially at home," which ordinarily means its place of incorporation or principal place of business.[85]  The complaint alleges that Total S.A.'s home is France and that Total Ltd.'s home is the United Kingdom.  As neither entity is at home in New York or the United States, the Court lacks general jurisdiction over them.

Specific jurisdiction considers whether a sufficient nexus exists between the forum and the defendant's conduct giving rise to the claims.[86]  "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the [forum]."[87]

The requirements of specific jurisdiction are not met here, either with respect to New York or the United States.  The simple reason is that virtually all the conduct described in the complaint is attributed to Total Gas.  The only arguably relevant allegations involving Total S.A. or Total Ltd. are as follows:

- • Total S.A. is the parent corporation of Total Gas, which is located in the United States;[88]

- • Total Gas "is part of [Total S.A.'s] trading group" and Total Ltd. "effectively[] directs Total [S.A.'s] global trading operations";[89]

---

85

    *See BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1552 (2017).

86

    *See, e.g.*, *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1781 (2017).

87

    *Id.*

88

    Cmplt. ¶¶ 18, 20.

89

    *Id.* ¶¶ 19, 20.

- In 2009, after Total Gas's president reviewed a report noting that the West Desk had engaged in a high volume of trading during bidweeks, he sent a memorandum to, and met with, executives of Total S.A. "about [Total Gas's] very high market share at several trading points and resultant regulatory scrutiny";[90]

- On June 10, 2012, shortly after receiving a "whistleblower" email from a trader at the West Desk, Total Gas's president "alerted senior management at Total [S.A.] and [Total Ltd.] and asked [Total Gas's] Vice President of Risk Control . . . to analyze the West Desk's bidweek trading";[91]

- Total Ltd. and Total S.A. "participated in biweekly steering committee meetings with [Total Gas] personnel where they discussed [Total Gas] trading issues, including positions and market views";[92]

- Officers at Total Ltd. "participated in setting the trading strategies and budget of [Total Gas], and approved certain staffing decisions as well as the structure of [Total Gas's trade floor]."[93]

None of these allegations meaningfully links Total S.A. or Total Ltd. to New York. And, as noted above, the few facts involving New York have no connection to this lawsuit. Long Beach has not attempted to explain, and cannot explain, why the Total S.A. chief executive's one presentation in New York City or the company's filings with the SEC have anything to do with

---

[90]  *Id.* ¶¶ 92-94. The allegation refers not to actual or threatened regulatory scrutiny, but to the possibility of regulatory scrutiny that the president apparently had inferred from the internal report he reviewed.

[91]  *Id.* ¶ 96.

[92]  *Id.* ¶ 125.

[93]  *Id.*

allegations that Total Gas, operating in Texas, manipulated prices used at four natural gas markets in the Southwest.[94]

The same is true as to Total S.A.'s and Total Ltd.'s contacts with the United States as a whole. Nothing in the complaint permits an inference that the facts giving rise to this lawsuit arose in any significant sense from these defendants' sparse contacts with the United States.[95] The story told by the complaint is that traders at Total Gas's West Desk devised and perpetrated the alleged scheme without the authorization, control, or even contemporaneous knowledge of Total S.A. or Total Ltd. The two vaguely described communications between Total Gas's president and one or both of the foreign corporations do not suggest otherwise.

In sum, even if the Court had the statutory authority to assert personal jurisdiction over Total S.A. or Total Ltd., the Constitution would forbid it.

### iii.        Pendent Personal Jurisdiction

As noted above, the minimum contacts test directs courts to consider whether a defendant has sufficient contacts with the forum. "The doctrine of pendent personal jurisdiction provides that 'where a federal statute authorizes nationwide service of process, and the federal and state-law claims derive from a common nucleus of operative fact, the district court may assert

---

[94]
> Likewise, the allegations that a wholly owned subsidiary of Total S.A. once made a $500,000 disgorgement payment to the SEC's New York office at Total S.A.'s direction, and that Total Gas reached a consent agreement with the SEC, have no asserted or apparent nexus to this lawsuit. *See id.* ¶ 16.

[95]
> Whether these defendants played a role in the alleged scheme through their own conduct is a separate question from whether they are *alter egos* of Total Gas and should be treated as a single entity for jurisdictional purposes. That question is addressed below.

personal jurisdiction over the parties to the related state-law claims even if personal jurisdiction is not otherwise available.'"[96]  The Court may not exercise pendent personal jurisdiction with respect to the state law claims because personal jurisdiction is lacking with respect to the federal claims.

B.      *Personal Jurisdiction Based on Total Gas's Contacts*

          The analysis thus far has considered whether the Court has personal jurisdiction over Total S.A. or Total Ltd. based on their own contacts with New York and the United States.  Long Beach argues also that the Court should assert personal jurisdiction over the foreign entities based on Total Gas's contacts with these forums.  Its argument is premised on an *alter ego* or, alternatively, an agency theory.

          1.      *Alter Ego Theory*

           "[T]he exercise of personal jurisdiction over an alter ego corporation does not offend due process."[97]  Thus, if a court finds that one corporation is the *alter ego* of another, it may disregard the corporate form for minimum contacts analysis.  Long Beach argues that both Total Gas and Total Ltd. are *alter egos* of Total S.A.[98]  On that ground, and based on the conduct attributed to Total Gas, it asks the Court to assert personal jurisdiction over the foreign defendants.

          For an *alter ego* relationship to exist under federal common law, the controlling corporation "must have used the corporate entity to perpetrate a fraud or have so dominated and

---

[96]     *Dennis*, 343 F. Supp. 3d at 211 (quoting *Charles Schwab*, 883 F.3d at 88).

[97]     *S. New England Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010).

[98]     Cmplt. ¶ 160.

disregarded the corporate entity's form that the entity primarily transacted the [subservient entity's] personal business rather than its own corporate business."[99]   Although this rule is for *alter ego* liability, courts apply it also to the question of whether an *alter ego* relationship exists for the purpose of personal jurisdiction.[100]

New York law[101] requires "a showing of fraud or . . . complete control by the dominating corporation that leads to a wrong against third parties."[102]   But where, as here, the question is whether a court may exercise personal jurisdiction over an alleged *alter ego*, New York courts apply a "'less onerous standard' than that necessary for equity to pierce the corporate veil for liability purposes under New York law."[103]   Whether an analogous "less onerous standard" exists for federal common law is unclear.[104]

---

99

    *Dow Chem. Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 342 (2d Cir. 1986) (citation, quotation marks, and brackets omitted).

100

    *See, e.g.*, *Status Int'l S.A. v. M & D Mar. Ltd.*, 994 F. Supp. 182, 186 (S.D.N.Y. 1998); *Tsangaris v. Elite, Inc.*, No. 92-cv-7855 (RPP), 1993 WL 267425, at *3 (S.D.N.Y. July 9, 1993).

101

    "The law of the forum state governs where, as here, neither party alleges that the law of a different state would control and differs from New York law."  *See, e.g.*, *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 262 n.48 (S.D.N.Y. 2004).

102

    *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991).

103

    *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 196 (2d Cir. 2005) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)).

104

    *Compare* sources cited in note 100 *supra* (not purporting to apply a less onerous standard), *with In re Platinum & Palladium Antitrust Litig.*, No. 1:14-cv-9391 (GHW), 2017 WL 1169626, at *47 & n.23 (S.D.N.Y. Mar. 28, 2017) (noting, without distinguishing between federal and New York law, that some courts apply a "less onerous" standard but questioning whether they should).

The antitrust claims are governed by federal common law because they arise under federal law.  The question of which law applies to the state law claims is more complicated.[105] Rather than decide an issue that the parties did not brief adequately, the Court considers both standards with respect to the state law claims.

The complaint offers little more than bare allegations of control.  It says virtually nothing about the management of the defendants, explains only minimally their relationships with each other, and does not detail what role, if any, Total S.A. or Total Ltd. played in Total Gas's operations.  Nor, as explained above, does the complaint allege in any meaningful way that either foreign defendant was involved in the conduct at issue in this case.  The few paragraphs that mention Total S.A. and Total Ltd. do not permit an inference that any defendant exercised, as New York law requires, "complete control [over another defendant] . . . that leads to a wrong against third parties," even under the "less onerous standard" that applies in the context of personal jurisdiction. This same problem dooms the *alter ego* theory under federal common law's "dominated and disregarded" standard, whether or not that doctrine employs also a "less onerous standard" at the personal jurisdiction stage.[106]

---

[105]

If the Court's jurisdictional authority arose from Rule 4(k)(1)(A), New York's *alter ego* rule arguably would apply because the basis for the Court's jurisdiction would be state law.  But the reason that the Court would look to state law is Rule 4(k)(1)(A)'s instruction to do so.  One could argue that Rule 4(k)(1)(A) simply incorporates state law and that federal common law therefore applies.  Moreover, if the Court chose to exercise personal jurisdiction pendent to the federal claims – pendent personal jurisdiction is federal common law – the federal doctrine arguably would apply.  The Court need not and does not pass on the merits of these theories because the parties did not consider them.

[106]

Total S.A. and Total Ltd. make factual assertions in declarations and in their memoranda supporting their argument that Total Gas is a separate corporate entity.  *See, e.g.*, Dkt. 45 at 16-19.  The Court does not consider these assertions in holding that the complaint does not permit a finding of *alter ego*.

The complaint fails to plead that, for the purpose of personal jurisdiction, any defendant is the *alter ego* of another.

### 2.    Principal-Agent Theory

Long Beach alleges also that Total Gas is an agent of Total S.A. and Total Ltd. and that the Court therefore should attribute Total Gas's contacts to the foreign defendants for jurisdictional purposes.  The parties fail to argue that any particular law should govern the existence of a principal-agent relationship.  For the reasons explained in its *alter ego* analysis, the Court applies the federal common law of agency to the federal claims, and it considers both the federal and New York standards as to the state law claims.  That said, the issue here turns not on the standards themselves, but on certain limitations common to both standards.

"It is well established that a defendant can 'purposefully avail itself of a forum by directing its agents or distributors to take action there.'"[107]  Although the Second Circuit has "not clearly delineated the showing necessary before an agent's contacts will be imputed to its principal for purposes of personal jurisdiction under the Due Process Clause," it has articulated several principles explaining when such a finding is inappropriate.[108]  Under both New York and federal law, "a defendant must have purposefully availed itself of the privilege of doing business in the forum" for a principal-agent theory of jurisdiction to apply.[109]  At least under New York law, this

---

[107]

*Charles Schwab*, 883 F.3d at 84 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014)).

[108]

*See id.* at 85.

[109]

*Id.* (citation and quotation marks omitted).

means that "the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal."[113]

      After stating these requirements in the context of a parent corporation and a broker-dealer subsidiary that sold securities on the parent's behalf, the Second Circuit held that "an agency relationship . . . could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities."[114]  For that theory to succeed, the plaintiff must do more than "generally allege[] that [the parent] controlled or otherwise directed or materially participated in the operations of the broker-dealer[], and reaped proceeds or other financial benefits from the broker-dealer['s] sales of [the relevant] financial instruments."[115]  "The Second Circuit has credited allegations of principal-agent relationships, for example, where a plaintiff alleged that corporate officers 'benefitted from [the] corporation's in-forum activities and exercised extensive control over [the] corporation in the transaction underlying the suit.'"[116]

      These same principles control here and make clear that Long Beach does not sufficiently allege that the foreign defendants purposefully availed themselves of the benefit of

---

[113]

    *Id.* (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981)).

[114]

    *Id.* at 85-86.

[115]

    *Id.* at 86.

[116]

    *Dennis v. JPMorgan Chase & Co.*, No. 16-cv-6496 (LAK), 2020 WL 729789, at *2 (S.D.N.Y. Feb. 13, 2020) (quoting *Charles Schwab*, 883 F.3d at 85).

    Although this language suggests that the standard for finding a principal-agent relationship is similar to that for piercing the corporate veil, the two standards differ at least insofar as the latter requires a finding of "abuse of control."  *See Itel Containers Int'l Corp. v. Atlanttrafik Exp. Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir. 1990) (distinguishing the standards on this ground).

30

doing business in New York or the United States with respect to the claims at issue.  Largely for the reasons explained above, the complaint does not allege plausibly that any defendant exercised control, extensive or otherwise, over any other defendant with regard to the facts giving rise to this lawsuit.  Nor does it allege that Total Gas acted with the knowledge or consent of Total S.A. or Total Ltd.  Its threadbare allegations of control fall short under federal law and New York law.

* * *

The Court lacks personal jurisdiction over Total S.A. and Total Ltd. with respect to all the claims asserted against them in the complaint.

II.      *Direct or Derivative Liability of Total S.A. and Total Ltd.*

As noted previously, Counts I through IV are pled solely against Total Gas.  Count V alleges that Total S.A. and Total Ltd. are liable under three theories: that (1) they controlled Total Gas with respect to the relevant conduct, which the Court interprets as a theory of direct liability; (2) Total Gas and Total Ltd. are *alter egos* of Total S.A., and Total Gas is an *alter ego* also of Total Ltd.; and (3) Total Gas and Total Ltd. are agents of Total S.A., and Total Gas is an agent also of Total Ltd.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[117]  "A claim has facial

---

[117]     *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

31

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[118]

Total S.A. and Total Ltd. argue that the complaint fails to plead facts sufficient to support any of the three theories of liability.

### A.    *Direct Liability*

In its personal jurisdiction analysis, the Court held that the complaint pleads virtually no facts linking Total S.A. or Total Ltd. to the alleged misconduct.  The same is true for present purposes, and the Court therefore holds that the claims against the foreign defendants fail under Rule 12(b)(6).  Other than the allegations enumerated in the Court's minimum contacts analysis, nothing in the complaint suggests that Total S.A. or Total Ltd. played any meaningful role in the alleged antitrust or state law violations.  Threadbare allegations that Total S.A. exercised "control" over its subsidiaries or that it operated "as a single entity with [Total Gas]" do not suffice to state a claim for relief.

### B.    *Alter Ego Liability*

The Court already has concluded that the complaint fails to plead sufficiently under federal common or New York law that any defendant is the *alter ego* of another for the purposes of personal jurisdiction.  The Court now conducts the *alter ego* analysis for liability purposes.

---

[118]      *Id.*

### 1.     *Sherman Act Section 2 Claims*

The federal common law standard for *alter ego* liability applies to the federal claims for the reasons explained in the personal jurisdiction analysis.   Under that standard, the Court concluded that the complaint fails to demonstrate that any defendant is the *alter ego* of another for the purposes of personal jurisdiction.[119]   Because the analysis is the same for liability purposes, the conclusion is the same, as well.

### 2.     *State Law Claims*

At the personal jurisdiction stage, the Court analyzed the principal-agent question under New York law because neither party argued that a different jurisdiction's law should apply. For liability purposes, however, Total S.A. and Total Ltd. argue that New York's choice of law rules require the application of Delaware law.   The Court agrees.   "[U]nder New York choice of law principles, the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders."[120]

---

[119]

The Court reached this conclusion regardless of whether the standard applied for purposes of personal jurisdiction is "less onerous" than that applied for liability purposes.

[120]

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (brackets, quotation marks, and citation omitted).

Total S.A. and Total Ltd. assert that the outcome is the same under New York law.  *See* Dkt. 45 at 24 n.10.  Long Beach takes no position on the choice of law issue, but its authority applies Delaware law. *See* Dkt. 37 at 31 (citing, *e.g.*, *Bentivoglio v. Event Cardio Grp., Inc.*, No. 18-cv-2040 (PKC), 2019 WL 6341130, at *5 (S.D.N.Y. Nov. 27, 2019) (applying Delaware law); *Allison v. Clos-ette Too, L.L.C.*, No. 14-cv1618 (LAK), 2015 WL 136102, at *3 (S.D.N.Y. Jan. 9, 2015) (same)).  While the parties' failure to assert a true conflict ordinarily is grounds for applying forum law, the Court applies Delaware law because both assume that it applies and rely exclusively on Delaware authority.

"To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness . . . [is] present."[121]  "Operating as a 'single entity' requires showing the parent entity's 'complete domination and control' to such an extent that the subsidiary entity 'no longer has legal or independent significance of its own.'"[122]  "A plaintiff seeking to persuade a Delaware court to disregard the corporate structure faces 'a difficult task.'"[123]  "Although the question of domination is generally one of fact, courts have granted motions to dismiss as well as motions for summary judgment in favor of defendant parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute."[124]

Largely the reasons explained in the Court's analysis of the *alter ego* issue under the standards of federal common law ("dominated and disregarded the corporate entity's form") and New York law ("complete control"), the complaint falls short of Delaware's "complete domination and control" standard.  Long Beach has not alleged plausibly any facts suggesting that any defendant meaningfully dominated or controlled another.  Although it asserts that Total S.A. is the parent of Total Gas and Total Ltd., it barely discusses their relationships with each other, either in general or

---

[121]

    *Id.* at 1457 (quoting *Harper v. Delaware Valley Broadcasters, Inc.*, 743 F. Supp. 1076, 1085 (D. Del. 1990)).

[122]

    *Bentivoglio*, No. 18-cv-2040 (PKC), 2019 WL 6341130, at *5 (quoting *Wallace ex rel. Cencom Cable Income Partners II, Inc. v. L.P. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999)).

[123]

    *Fletcher*, 68 F.3d at 1458 (quoting *Harco Nat. Ins. Co. v. Green Farms. Inc.*, C.A. No. 1131, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989))

[124]

    *Id.*

in a way that elaborates helpfully on the role, if any, that the foreign defendants played in the conduct relevant to this case.  Showing that the defendants operated as a single economic entity requires more than skeletal allegations of "extraordinary administrative control" and "biweekly steering committee meetings" involving "trading issues."[125]  In addition, the complaint does not explain how there would be any injustice or unfairness in declining to hold Total S.A. or Total Ltd. liable for the actions of Total Gas.  There are no allegations that Total Gas would be unable to satisfy a judgment or that Long Beach could not prosecute its case in the absence of the foreign defendants.[126]

C.      *Principal-Agent Liability*

The principal-agent question requires similarly the application of different laws to different claims.  Federal common law applies once again to the federal claims.  Because neither party argues for the application of any particular law to the state law claims, New York's agency doctrine applies.

---

[125]

*See* Cmplt. ¶ 125.

[126]

In its personal jurisdiction analysis, the Court concluded under New York law that Long Beach had failed to show sufficiently that any defendant was the *alter ego* of another.  It did so under the "less onerous" version of New York's *alter ego* standard that applies in the context of personal jurisdiction.  Accordingly, if New York law applied at the liability stage, the ordinary level of onerousness would apply, and the Court would reach the same conclusion for the same reasons.

### 1.    *Sherman Act Section 2 Claims*

Federal antitrust law provides that an alleged principal can be held liable for the unlawful conduct of its agent.[127]  "[U]nder general rules of agency law," and with regard to Section 2 of the Sherman Act specifically, "principals are liable when their agents act with apparent authority."[128]  "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."[129]  "Under an apparent authority theory, '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.'"[130]

As noted, the complaint alleges that traders at Total Gas's West Desk perpetrated the scheme over several years.  But it fails to allege that they did so at any direction from, or with the contemporaneous knowledge of, Total S.A. or Total Ltd.  It does not allege that either foreign defendant monitored or failed to monitor the traders, that they authorized any of the trades at issue, or even that they created indirectly conditions that helped facilitate the misconduct.  Moreover, those

---

[127]

 *See Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572-74 & n.11 (1982).

[128]

 *Id.* at 565-66.

[129]

 *Id.* at 566 n.5 (quoting RESTATEMENT (SECOND) OF AGENCY § 8 (1957)).

[130]

 *Id.* at 566 (quoting RESTATEMENT (SECOND) OF AGENCY § 261 (1957)).

counterparties' alleged injuries arose not from the trades themselves, but from the effect of those trades on the Monthly Index Prices.[131]

Long Beach places significant weight on its allegation that the foreign defendants "were closely involved in, and exerted significant control over, [Total Gas's] operations."[132]  It claims, among other things not relevant to trading activity, that Total S.A. set risk limits for Total Gas's traders, that Total S.A. "retained extraordinary administrative control over the daily operation of critical business components such as IT systems and [Total Gas's] trading book," that "trading issues" were discussed in "biweekly steering committee meetings" involving unidentified "officers" of the three defendants, and that "officers" at Total Ltd. "participated in setting the trading strategies and budget of [Total Gas], and approved certain staffing decisions as well as the structure of [Total Gas's] trade floor."[133]  "General allegations of corporate ownership, combined marketing, shared board membership, and so forth are insufficient to establish a principal-agent relationship between corporate entities."[134]  And setting aside the vagueness of these claims, the complaint fails to connect

---

[131] In fact, Long Beach alleges that during bidweeks, Total Gas either overpaid for natural gas or sold its own natural gas at a discount.  If true, these facts would mean that the counterparties *benefitted* from the alleged scheme, at least with respect to these trades.

[132] Cmplt. ¶ 125.

[133] *Id.*

Long Beach provides slightly more detail about the "officers," "meetings," and alleged relationships among the defendants in its opposition memorandum.  Dkt. 53 at 28-30.  The Court does not credit these allegations to the extent that they are not found in the complaint, but whatever additional specificity they provide would make no material difference.

[134] *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), 2015 WL 6696407, at *21 (S.D.N.Y. Nov. 3, 2015) (citing *Fletcher*, 68 F.3d at 1459-62).

them to the trading activity at issue in this case.  Liability on an apparent authority theory "is based upon the fact that the putative agent's position *facilitates the consummation of the fraud*."[135]

This final point suggests an additional problem: Long Beach has not pled sufficiently that Total Gas acted with the apparent authority of the foreign defendants.  As noted at the outset, "[a]pparent authority is the power to affect the legal relations of another person by transactions with third persons, *professedly as agent for the other* [*i.e.*, the principal], *arising from and in accordance with the other's manifestations to such third persons.*"[136]  The complaint contains no allegations that Total Gas professed to be an agent for Total S.A. or Total Ltd. when engaging in the relevant activity.  Nor does it contain allegations that Total S.A. or Total Ltd. made manifestations to third persons permitting them to conclude that Total Gas was acting under their authority and that such conclusions influenced the third parties' actions.  In fact, the complaint does not allege that Total S.A. or Total Ltd. had *any* interactions with relevant third persons, such as the counterparties to Total Gas's trades, other traders on the affected markets, Long Beach itself, or those who compiled the NGI and Platts Monthly Index Prices.  For this reason too, the principal-agent theory fails.

### 2. State Law Claims

New York law is no different on this point.  Like federal courts, the New York Court of Appeals applies the "apparent authority" standard taken from Section 8 of the Restatement

---

[135]

      *Hydrolevel Corp.*, 456 U.S. at 566 (emphasis added, citation, brackets, and quotation marks omitted).

[136]

      *Id.* at 566 n.5 (emphasis added) (quoting RESTATEMENT (SECOND) OF AGENCY § 8 (1957)).

38

(Second) of Agency.[137]   The Court of Appeals "has made it clear that 'apparent authority is dependent upon verbal or other acts *by a principal* which reasonably give an appearance of authority to conduct the transaction.'"[138]   The complaint makes no such allegation here.  It does not allege even that Total S.A. or Total Ltd. knew about the trades giving rise to this lawsuit until after they were made.

* * *

Total S.A. and Total Ltd.'s motion to dismiss is granted.  The Court turns now to Total Gas's motion, which the foreign defendants join.

III.    *Article III Standing*

Standing is a doctrine rooted in Article III, Section 2 of the Constitution, which restricts the federal judicial power to "Cases" and "Controversies."  To have standing to sue in federal court, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."[139]  The plaintiff bears the burden of alleging clearly facts that, if true, would satisfy each of these elements.[140]   Where, as here, a plaintiff sues on behalf of a putative class, the standing

---

[137]

*Fletcher*, 68 F.3d at 1462.

[138]

*Id.* (emphasis in original) (quoting *Greene v. Hellman*, 51 N.Y.2d 197, 204 (1980)).

[139]

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

[140]

*Id.*

inquiry looks only to the plaintiff's own alleged injuries, and not to those of the proposed class members.[141]

       In the *Harry* litigation, the plaintiffs claimed to have traded natural gas contracts not incorporating the Monthly Index Prices at locations other than the Southwestern Hubs.[142]   The Second Circuit held that they had Article III standing to sue for injuries arising from the alleged manipulation of the Monthly Index Prices.[143]   It reached this holding by crediting as "within the realm of possibility" the plaintiffs' theory that "prices at U.S. natural gas hubs are so interconnected that manipulation at any of the hubs amounts to manipulation of all of them."[144]

       The Court is bound by this holding.  The complaint is based on the same facts as the *Harry* litigation.  Long Beach, like the plaintiffs there, alleges that it traded natural gas contracts during the time when Total Gas allegedly manipulated the Monthly Index Prices.  Moreover, and unlike the *Harry* plaintiffs, Long Beach alleges that it traded at one of the Southwestern Hubs (SoCal) and that its contracts incorporated the SoCal Monthly Index Prices.

       Total Gas argues that Long Beach has not alleged that it suffered an economic loss. In its view, the complaint permits an inference that Long Beach *profited* as a result of the inflation and deflation of the SoCal Monthly Index Prices.  It contends that to demonstrate standing, Long Beach would need to account for all of its trades and show that it was a net loser.  Total Gas

---

[141]
      *See, e.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006); 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 2:3 (5th ed.).

[142]
      *See Harry*, 889 F.3d at 109.

[143]
      *Id.* at 111.

[144]
      *Id.*

40

concedes, however, that the Second Circuit found standing in *Harry* where the plaintiffs made no such showing.[145]  More fundamentally, "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing."[146]

At least at this pleading stage, Long Beach has Article III standing to pursue claims premised on trading at the four Southwestern Hubs.[147]

## IV.    Antitrust Standing

"It is a well-established principle that, while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'"[148] Assuming the existence of an antitrust violation, courts ask (1) whether the plaintiff has "suffered antitrust injury" as a consequence of the violation, and (2) whether the plaintiff would be an "efficient enforcer[] of the antitrust laws."[149]  This case turns on the first of these criteria.

An antitrust injury is an "injury of the type the antitrust laws were intended to prevent

---

145

    *See* Dkt. 20 at 10 n.7 (citing *Harry*, 888 F.3d at 110-11).

146

    *Denney*, 443 F.3d at 265; *see also id.* ("For purposes of determining standing, we 'must . . . construe the complaint in favor of the complaining party." (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

147

    This conclusion says nothing about the question of whether Long Beach is typical, or could be an adequate representative, of a class of individuals who traded on the three hubs where it does not allege to having traded.  These questions are not at issue here and are considered properly under Rule 23(a).  *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165 (2d Cir. 2012).

148

    *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005).

149

    *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 772 (2d Cir. 2016); *see id.* at 770.

and that flows from that which makes defendants' acts unlawful."[150]  Determining whether a plaintiff

has suffered an antitrust injury involves a three-step process:

> "[1] the plaintiff must 'identify the practice complained of and the reasons such a
> practice is or might be anticompetitive'; then [2] the court must 'identify the actual
> injury the plaintiff alleges' by 'look[ing] to the ways in which the plaintiff claims it
> is in a worse position as a consequence of defendant's conduct'; and finally, [3] the
> court must 'compare the anticompetitive effect of the specific practice at issue to the
> actual injury the plaintiff alleges.'"[151]

In *Harry*, the Second Circuit held that the plaintiffs failed to satisfy this three-

pronged test.

> "Plaintiffs argue that they adequately alleged that they were part of the same
> undifferentiated natural gas commodities and commodities derivatives market as
> Defendants, that they were harmed by artificial prices at Henry Hub and on
> NYMEX, and that Defendants' manipulations required a connection between
> regional hubs, and as such trading at Henry Hub was inextricably intertwined with
> their trading.
>
> Set aside whether they were part of the same market as Defendants (they were not)
> or whether they have shown that Plaintiffs' alleged injuries were the fulcrum for
> Defendants' scheme (they were not); Plaintiffs do not even present evidence that
> they traded at 'artificial prices.'  There is no actual injury the Plaintiffs allege, let
> alone a connection between Defendants' unlawful conduct and that non-injury.  Any
> further analysis of the connection between regional hubs and Henry Hub or
> comparisons with other case law on antitrust standing is superfluous."[152]

Long Beach does not allege that it traded natural gas contracts incorporating the

Permian, Waha, or San Juan Monthly Index Prices or that it traded at those hubs.  Thus, just as in

*Harry*, "[t]here is no actual injury that the [plaintiff] allege[s]" with respect to the trading on those

---

[150]

> *Harry*, 889 F.3d at 115 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S.
> 477, 489 (1977)).

[151]

> *Id.* (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013)).

[152]

> *Id.* at 116.

markets.[153]  Long Beach does not have antitrust standing to pursue claims based on the manipulation of the Monthly Index Prices at those three hubs.  Unlike the *Harry* plaintiffs, however, Long Beach does allege that it traded derivatives at SoCal that were based on the SoCal Monthly Index Price. The Court applies the three-step inquiry to this portion of its claim.

For the first question, Long Beach alleges that Total Gas manipulated the Monthly Index Prices at SoCal during the Class Period.  It posits that this practice was anticompetitive because it caused entities that bought or sold natural gas contracts on this market to pay higher prices for their purchases or receive lower prices for their sales.

"Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."[154]  Based in part on this principle, the Second Circuit found the "anticompetitive practice" factor satisfied where several competitors allegedly conspired manipulate an index price.[155]  But part of the reason the conduct alleged was anticompetitive was that it involved a *conspiracy*, which Section 1 of the Sherman Act forbids.  Here, Long Beach claims that Total Gas acted alone.  It attempts to proceed on a *monopoly* theory and raises its claim under Section 2.

"Section 2, by contrast [to Section 1], is aimed primarily not at improper conduct but at a pernicious market structure in which the concentration of power saps the salubrious influence

---

[153]
      *See id.*

[154]
      *Gelboim*, 823 F.3d at 772 (citation and quotation marks omitted).

[155]
      *Id.* at 771-75; *see also Dennis*, 343 F. Supp. 3d at 163 (similar).

of competition.[156]  In plain English, this eloquent language means that Section 2 is not an all-purpose weapon against shady business practices.  It instead takes aim at those who acquire monopoly power, "the power to control prices or exclude competition," and use it to injure competition.[157] "[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."[158]

This final point is critical.  Section 2 is not intended to punish "the proverbial inventor of the better mousetrap" or one who succeeds by virtue of a superior product or business acumen.[159]  If it were, the statute would stifle legitimate business competition – the opposite of its goal.  "Courts . . . have been engaged for years in a case-by-case process of distinguishing between conduct that reflects a 'purpose or intent to exercise [monopoly] power,' and that which reflects no more than aggressive competition on the merits, competition that properly may utilize the advantages of size, but that may not employ the power derived from a dominant position in the market."[160]  The aim is to prohibit the use of monopoly power to gain competitive advantages at the

---

[156]
     *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979).

[157]
     *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (citation and quotation marks omitted).

[158]
     *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015).

[159]
     *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 465 (S.D.N.Y. 1996).

[160]
     *Id.* (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948), and then citing *Berkey*, 603 F.2d at 272).

44

expense of others or victimize consumers by supracompetitive prices enabled by eliminating competition.

Long Beach's theory is that Total Gas influenced the price for natural gas, and thereby increased its profits on pre-bidweek derivatives trading, by manipulating the Monthly Index Prices by means of its bidweek transactions. This theory loosely resembles a monopoly allegation in the limited sense that Total Gas influenced natural gas prices and thereby injured Long Beach, which was forced to pay inflated rates. But if that were all that were required under Section 2, a plaintiff could state a monopolization claim by alleging that a defendant influenced the Monthly Index Prices by coercively threatening NGI and Platts to set them according to its will or by some other conduct having nothing to do with competition. Coercive threats no doubt would be unlawful on different legal theories – as may be the manipulation alleged in the complaint. But the problem with both allegations is that the type of anticompetitive conduct prohibited by Section 2 is lacking.

An example borrowed from the context of predatory pricing helps underscore this point. In *Brooke Group Limited v. Brown & Williamson Tobacco Corp.*,[161] the Supreme Court discussed Section 2 of the Sherman Act's prohibition on predatory pricing, a practice that at times is a gateway to the acquisition or maintenance of monopoly power.[162] The essence of a predatory pricing claim is that the defendant "priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market."[163] As this language makes plain, the claim cannot lie where a defendant merely lowers its

---

[161]    509 U.S. 209 (1993).

[162]    *Id.* at 222.

[163]    *Id.*

prices.  Instead, the plaintiff must show that the defendant lowered its prices "below an appropriate measure of its . . . costs" in circumstances where there exists "a dangerous probability" that the defendant will recoup its short-term losses once the competition has been eliminated and it possesses a monopoly.[164]  The critical point is that price cutting, which ordinarily is a pro-competitive practice, is not a violation of Section 2 unless it has a significant anticompetitive effect – *i.e.*, it augurs the willful acquisition, maintenance, or exploitation of monopoly power.

As the foregoing discussion makes clear, the market manipulation is not alleged to have derived from Total Gas's size or its share of market power.  Instead, it derived from strategically timed trades that, as far as the complaint alleges, any other participant in the market could have made.  While the intent and effect of those trades was to influence prices, Long Beach does not allege that they involved the willful attainment, maintenance, or exercise of monopoly power.  Accordingly, it has failed to identify an anticompetitive practice of a type which the antitrust laws were intended to prohibit.  That is fatal to its Section 2 claims.  But there is more.

This conclusion that Long Beach has failed to allege anticompetitive conduct flows also into the analysis of the second and third steps of the antitrust injury analysis.  As to the second, the actual injury that Long Beach alleges is that, as a buyer of natural gas, it lost money because the alleged market manipulation moved the Monthly Index Prices in directions unfavorable to its contracts.  While this injury is claimed to have been the consequence of Total Gas's conduct, Long Beach has failed to show that the conduct was anticompetitive within the meaning of the antitrust

---

[164]  *Id.* at 222-24; *cf. id.* at 224 ("It is axiomatic that the antitrust laws were passed for the protection of *competition*, not *competitors*." (citation and quotation marks omitted)).

laws.[165]   Likewise, the third step is not satisfied because Long Beach has failed to allege an *anticompetitive* effect given its failure to allege any anticompetitive practice.[166]

The Section 2 claims for monopolization and attempted monopolization are dismissed for lack of antitrust standing.

## V.   *State Law Claims*

Finally, Total Gas contends that the complaint fails to state a claim under the California UCL and New York's law of unjust enrichment.

### A.   *California UCL Claim*

The UCL authorizes claims for restitution by private parties injured by "unfair competition," which means "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [a separate statute]."[167]   "Each

---

[165]

Total Gas argues for the first time in its reply brief that Long Beach did not suffer an antitrust injury because "it is merely a go-between for natural gas it buys from an upstream purchaser and sells to downstream consumers, with the cost that it paid borne *entirely* by the latter." Dkt. 50 at 4 (citing *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, (1990)). "Issues raised for the first time in a reply brief are generally deemed waived." *Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010).

[166]

Long Beach notes that at least one court in this district has held that a monopoly claim of this nature involves an antitrust injury. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 133 (S.D.N.Y. 2016) ("[The plaintiff] has pled an antitrust injury causally linked to [the defendant's] practices: it is a purchaser of electricity on the daily markets in which it alleges it paid higher supra-competitive prices or received lower sub-competitive prices as a result of [the defendant's] rate-manipulation."). For the foregoing reasons, the Court respectfully disagrees.

[167]

CAL. BUS. & PROF. CODE § 17200; *see id.* § 17203 (restitution); *id.* § 17204 (private right of action).

prong of the UCL is a separate and distinct theory of liability."[168]  Long Beach seeks restitution on the theory that Total Gas engaged in "unfair, unconscionable, deceptive or fraudulent acts and practices" causing injury to its property.[169]

The UCL has a standing requirement for suits by private plaintiffs.  The Court begins there.

### 1.    UCL Standing

The UCL's private right of action authorizes suit by "a person who has suffered injury in fact and has lost money or property as a result of . . . unfair competition."[170]  "To satisfy the . . . standing requirements imposed by [the voter initiative that created them], a party must . . . (1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim."[171]

For the first prong, the phrase "injury in fact" has the same meaning as it does for Article III standing.[172]  The requirement that a plaintiff have "lost money or property," however, is

---

[168]

   *Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009).

[169]

   Cmplt. ¶¶ 151-54.

[170]

   CAL. BUS. & PROF. CODE § 17204.

[171]

   *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011).

[172]

   *Id.*

unique to the UCL.  The loss of money or property can be shown in "innumerable ways."[173]  And "the quantum of lost money or property necessary to show [UCL] standing is only so much as would suffice to establish injury in fact."[174]  That said, a plaintiff must "allege or prove an identifiable monetary or property injury."[175]  In this way, "the lost money or property requirement is more difficult to satisfy than that of injury in fact."[176]

The "as a result of" prong "requires a showing of a causal connection or reliance on the alleged misrepresentation."[177]  In effect, the statute incorporates ordinary principles of actual and proximate causation.[178]

With respect to trading at SoCal, the complaint alleges that Long Beach suffered an injury in fact and lost money by paying inflated natural gas prices as a result of Total Gas's conduct. Long Beach has standing under the UCL to pursue its claims based on this trading for the same reasons it has standing under Article III.

The question of whether Long Beach has UCL standing to pursue its claims based on trading at the Permian, Waha, or San Juan hubs is trickier.  The Second Circuit held that the *Harry* plaintiffs had Article III standing premised on the alleged manipulation of indices used at

---

[173] *Id.*

[174] *Id.* at 886.

[175] *Id.* at 887.

[176] *Id.*

[177] *Id.* (citation omitted).

[178] *See id.* at 887-88.

hubs where they did not trade because it was "within the realm of possibility" that "prices at U.S. natural gas hubs are so interconnected that manipulation at any of the hubs amounts to manipulation of all of them."[179]  This holding necessarily entailed a finding that any entity that traded at any U.S. natural gas hub during the Class Period suffered an injury in fact with respect to the alleged price manipulation at Permian, Waha, and San Juan.  The Court is bound by this precedent; the UCL's injury in fact requirement is met.

However, this does not mean that Long Beach has made the "more difficult" showing that it "lost money or property" as a result of these trades.[180]  Long Beach did not trade at Permian, Waha, or San Juan.  And it does not attempt to explain how a finder of fact could determine whether it lost any money or property in connection with the defendants' alleged manipulation at those markets.  While the interconnectedness theory suffices under Article III (though barely), it is not enough under the UCL.  Long Beach's failure to "allege or prove an identifiable monetary or property injury" requires the Court to dismiss this claim as it pertains to Permian, Waha, and San Juan.[181]

Far from helping Long Beach, *Harry* dooms its cause.  Although the Second Circuit concluded that the plaintiffs had Article III standing on their interconnectivity theory, it held several times that this theory was not "plausible" for Rule 12(b)(6) purposes.[182]  In fact, the court affirmed

---

[179]   *Harry*, 889 F.3d at 111.

[180]   *See Kwikset*, 246 P.3d at 887.

[181]   *See id.*

[182]   *See Harry*, 889 F.3d at 111, 114-15.

the dismissal of the CEA and Sherman Act claims *because* this theory was implausible.  It observed that "[o]nly speculation" could allow it to infer whether the plaintiffs had lost money as a result of the alleged manipulation of indices at hubs where they did not trade.[183]  Further, it concluded that allegations of this nature could not demonstrate even that the plaintiffs had "traded at 'artificial prices'" on other markets.[184]  For that reason, the court held, for the purpose of antitrust standing, that "[t]here is no actual injury the Plaintiffs allege, let alone a connection between [the defendants'] unlawful conduct and that non-injury."[185]  The same reasoning applies here, where Long Beach makes no effort to explain how the manipulation of the index prices at Permian, Waha, or San Juan hubs plausibly could have caused it to pay artificially inflated prices at SoCal, the one market where it claims to have traded.

### 2.    *Entitlement to Restitution*

Plaintiffs who prevail under the UCL "are generally limited to injunctive relief and restitution."[186]  Long Beach has UCL standing insofar as it claims injury with respect to trading at

---

[183]

See id. at 115 ("We do not require that a plaintiff calculate damages at the pleading stage, but we certainly need some reason to believe that any damage has occurred at all.  Only speculation could lead us to that belief here.").

[184]

Id. at 116.

[185]

Id.

[186]

Zhang v. Superior Court, 304 P.3d 163, 167 (Cal. 2013) (citation omitted).

SoCal.  However, "the standards for establishing standing under [the UCL] and eligibility for restitution . . . are wholly distinct."[187]  Here, that distinction matters.

"Restitution under [UCL § 17203] is confined to restoration of any interest in 'money or property, real or personal, which may have been acquired by means of . . . unfair competition.'"[188] "A restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, *and that it have been acquired by a defendant*, on the other."[189] "Compensatory damages are not recoverable as restitution."[190]

The complaint alleges that Total Gas profited as a result of its alleged market manipulation.  It alleges also that the market manipulation caused Long Beach to lose money.  It does not, however, connect the profit and the loss.  There is no claim that Total Gas *acquired* any of the money that Long Beach lost or even that the two parties ever traded with each other. According to the complaint, Total Gas's profits came from the counterparties to its trades, and Long Beach's losses went to the counterparties to its trades.

Because Long Beach does not allege that Total Gas ever came to possess any of its money or property, and otherwise offers no theory as to how it might recover restitution, it fails to

---

187

    *Kwikset*, 246 P.3d at 894.

188

    *Zhang*, 304 P.3d at 167 (quoting CAL. BUS. & PROF. CODE § 17203).

189

    *Id.* (citation omitted, emphasis added).

190

    *Id.* (citation and brackets omitted); *see Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 948 (Cal. 2003) ("[T]he UCL is not an all-purpose substitute for a tort or contract action. . . . [T]he remedies provided are limited. . . . [I]t is well established that individuals may not recover damages . . . [including] nonrestitutionary disgorgement.").

establish entitlement to that relief.  It fails also to explain how it is entitled to any other form of relief that may be available under the UCL.[191]  Its claim is dismissed.


       B.     *New York Unjust Enrichment Claim*

        Long Beach asserts also a claim for unjust enrichment.  It "seek[s] restitution with respect to, and/or disgorgement of, all illicitly obtained monies and profits obtained by [Total Gas] . . . either as damages or restitution."[192]  The Court understands this as a claim for restitution and, to the extent that they differ from restitution and are permissible, damages.

        The Court assumes without deciding that this claim arises under New York law. Total Gas posits that New York or California law might apply and argues that the outcome is the same under either.[193]  In discussing this claim, Long Beach cites only to New York cases and thereby assumes that New York law applies.[194]  "The law of the forum state governs where, as here, neither party alleges that the law of a different state would control and differs from New York law."[195]

---

191

     The complaint "seek[s] restitution and/or monetary recoveries permitted under California law as referenced herein for these injuries."  Cmplt. ¶ 154.  The meaning of the "monetary recoveries" language is entirely unclear.  The only form of monetary recovery permitted by the UCL that Long Beach has brought to the Court's attention is restitution.

192

     *Id.* ¶ 158.

193

     Dkt. 27 at 31-32 & n.19.

194

     Dkt. 37 at 33.

195

     *VTech Holdings*, 348 F. Supp. 2d at 262 n.48.

     California's unjust enrichment doctrine is notoriously confusing.  For many years, courts believed that "in California, there is not a standalone cause of action for 'unjust enrichment,' which is synonymous with 'restitution.'"  *Astiana v. Hain Celestial Grp., Inc.*,

"In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."[196] "The theory of unjust enrichment lies as a quasi-contract claim."[197]   It "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."[198]   While there need not be privity between the plaintiff and defendant, "a plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party."[199]   The

---

783 F.3d 753, 762 (9th Cir. 2015).  But like the discovery of a Lazarus taxon – a species long believed to be extinct that one day reappears – "the California Supreme Court [recently] has clarified California law, allowing an independent claim for unjust enrichment to proceed in an insurance dispute." *Bruton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (citing *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 353 P.3d 319 (Cal. 2015)).  Whether this cause of action is different from a quasi-contract claim for restitution remains disputed.  *See Price v. L'Oreal USA, Inc.*, No. 17-cv-0614 (LGS), 2017 WL 4480887, at *5 (S.D.N.Y. Oct. 5, 2017).  But regardless of how it is captioned, California law permits a claim for restitution that resembles what other states, including New York, call unjust enrichment.  *See Hartford*, 353 P.3d at 326 (authorizing claims for restitution in the absence of a contract where "the enrichment obtained lacks any adequate legal basis and thus cannot conscientiously be retained" (citation and quotation marks omitted)).

[196]

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (citation and quotation marks omitted).

[197]

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of New Jersey, Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (emphasis and citation omitted).

[198]

*E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 455 (2018) (citation omitted).

[199]

*Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511, 516 (2012).

New York Court of Appeals has found several times that a relationship between two commercial entities was "too attenuated" where they "simply had no dealings with each other."[200]

There is not a sufficiently close relationship between Total Gas and Long Beach. Insofar as the complaint alleges, they "simply had no dealings with each other" and were not aware of each other's existence during the Class Period.

Moreover, that lack of a relationship prevents Long Beach from pleading the elements of unjust enrichment. Total Gas's alleged enrichment did not come at Long Beach's expense, at least in the equitable sense contemplated by the unjust enrichment cause of action. It came at the expense of the counterparties to Total Gas's trades, who allegedly paid more money to Total Gas as a result of the price manipulation.[201] Traders like Long Beach that used the index prices but did not transact with Total Gas were collateral damage. In these circumstances, Long Beach fails to show how equity or good conscience make it any more entitled than Total Gas to money allegedly taken from third parties.[202]

---

[200]

See id. at 516-18 (citing cases).

[201]

These parties might not have a claim for unjust enrichment, either, because their relationship with Total Gas was created by the same contracts that incorporated the allegedly manipulated prices. "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Beth Israel*, 448 F.3d at 587 (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987)).

[202]

As noted above, California's unjust enrichment or quasi-contract doctrine is similar to New York's. *See supra* note 195; *see also First Hill Partners, LLC v. BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 634 (S.D.N.Y. 2014) (noting the similarity). California's doctrine authorizes claims for restitution where a defendant was "unjustly enriched *at the expense of another*." *Hartford*, 353 P.3d at 326 (emphasis added). As explained, the complaint does not allege that Total Gas was enriched at Long Beach's expense. The outcome would be the same under California law.

*Conclusion*

Total S.A.'s and Total Ltd.'s motion to dismiss [Dkt. 44] and Total Gas's motion to dismiss [Dkt. 26] are granted, all for failure to state a claim upon which relief may be granted and the first motion on the additional ground of lack of personal jurisdiction.

SO ORDERED.

Dated:     June 8, 2020

_____
Lewis A. Kaplan
United States District Judge